UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF OHIO

WESTERN DIVISION

| | |
|---|---|
| BEAVER COUNTY RETIREMENT BOARD, Individually and On Behalf of All Others Similarly Situated, ) ) ) ) | No. 1:07-cv-00750-SJD **(Consolidated)** |
| Plaintiff, ) ) ) | Judge J. Dlott |
| vs. ) ) | CLASS ACTION |
| LCA-VISION INC., STEVEN C. STRAUS, ALAN H. BUCKEY and CRAIG P.R. JOFFE, ) ) ) ) | |
| Defendants. ) ) | |
| ) | DEMAND FOR JURY TRIAL |

CONSOLIDATED COMPLAINT FOR VIOLATION
OF THE FEDERAL SECURITIES LAWS

# TABLE OF CONTENTS

**Page**

OVERVIEW AND BACKGROUND ........................................................................................1

JURISDICTION AND VENUE ............................................................................................7

THE PARTIES ....................................................................................................................8

    Lead Plaintiff ...............................................................................................................8

    Defendants ...................................................................................................................8

FRAUDULENT SCHEME AND CONDUCT........................................................................12

BACKGROUND TO THE CLASS PERIOD AND OVERVIEW OF THE SCHEME TO DEFRAUD............................................................................................................................13

DEFENDANTS' WRONGFUL CONDUCT DURING THE CLASS PERIOD.........................16

    False Statements and Omissions Related to Third Quarter 2006 Financial Results..........16

    False Statements and Omissions Related to Fourth Quarter and Full Year 2006 Financial Results and 2007 Guidance .....................................................................18

    False Statements and Omissions Related to the Restatement of LCA's 2006 Financial Results and 2007 Guidance .....................................................................22

    False Statements and Omissions Related to First Quarter 2007 Financial Results and 2007 Guidance ................................................................................................27

    False Statements and Omissions Related to Second Quarter 2007 Financial Results and 2007 Guidance ................................................................................................35

    LCA Announces Disastrous Third Quarter 2007 Financial Results and Suspends Guidance ..................................................................................................................41

    Post Class Period Revelations....................................................................................48

LCA'S FALSE FINANCIAL REPORTING PRIOR TO AND DURING THE CLASS PERIOD ...........................................................................................................................50

    LCA's Improper Accounting for Its Bad Debts..........................................................51

    LCA's Restatement Improper Accounting for Its Deferred Revenue ...........................56

    LCA's Restatement Is an Admission of Falsity..........................................................58

    LCA's Financial Statements Violated Fundamental Concepts of GAAP .......................59

- i -

**Page**

DEFENDANTS CERTIFIED FALSE AND MISLEADING FINANCIAL RESULTS .............61

LCA'S VIOLATIONS OF SEC REGULATIONS DUE TO INADEQUATE
CONTROLS ........................................................................................................62

INSIDER SALES...................................................................................................64

ANNUAL COMPANY BONUSES .........................................................................65

LOSS CAUSATION/ECONOMIC LOSS ................................................................66

APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET
DOCTRINE .........................................................................................................68

NO SAFE HARBOR EXISTS FOR DEFENDANTS' STATEMENTS .......................69

LEAD PLAINTIFF'S CLASS ACTION ALLEGATIONS ........................................69

FIRST CLAIM......................................................................................................71

    Violation of Section 10(b) of the 1934 Act and Rule 10b-5 Promulgated
    Thereunder Against All Defendants ..................................................................71

SECOND CLAIM..................................................................................................74

    Violation of Section 20(a) of the 1934 Act Against the Individual Defendants and
    LCA.................................................................................................................74

PRAYER FOR RELIEF ........................................................................................75

JURY DEMAND ..................................................................................................76

## OVERVIEW AND BACKGROUND

1.      This is a securities class action on behalf of all persons who purchased or otherwise acquired the publicly traded securities of LCA-Vision, Inc. ("LCA" or the "Company") between October 24, 2006 and November 2, 2007 (the "Class Period"), against LCA and certain of its officers for violations of the Securities Exchange Act of 1934 ("1934 Act") (the "Class").

2.      LCA is a provider of fixed-site laser vision correction services through its LasikPlus vision centers.  The Company's vision centers provide the staff, facilities, equipment and support services for performing laser vision correction that employ laser technologies to help correct nearsightedness, farsightedness and astigmatism.

3.      This action arises out of LCA's repeated false and misleading guidance projections and financial reporting throughout the Class Period.  Defendants assured the investing community that the health of its business was strong, that revenue growth would be 20% to 25%, and that the Company would continue to capture market share from its key competitors, including TLC Vision Corporation ("TLC").  Defendants, however, knew otherwise as the Company's internal tracking system showed that business was declining in early 2007 and continued to do so until it all came crashing down in October 2007, when defendants had no choice but to admit that business had declined so dramatically that the Company had to suspend 2007 guidance.  The Class member plaintiffs in this action lost hundreds of millions of dollars, as the LCA stock collapsed from a high of $50.69 per share to a low of $15.58 during the Class Period.

4.      LCA is a leading provider of laser vision correction services under the LasikPlus brand.  LCA owns and operates 76 LasikPlus fixed-site laser vision correction centers in the United States and a joint venture in Canada.  The Company focuses exclusively on laser vision correction services, and has performed over 950,000 laser vision correction procedures in their vision centers in the United States and Canada since 1991.  LCA's LasikPlus laser vision correction centers are

staffed with ophthalmologists and optometrists. Diagnostic equipment and laser brands are used to help correct nearsightedness, farsightedness and astigmatism.

5. In North America, laser vision correction providers are divided into three major segments: corporate owned centers like LCA and its chief rival TLC; independent surgeon-owned centers; and institution owned centers. According to LCA, as late as September 20, 2007, independent surgeon-owned centers accounted for the largest percentage of total procedure volume in the industry with an approximate 60% market share. Corporate-owned centers accounted for 36% of the total procedures performed, with LCA and TLC each accounting for 13% of that total (LCA 13% market share/TLC 13% market share). The remaining 4% of laser vision correction procedures were performed at institution-owned centers, such as hospitals or universities.

6. During the summer of 2007, LCA made presentations at various conferences. During those presentations LCA showed a graphic which indicated since 1Q03, TLC's market share had been dropping while LCA's market share increased until each had 13% market share in August/September 2007. The chart below is a replica of the one used by LCA at the September 20, 2007, Maximum Group First Annual Growth Conference showing the comparison of LCA's market growth with that of TLC.



7.     Beginning in 2005 through November 2007, as TLC's market share dwindled, its stock price stayed relatively flat or decreased.  During that same time period, however, LCA's stock price increased dramatically until the house of cards came crashing down at the end of the Class Period.  The chart below depicts a stock price comparison between LCA and TLC from January 3, 2005, until November 2, 2007, the end of the Class Period.



**LCA-Vision vs. TLC-Vision**
**January 3, 2005 - November 2, 2007**

8.     To prevent LCA's stock price from suffering the same fate of that of its main competitor's, defendants engaged in a scheme to defraud its investors, designed to convince investors that its business was not suffering the same adverse trends as TLC.  Eight times during the Class Period defendants confirmed the Company's original 2007 earnings per share ("EPS") guidance projection of $2.05 to $2.15 with revenue growth between 20% and 25%, all the while knowing that this guidance was overly aggressive given the market conditions.  Defendants were well aware that such guidance was impossible to meet as defendants had daily access to data from each of its service centers showing volume of calls, appointments scheduled and whether patients kept their appointments, the number of procedures performed, the cost of the treatments, and customer satisfaction, among other data.  This information would have shown that in early 2007 consumer response for the lasik procedure had decreased and by the summer of 2007 the Company's

- 4 -

business prospects had dropped off dramatically.  Significantly, just 35 days after last re-confirming 2007 EPS guidance, on July 31, 2007, defendants announced that the Company would be revising EPS guidance.  This announcement caused LCA stock to drop 22% over a two day period to $33.40 per share from $42.99 per share.  Hoping to keep their scheme alive, defendants attributed the revised guidance to unspent marketing expenses as opposed to the real culprit – definite weakness in consumer spending.

9.     Defendants furthered their scheme to defraud by engaging in false financial reporting during the Class Period.  Defendants caused the Company to falsely report its allowance for doubtful accounts causing its assets and income to be materially overstated.  During the Class Period, the Company was experiencing a growing bad debt problem due to its exposure to subprime borrowers.  LCA's accounts receivable arise from its direct patient financing.  Given the high cost of laser vision corrective surgery coupled with the fact that the surgery is considered elective and is generally not reimbursable by a third-party payer such as by a patient's medical insurance, a significant percentage of LCA's patients finance all or some of the cost of their procedures.  Indeed, about 65% of the Company's use some type of financing with the remaining 35% using cash or credit card to pay for their procedures.  Thus, financing was crucial to the Company's business and potential for growth.

10.     LCA provides its patients with financing options through an unaffiliated third-party finance company.  Nonetheless, not all of the Company's patients qualify for third-party financing.  Accordingly, LCA began its own direct financing program in May 2002.  The patients that the Company finances are patients that have been deemed ***not credit-worthy by a third-party finance company***.  Under the program, the patients pay a minimal upfront fee and agree to pay the remaining balance under payment plans ranging from twelve to thirty-six months.

11.     Just prior to the Class Period, the Company began expanding its own role in providing patient financing thus significantly increasing its credit risk.  Additionally, to keep up

sales volume, LCA maintained very lax credit standards and approved almost everyone who applied for its direct financing program.  Despite its growing bad debt exposure, LCA not only failed to increase its allowance for bad debts during the Class Period but actually reduced its allowance. Nonetheless, LCA was unable to continue concealing its bad debt problems and was forced to restore its bad debt allowance in 2Q 2007 and again in 3Q 2007 thus negatively impacting its results.

12.     In addition, defendants caused the Company to falsely report its revenue for year-end 2006 by failing to defer revenue associated with the sale of its lifetime warranties and instead recognizing the majority of the revenue immediately upfront.  In April 2007, the Company announced that it would be forced to restate its previously issued financial results due to its improper accounting.  Nonetheless, in connection with the restatement announcement, defendants announced that they were affirming the Company's 2007 guidance in order to keep LCA's stock trading at artificially inflated levels.

13.     In August and September 2007, defendants reiterated their revised guidance to the market.  The scheme, however, could not last much longer and on October 30, 2007, LCA suspended guidance indefinitely and announced disappointing third quarter results.  Steven E. Straus ("Straus") finally admitted in a conference call that day, what he and the other defendants had known all along.

> While we remain confident in the Company's long-term growth prospects, in the near term we face an uncertain business environment.  Notably, the percentage of preoperative high [sic] exams we're able to converge into treated patients has declined and is impacting our ability to accurately forecast conversion rates.  At the same time, macroeconomic trends and consumer sentiment are weakening, which gives us concern in the short term, much like we have heard from many major retailers recently.
>
> As we saw the conversion rate declining, we developed and implemented programs in an attempt to bolster performance.  Unfortunately, given the results we've seen over the past few weeks, we have concluded that this trend is not yet reversing.  Given these trends and uncertainties, we now expect the fourth quarter 2007 earnings per diluted share will be significantly below the $0.27 we reported in fourth quarter of 2006 and we're suspending revenue guidance.

14. In the days following this disclosure, the damage had been done and LCA's stock collapsed from a close of $28.11 per share on October 29, 2007 to $15.58 per share on November 2, 2007 on trading volume of 15.4 million shares.

15. In February 2008, the Company announced disastrous 4Q and year-end 2007 results. The Company announced diluted EPS of $1.64 per share which was a far cry from the $2.05 to $2.15 EPS defendants had been repeatedly assuring the market of during the Class Period. The earnings miss was due to a combination of lower revenue growth and an increase in expenses including a significant increase in the company's allowance for bad debts in the fourth quarter of 2007.

16. LCA further reported revenue growth for 2007 of only 11% (based upon originally reported results) versus defendants' guidance of 20% to 25% growth. The decline in revenue was due to a sharp decline in the procedural volume. The Company reported a 5% decrease in volume for the fourth quarter of 2007 versus the fourth quarter of 2006 and further reported an overall increase for the year of only 4%. Additionally, LCA announced that it would be forced to tighten its own credit standards which would have a direct material negative impact on its long-term growth.

## JURISDICTION AND VENUE

17. The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the 1934 Act, 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the Securities and Exchange Commission ("SEC"), 17 C.F.R. §240.10b-5. Jurisdiction is conferred by §27 of the 1934 Act and venue is proper pursuant to §27 of the 1934 Act.

18. Many of the acts charged herein, including the preparation and dissemination of materially false and misleading information, occurred in a substantial part of this District and LCA conducts business in this District. In connection with the acts alleged in this Consolidated Complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate

commerce, including, but not limited to, the mails, interstate telephone communications and facilities of the national securities markets.

## THE PARTIES

**Lead Plaintiff**

19.     Lead Plaintiff Beaver County Retirement Board ("Lead Plaintiff") purchased LCA common stock during the Class Period while such stock was artificially inflated and has been damaged thereby.

**Defendants**

20.     Defendant LCA is engaged in the provision of fixed-site laser vision correction services at its LasikPlus vision centers.  The Company's vision centers provide the staff, facilities, equipment and support services for performing laser vision correction that employ laser technologies to help correct nearsightedness, farsightedness and astigmatism.  LCA's vision centers are supported mainly by independent, ophthalmologists and optometrists, as well as other health care professionals. The ophthalmologists perform the laser vision correction surgery in the Company's vision centers, and either ophthalmologists or optometrists conduct pre-procedure evaluations and post-operative follow-ups in-center.  LCA's principal executive offices are located at 7840 Montgomery Road, Cincinnati, Ohio.  Throughout the Class Period, LCA traded in an efficient market on the New York Stock Exchange.

21.     Defendant Straus, during the Class Period, served as LCA's Chief Executive Officer ("CEO") and was a director of the Company.  As part of his duties, Straus was responsible for directing the Company's finances and business affairs.  During the Class Period, Straus participated in the issuance of false and misleading statements and failed to disclose material information about LCA's business, accounting, and financial status and outlook.  Straus prepared and signed the Company's SEC filings, issued statements in press releases and led the Company's conference calls

with analysts and investors, representing himself as one of the primary persons with knowledge about LCA's business, financial reports, and outlook and business practices.

22.     In conjunction with LCA's 2006 10-K public financial statement filed with the SEC, Straus signed certifications pursuant to §302 of the Sarbanes-Oxley Act of 2002 ("Sarbanes-Oxley Act"), attesting that he reviewed the contents of the filing to confirm the "report does not contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which such statements were made, not misleading." To assure that the certification was not simply a hollow gesture, Straus was required to and confirmed that he, along with defendant Alan H. Buckey (Buckey"), was responsible for establishing and maintaining disclosure controls and procedures, designed such controls to assure that material information relating to LCA's business was promptly made known to Straus and the Company's senior executives and had routinely evaluated the effectiveness of the Company's policies with regard to assuring that he and other executives were made aware of material information.

23.     Defendant Buckey was LCA's Executive Vice President, Finance and Chief Financial Officer ("CFO") during the Class Period. Buckey participated in the issuance of false and misleading statements and failed to disclose material information about LCA's business, accounting, and financial status and outlook. Buckey prepared and signed the Company's SEC filings, issued statements in press releases and led the Company's conference calls with analysts and investors, representing himself as one of the primary persons with knowledge about LCA's business, financial reports, and outlook and business practices.

24.     In conjunction with LCA's 3Q06 and 2006 10-K filed with the SEC, Buckey signed a certification pursuant to §302 of the Sarbanes-Oxley Act, attesting that he reviewed the contents of the filing to confirm the "report does not contain any untrue statement of a material fact or omit to

- 9 -

state a material fact necessary in order to make the statements made, in light of the circumstances under which such statements were made, not misleading." To assure that the certification was not simply a hollow gesture, Buckey confirmed that he, along with Straus, was responsible for establishing and maintaining disclosure controls and procedures, had designed such controls to assure that material information relating to LCA's business was promptly made known to Buckey and the Company's senior executives and had routinely evaluated the effectiveness of the Company's policies with regard to assuring that he and other executives were made aware of material information.

25.     Defendant Craig P.R. Joffe ("Joffe"), during the Class Period, was a director, Chief Operating Officer ("COO"), and General Counsel of LCA, and additionally served as Interim CEO until November 2006. During the Class Period, Joffe participated in the issuance of false and misleading statements and failed to disclose material information about LCA's business, accounting, and financial status and outlook. During the Class Period, while in possession of material, undisclosed information about LCA's false statements, accounting fraud, and false financial statements and disclosures, Joffe sold 374,829 shares of his LCA stock for proceeds of $13.2 million. Joffe's stock sales were not part of any pre-established trading plan and were out of line with his pre-Class Period trading practices, as he made no insider sales in the year prior to the start of the Class Period.

26.     In conjunction with LCA's 3Q06 filed with the SEC, Joffe signed a certification pursuant to §302 of the Sarbanes-Oxley Act, attesting that he reviewed the contents of the filing to confirm the "report does not contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which such statements were made, not misleading." To assure that the certification was not simply a hollow gesture, Joffe confirmed that he, along with Straus, was responsible for establishing and

maintaining disclosure controls and procedures, had designed such controls to assure that material information relating to LCA's business was promptly made known to Joffe and the Company's senior executives and had routinely evaluated the effectiveness of the Company's policies with regard to assuring that he and other executives were made aware of material information.

27. During the Class Period, Straus, Buckey, and Joffe (combined, the "Individual Defendants"), as senior executive officers and directors of LCA were privy to confidential and proprietary information concerning LCA, its operations, finances, financial condition, and present and future business prospects. The Individual Defendants also had access to material adverse non-public information concerning LCA, as discussed in detail below. Because of their positions with LCA, the Individual Defendants had access to non-public information about its business, finances, products, markets, and present and future business prospects via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and/or Board of Directors meetings and committees thereof and via reports and other information provided to them in connection therewith. Because of their possession of such information, the Individual Defendants knew or recklessly disregarded the fact that adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

28. The Individual Defendants are liable as direct participants in the wrongs complained of herein. In addition, the Individual Defendants, by reason of their status as senior executive officers and/or directors were "controlling persons" within the meaning of §20(a) of the 1934 Act.

29. The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of LCA's quarterly reports, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market. Each defendant was provided with drafts and copies of the Company's financial statements, reports and press releases, alleged herein to be misleading, prior to or shortly after their

issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information, each of these Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations which were being made were then materially false and misleading.  The Individual Defendants are liable for the false statements pleaded herein, as those statements were each "group-published" information, the result of the collective actions of the Individual Defendants.

30.     As senior executive officers and/or a director and as controlling persons of a publicly traded company whose common stock was, and is, registered with the SEC pursuant to the 1934 Act, and was traded on the Nasdaq National Market ("Nasdaq") and governed by the federal securities laws, the Individual Defendants had a duty to promptly disseminate accurate and truthful information concerning LCA's financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings, and present and future business prospects, and to correct any previously issued statements that had become materially misleading or untrue, so that the market price of LCA's common stock would be based upon truthful and accurate information.  The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

**FRAUDULENT SCHEME AND CONDUCT**

31.     Defendants are liable for: (i) making false statements; or (ii) failing to disclose adverse facts known to them about LCA.  Defendants' fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of LCA common stock was a success, as it: (i) deceived the investing public regarding LCA's prospects and business; (ii) artificially inflated the price of LCA's common stock; and (iii) caused Lead Plaintiff and other members of the Class to purchase LCA common stock at inflated prices.

## BACKGROUND TO THE CLASS PERIOD AND OVERVIEW
## OF THE SCHEME TO DEFRAUD

32.     Laser Centers of America, Inc., LCA's corporate predecessor, was formed in 1986. In 1991, shortly after the first laser to perform laser vision correction procedures in Canada was approved, LCA began applying its laser operating expertise to the field of refractive eye surgery, particularly to Photorefractive Keratectomy ("PRK"), a procedure in which lasers are used to correct nearsightedness and other eye conditions.  PRK is an outpatient procedure performed with an excimer laser to treat nearsightedness and other eye conditions.  In 1995, the Food and Drug Administration ("FDA") approved PRK technology in the United States.  In December of 1995, LCA opened its first laser vision correction center in the United States at its corporate headquarters in Cincinnati.  In January of 1996, shares of LCA common stock began trading on the Nasdaq SmallCap Market.

33.     In 1997, the FDA approved the technology for a more advanced outpatient procedure for laser vision correction Laser in situ keratomileusis ("LASIK"), to treat nearsightedness, also using an excimer laser.  Within one year of its FDA approval, LASIK quickly outpaced PRK as the preferred procedure for laser vision correction surgery.  Throughout 1997, consumer demand for laser vision correction grew rapidly in the United States due to broader market acceptance, improved technology and expanded treatment options.  By the end of 1997, LCA began to focus exclusively on laser vision correction surgery.  In July of 1999, LCA introduced the "LasikPlus" name at its laser vision correction center in Baltimore, Maryland.  Due to the initial success of the Baltimore LasikPlus vision center and in an effort to build consumer awareness of its laser vision correction centers and the procedure, LCA began to rename all of its facilities LasikPlus and also launched marketing and advertising campaigns through the use of radio, print media, direct mail and internet marketing.  Throughout the years, LCA continued to open more vision correction centers.  As of

March 31, 2008, LCA operated 76 LasikPlus vision centers in 33 states and 59 markets in the United States and a joint venture in Canada.

34.      During much of the Class Period defendants repeatedly gave the market the impression that all was fine with the Company business.  This was far from the truth and at the end of the Class Period defendants had to finally admit the true state of affairs at the Company – business had dramatically declined – and the Company had no alternative but to suspend guidance indefinitely.

35.      In the second half of 2006, LCA confirmed that during the past four quarters the Lasik market had "been flat to down 3%."  As such, on September 29, 2006, after the market closed, LCA issued a press release announcing that the Company reduced its EPS and revenue guidance for 2006.

36.      This news caused LCA's stock to drop from above $40 per share to below $30 per share.  Defendants thus knew that any additional adverse announcements would confirm market fears that LCA was heading in the same direction as TLC.  When defendants later reported LCA's results for 3Q06, which were false and misleading, LCA's stock rebounded and continued to trade at artificially inflated levels.

37.      Given the decline in LCA's stock price for pre-announcing third quarter results, defendants were much more positive in announcing 4Q06 results.  LCA reported a strong 4Q06.  LCA reported full year EPS of $1.80 which was well ahead of management's revised guidance (annual guidance was lowered to $1.60 to $1.70 at the end of September 2006).  In addition, same-store growth rebounded to 10% in 4Q06, up from 6% in 3Q06.  Defendants also gave favorable EPS guidance of $2.05-$2.15 for 2007.  This positive information caused LCA's stock price to rise from $38.71 per share on February 9, 2007, to $46.13 per share on February 12, 2007, an increase of 19%.

38.     What defendants knew, but did not disclose to the market was that the Company's internal data base showed that the business outlook was not as favorable as they led the market to believe.  However, to prevent from having the Company stock price suffer the same fate as that of rival TLC's, defendants continued to perpetuate a fraud on its investors.  Eight times during the Class Period defendants reiterated the Company's overly aggressive EPS guidance, only to lower guidance in July 2007.  In July 2007, defendants continued to keep their scheme alive by blaming the revised guidance on unspent marketing expenses as opposed to what they already knew based on internal data – consumer spending was soft and the business outlook was poor.  Not until three months later, October 14, 2007, did defendants finally reveal the truth about the Company's business which caused them to suspend guidance indefinitely, causing LCA's stock to crash and causing plaintiffs to lose millions of dollars.

39.     In addition, the defendants' had knowledge with respect to the falsity of the statements regarding the Company's guidance for 2007 due to their access to extensive amounts of readily available information which contradicted their statements.  LCA had its own multi-function tracking system known as Mozart.  Each LCA center, and LCA corporate headquarters in Cincinnati, Ohio, were linked via this tracking system.  The Mozart system tracked on a daily basis how the Company business was performing, including identifying the call volume, number of appointments, whether or not patients booked treatments, number of eye procedures completed, treatment prices, point of service information which was the reporting of payments for processing, customer satisfaction surveys from all LCA centers.  Every center is connected to the server and Mozart.  Therefore, as data was entered from a particular center it was accumulated and processed at LCA headquarters.  The system compiled all the information on a daily basis and an operational metric report or "morning report" which included month to month comparisons was sent to each center every day.  With this system, defendants could do a comparison on a daily, weekly, monthly and

quarterly basis. Management needed this data to make weekly and monthly projections of company business. Reviewing this data would have shown that in February/March 2007 business was declining and by the summer of 2007 business was going off a cliff.

40.     In fact, on a June 21, 2007, presentation at the William Blair 27th Annual Growth Stock Conference, Buckey confirmed the existence of such a tracking system and how the company used the data compiled. Buckey stated:

> We are a very data driven company. I'm not intending you to analyze this chart but just to let you know that we've got an Oracle database that regenerates every night. So we know all our key operating metrics from company level and drill down by region, by center, by market. And we know how many people are scheduled for their eye exam, of those; how many attended; of those, how many were candidates versus non-candidates; and then, how many signed up for treatment. And then of those who were scheduled for treatment, how many attended. And we can use that to benchmark centers against each other, against the Company average, looking not only for underperforming centers but those that are outperforming to take our best ideas and share them across the Company.

### DEFENDANTS' WRONGFUL CONDUCT DURING THE CLASS PERIOD

**False Statements and Omissions Related to Third Quarter 2006 Financial Results**

41.     On October 24, 2006, LCA released financial results for the third quarter and nine months ended September 30, 2006. LCA reported the following:

| (in thousands except EPS) | Three months ended | | Nine months ended | |
| --- | --- | --- | --- | --- |
| | September 30, 2006 | September 30, 2005 | September 30, 2006 | September 30, 2005 |
| Revenues – Laser refractive surgery | $59,302 | $47,031 | $198,152 | $145,612 |
| Direct costs of services | $18,840 | $13,049 | $58,014 | $39,973 |
| Operating income | $9,933 | $12,028 | $47,668 | $40,300 |
| Net income | $7,245 | $7,946 | $31,214 | $25,084 |
| Diluted [EPS] | $0.34 | $0.37 | $1.46 | $1.17 |

| (in thousands) | Three months ended | |
| --- | --- | --- |
| | September 30, 2006 | December 31, 2005 |
| Current portion of accounts receivable, net | $12,234 | $10,520 |

- 16 -

| | | |
|---|---|---|
| Current portion of allowance for doubtful accounts | $2,420 | $2,641 |
| Total current assets | $156,197 | $134,706 |
| Accounts receivable net | $1,807 | $1,132 |
| Allowance for doubtful accounts | $435 | $504 |
| Total assets | $193,748 | $166,852 |

42.    On October 30, 2006, LCA filed its quarterly report with the SEC on Form 10-Q. The Company's Form 10-Q was signed by Joffe and Buckey and reaffirmed the previously announced financial results.  With respect to its financial results, the Company represented:

> In the opinion of management, these condensed consolidated financial statements contain all adjustments (which include only normal recurring adjustments) necessary to present fairly the financial position, results of operations and cash flows for the interim periods reported.

43.    In addition, Joffe and Buckey as required by the securities laws, signed and filed certifications on behalf of themselves and the Company with the SEC relating to LCA's Form 10-Q for the third quarter of 2006, ending September 30, 2006, which stated that the report was truthful, the financial statements in it were accurate and LCA's internal disclosure and accounting controls were designed to be effective to detect and prevent fraud and had been tested and found to be effective.

44.    Due to these positive financial results, LCA's stock increased from $32.92 per share on the weekend prior to the earnings release to $34.76 per share the day after the release.

45.    Defendants' statements regarding the Company's 3Q06 financial results and business and prospects were materially false and misleading when made.  Defendants knew or recklessly disregarded, but failed to disclose, the following:

(a)    LCA had a large bad debt problem related to patients receivables under its direct financing program for which defendants failed to properly account for in the Company's allowance for doubtful accounts; the allowance was materially understated given the exposure to bad debt faced by LCA;

(b)      Defendants failed to properly account for LCA's deferred revenue related to its extended warranties;

(c)      LCA lacked adequate internal controls related to its deferred revenue;

(d)      LCA had far greater exposure to anticipated bad debts and defaults related to its patient receivables, than it had previously disclosed; and

(e)      Given the deterioration and the increased volatility in the subprime market, the Company would be forced to tighten its credit standards which would have a direct material negative impact on its long-term growth.

**False Statements and Omissions Related to Fourth Quarter and Full Year 2006 Financial Results and 2007 Guidance**

46.      On February 12, 2007, LCA issued a press release reporting Fiscal 4Q06 and FY06 financial results. The press release specifically noted that the Company expected 2007 EPS of $2.05 to $2.15. Straus also stressed how well the Company had performed in the fourth quarter and year-end:

> "We are pleased to report another year of strong growth for LCA-Vision and LasikPlus. 2006 marks our fourth consecutive year of growth in excess of 30% in revenues, procedure volume and operating income. Our results reflect market share gains in both new and existing markets as well as our continued ability to consistently outperform the industry. We are also pleased with our fourth quarter results. We have operated in a market that has been flat-to-down for the past five quarters, and despite those odds, delivered 13% growth in earnings per diluted share, revenue growth of 26%, and a 23% increase in procedure volume. Growth in same-store revenues accelerated to 10% in the fourth quarter from 6% in the third quarter reflecting growth in word-of-mouth referrals and positive response to some of our new marketing initiatives. Based on industry sources, we believe that our market share in the U.S. grew to an estimated 15% in 2006's fourth quarter from about 12% in 2005's fourth quarter. Since we only operate in 46 U.S. markets, we believe that our market share is well over 30% in most of the markets we serve."

*      *      *

> "We are enthused about the growth potential for LCA-Vision/LasikPlus in 2007 and beyond," added Mr. Straus. "We operate in a highly fragmented market and our industry is still in its infancy here in the U.S. with only about 9% of the 60 million people eligible for the laser vision correction procedure treated to-date. The LasikPlus brand is built on high employee and patient satisfaction and superior

- 18 -

shareholder returns. Our growth over the past several years reflects the strength of our people and our operations; and as the industry leader, we believe that we are in a strong position to capitalize on this huge market potential."

47.    Additionally, in the press release, LCA reported the following:

| (in thousands except EPS) | Three months ended | | Full year ended | |
|---|---|---|---|---|
| | December 31, 2006 | December 31, 2005 | December 31, 2006 | December 31, 2005 |
| Revenues – Laser refractive surgery | $58,776 | $46,785 | $256,927 | $192,397 |
| Direct costs of services | $19,598 | $14,979 | $77,612 | $54,952 |
| Operating income | $9,314 | $8,626 | $56,981 | $48,924 |
| Net income | $7,082 | $6,568 | $38,296 | $31,653 |
| Diluted [EPS] | $0.34 | $0.30 | $1.80 | $1.47 |

| (Dollars in thousands) | Three months ended | |
|---|---|---|
| | December 31, 2006 | December 31, 2005 |
| Current portion of accounts receivable, net | $12,160 | $10,520 |
| Current portion of allowance for doubtful accounts | $2,310 | $2,641 |
| Total current assets | $124,625 | $134,706 |
| Accounts receivable net | $2,174 | $1,132 |
| Allowance for doubtful accounts | $532 | $504 |
| Total assets | $166,987 | $166,852 |

48.    On the same day, Straus and Buckey reiterated guidance and made similar comments about the health of the Company during a conference call for analysts and investors:

**Steve Straus – *LCA-Vision, Inc. – CEO***

*            *            *

As mentioned in the news release we issued earlier this morning, 2006 marks our fourth consecutive year of growth in excess of 30% in revenues, procedure volume and operating income.  In fact, the compound annualized growth rate in revenues over the last three years is 47%.  Our results reflect market-share gains in both new and existing markets, as well as our continued ability to consistently outperform the industry.

*            *            *

***We are pleased to have strengthened our same store revenues to 10% in the fourth quarter, up from 6% in the third quarter, which we believe reflects the importance***

- 19 -

*of word-of-mouth referrals as well as the positive response received from some of our new marketing initiatives.*

*        *        *

We are currently projecting full-year earnings per diluted share to be in the range of $2.05 to $2.15 with revenue growth between 20 and 25%. We expect to open 12 to 15 vision centers.

*        *        *

Our longer-term plans call for expansion into the top 80 to 100 U.S. markets with multiple centers in larger markets. To reach that point, we plan to grow our real estate base by 20 to 25% annually over the next several years. For the first quarter of 2007, we expect our marketing spend to be approximately $17.5 million. However, we continue to seek more effective and efficient methods of patient acquisition.

*        *        *

**Alan Buckey – *LCA-Vision, Inc. – CFO***

*        *        *

Fourth-quarter 2006 procedure volume increased 23% to over 42,000 procedures, up from 34,225 in the fourth quarter of 2005. Revenue per procedure also increased to just short of 1400 per procedure, up from 1367 in the fourth quarter of 2005. Fourth-quarter 2006 operating income increased 8% to approximately $9.3 million, up from approximately $8.6 million in the fourth quarter of 2005. For the full year 2006, revenues grew 34% to approximately 257 million, up from approximately $192 million for the full year, 2005. Same-store revenues increased 18% over the four quarters of 2006.

Procedure volume for the full year 2006 increased 30% to over 185,000 procedures, up from 142,000 procedures performed in 2005. Revenue per procedure for the full year increased to $1387 in 2006, up from 1355 in 2005.

49.     On February 12, 2007, William Blair & Company issued a report on LCA based on statements by defendants including the conference call. The report gave LCA a stock rating of Outperform. The report reiterated the Company's statements regarding strong fourth quarter and full year results and LCA's 2007 guidance:

Before the markets opened on Monday, LCA-Vision reported strong fourth-quarter results. GAAP earnings per share of $0.34 were $0.09 ahead of the consensus forecast and up approximately 26% year-over-year (after adjusting 2005 results of incorporate stock-based compensation expense).

- 20 -

For the full year, LCA-Vision reported $1.80 in EPS, well ahead of management's revised guidance (annual guidance was lowered to a range of $1.60 to $1.70 at the end of third quarter 2006) and within the guidance range given before the company's third-quarter preannouncement.

\*       \*       \*

Same-store growth rebounded to 10% in the fourth quarter (up from 6% in third quarter 2006), even though the company faced a difficult 34% year-ago comparison. . . .

\*       \*       \*

Management also provided its first look at 2007 guidance, which compared favorably with both our estimate and the consensus forecast. Specifically, the company guided toward EPS of between $2.05 and $2.10 (versus consensus expectations of $1.99) on revenue growth of 20% to 25% (in line with the consensus forecast of 21.8% growth). Management also indicated that LCA-Vision will spend roughly $17.5 million on marketing and advertising in first quarter 2007 – both to maintain existing advertising momentum as well as to systematically test novel market messages and distribution channels ( most likely television and the Internet, in our view).

50.     Based on the Company's robust comments, LCA's stock shot up from $38.71 per share on February 9, 2007 to $46.13 per share on February 12, 2007.

51.     On February 27, 2007, LCA filed its annual report with the SEC on Form 10-K. The Company's Form 10-K was signed by Straus and Buckey and reaffirmed the previously announced financial results.

52.     In addition, Straus and Buckey as required by the securities laws, signed and filed certifications on behalf of themselves and the Company with the SEC relating to LCA's Form 10-K for the year-ending December 31, 2006, which stated that the report was truthful, the financial statements in it were accurate, and LCA's internal disclosure and accounting controls were designed to be effective to detect and prevent fraud and had been tested and found to be effective.

53.     Defendants' statements regarding the Company's 4Q06 financial results, business and prospects, and guidance for 2007 were materially false and misleading when made. Defendants knew or recklessly disregarded, but failed to disclose, the following:

(a)     LCA had a large bad debt problem related to patients receivables under its direct financing program for which defendants failed to properly account for in the Company's allowance for doubtful accounts; the allowance was materially understated given the exposure to bad debt faced by LCA;

(b)     Defendants failed to properly account for LCA's deferred revenue related to its extended warranties;

(c)     Much of LCA's purported growth was driven not so much by its marketing initiatives as by the easy credit LCA granted to customers, many of whom would ultimately not pay the amount owed;

(d)     LCA lacked adequate internal controls related to its deferred revenue;

(e)     LCA had far greater exposure to anticipated bad debts and defaults related to its patient receivables, than it had previously disclosed;

(f)     Given the deterioration and the increased volatility in the subprime market, the Company would be forced to tighten its credit standards which would have a direct material negative impact on its long-term growth; and

(g)     Defendants knew that the Company's revenues were driven almost entirely by the number of procedures performed in its vision centers during the first quarter of the each year and that the Company's existing stores (in operation for over 12 months) were not showing growth and any overall growth was being derived from new store openings.  As a result, the Company's projections issued during the Class Period about its forecasted 2007 EPS were at a minimum reckless.

**False Statements and Omissions Related to the Restatement of LCA's
2006 Financial Results and 2007 Guidance**

54.     On April 18, 2007, LCA issued a press release announcing "it will restate financial results for 2004, 2005 and 2006 to reflect a change in revenue recognition for the Company's

separately priced extended warranties." Notwithstanding the restatement, Straus confirmed Company guidance for 2007:

> "At present, we are comfortable with our 2007 revenue guidance growth of 20 to 25 percent compared with 2006, and our 2007 earnings per share guidance of $2.05 to $2.15."

55.     On April 18, 2007, LCA held a conference call for analysts and investors and continued to downplay the impact of the restatement on the Company business or business momentum and confirmed guidance for 2007:

**Steve Straus – *LCA Vision, Inc. – CEO***

> We're committed to being forthcoming with issues as they rise and to transparency with the investment community. We are discussing what the SEC an accounting charge that involves how we account for our separately priced extended warranties and a pending restatement of our 2004, 2005 and 2006 financial statements. We're committed to resolving this issue as soon as practical. And we continue to be highly enthusiastic about LCA-Vision and our future growth prospects. We remain comfortable with our 2007 financial guidance.

> *       *       *

> At present we're comfortable with our 2007 revenue guidance growth of 20 to 25% compared with 2006 results, and with our 2007 earnings per share guidance of $2.05 to $2.15. As I mentioned our intention is to fully address this matter with the SEC as quickly as possible, and to continue with our strategy of leveraging the strength of our business model to further build upon our leading position in laser vision correction in the United States.

56.     During the same conference call Buckey denied that the restatement would have any net effect on company business and confirmed 2007 guidance. The following exchange took place on this topic:

**Ryan Daniels – *William Blair – Analyst***

> A couple of quick questions for you on the restatement. First off, if we think about what is taking place, obviously some of the revenue in net income from previous years will now spill into 2007, and some of your projected 2007 revenue and net income will spill forward into previous years. I'm trying to get a feel for what the net effect of that is, or maybe what the net outlook on cash flows which shouldn't be impacted by this is to get a feel for how this relates to your previous earnings guidance. Can you give me a little insight on that?

- 23 -

**Alan Buckey – *LCA-Vision, Inc.* – *EVP of Finance, CFO***

Sure, Ryan. This is Alan. The second question first. There is no change in cash flows because this is just a timing difference on when the revenue was recognized. So you're right, there will be revenues from prior years that get recognized in 2007 and beyond, and there will be revenues year-to-date that will get deferred into future years. But the key is how we price and market warranties going forward. And what Steve talked about in his remarks is that we intend to bundle the pricing of warranties with the laser option so that the accounting for that falls under FAS 5. Accounting for Warranties, rather than FTB 90-1, Accounting for Separately Price Warranties. The accounting is significantly different whether you have separately priced warranties versus bundled warranties. I just wanted to make that distinction.

The net effect, we don't know the exact net effect yet. We are still finalizing the calculations. We've got to get concurrence with the SEC. That is why we're saying – we think at this point we are saying the net effect is neutral, and therefore we're comfortable with our previously stated guidance.

57.    On April 18, 2007, William Blair & Company issued a report based on the conference

call pointing out that despite the restatement LCA confirmed 2007 guidance:

The bottom line is that this accounting change has no impact whatsoever on prior, current, or future cash flows. As such, while we are disappointed in the need for a restatement, we recognize that it does very little to the investment thesis on the company. Moreover, management indicated that it does not expect the restatement to alter its previously provided guidance (as the lost revenues/earnings which will be deferred in early 2007 will be equally offset by the shift of prior-period revenues/earnings into 2007).

58.    On April 19, 2007, RBC Capital Markets and Maxim Group each issued reports

based on LCA's conference call and reiterated that the Company confirmed its 2007 guidance. In

fact, RBC Capital reported that LCA's guidance may be conservative:

LCAV maintained its previously issued FY07 guidance of 20-25% revenue growth and EPS of $2.05-$2.15. We believe this may be conservatism by LCAV, as management indicated procedure volumes and to a lesser extent, pricing growth, are still on plan for the year.

59.    While the announced restatement caused LCA's stock price to decline, the stock

continued to trade at artificially inflated prices as the Company continued to confirm 2007 guidance

which was repeated by market analysts.

60. On May 8, 2007, LCA "announced that it has filed with the Securities and Exchange Commission (SEC) an amended Annual Report on Form 10-K/A for the year ended December 31, 2006, including prior period restatements for the years 2002 to 2006." LCA's stock price declined only briefly on this news, as the market had previously absorbed this news and the next day the Company issued a release affirming 2007 guidance:

> Outlook
>
> LCA-Vision affirmed its previous guidance for the 2007 full year. The company currently expects earnings per diluted share for the full-year of 2007 to be in the range of $2.05 to $2.15 with revenue growth between 20% and 25%, compared to the originally reported 2006 revenue of $256.9 million.

61. On May 9, 2007, LCA filed its amended annual report for year ending December 31, 2006 with the SEC on Form 10-K. LCA reported the following:

| (in thousands except EPS) | Three months ended | | Full year ended | |
| --- | --- | --- | --- | --- |
| | December 31, 2006 (restated) | December 31, 2005 (restated) | December 31, 2006 (restated) | December 31, 2005 (restated) |
| Direct costs of services | $19,589 | $14,979 | $77,612 | $54,952 |
| Operating income | $6,851 | $5,038 | $40,779 | $34,953 |
| Net income | $5,573 | $4,341 | $28,370 | $22,981 |
| Diluted [EPS] | $0.27 | $0.20 | $1.34 | $1.07 |

| (in thousands) | Three months ended | |
| --- | --- | --- |
| | December 31, 2006 (restated) | December 31, 2005 (restated) |
| Current portion of accounts receivable, net | $12,160 | $10,520 |
| Current portion of allowance for doubtful accounts | $2,310 | $2,641 |
| Total current assets | $134,981 | $141,465 |
| Accounts receivable net | $2,174 | $1,132 |
| Allowance for doubtful accounts | $532 | $504 |
| Total assets | $189,470 | $181,259 |

62. In addition, Straus and Buckey as required by the securities laws, signed and filed certifications on behalf of themselves and the Company with the SEC relating to LCA's Form 10-

K/A for the year ending December 31, 2006, which stated that the report was truthful, the financial statements in it were accurate, and LCA's internal disclosure and accounting controls were designed to be effective to detect and prevent fraud and had been tested and found to be effective.

63. Defendants' statements regarding the Company's restatement of its financial results for full year 2006 and prior years, business and prospects and guidance for 2007 were materially false and misleading when made. Defendants knew or recklessly disregarded, but failed to disclose, the following:

(a)    LCA had a large bad debt problem related to patients receivables under its direct financing program for which defendants failed to properly account for in the Company's allowance for doubtful accounts; the allowance was materially understated given the exposure to bad debt faced by LCA;

(b)    LCA had far greater exposure to anticipated bad debts and defaults related to its patient receivables, than it had previously disclosed;

(c)    Much of LCA's purported growth was driven not so much by its marketing initiatives as by the easy credit LCA granted to customers, many of whom would ultimately not pay the amount owed;

(d)    Given the deterioration and the increased volatility in the subprime market, the Company would be forced to tighten its credit standards which would have a direct material negative impact on its long-term growth;

(e)    Defendants could see from their analysis of the Mozart system that demand was not as strong as represented to the public; and

(f)    Defendants knew that the Company's revenues were driven almost entirely by the number of procedures performed in its vision centers during the first quarter of the each year and that the Company's existing stores (in operation for over 12 months) were not showing growth and

any overall growth was being derived from new store openings.  As a result, the Company's projections issued during the Class Period about its forecasted 2007 EPS were at a minimum reckless.

**False Statements and Omissions Related to First Quarter 2007 Financial Results and 2007 Guidance**

64.     On May 9, 2007, LCA released 1Q07 results and affirmed 2007 guidance.  In the press release, LCA reported the following:

| (in thousands except EPS) | Three months ended | |
| --- | --- | --- |
| | March 31, 2007 | March 31, 2006 (restated) |
| Direct costs of services | $24,465 | $20,915 |
| Operating income | $15,543 | $14,710 |
| Net income | $10,926 | $9,427 |
| Diluted [EPS] | $0.54 | $0.44 |

| (in thousands) | Three months ended | |
| --- | --- | --- |
| | March 31, 2007 | December 31, 2006 (restated) |
| Current portion of accounts receivable, net | $13,870 | $12,160 |
| Current portion of allowance for doubtful accounts | $2,400 | $2,310 |
| Total current assets | $161,485 | $134,981 |
| Accounts receivable net | $3,523 | $2,174 |
| Allowance for doubtful accounts | $869 | $532 |
| Total assets | $219,321 | $189,470 |

65.     On May 9, 2007, LCA held a conference call for analysts and investors and made the following statements concerning its accounts receivables:

**John Ransom – *Raymond James – Analyst***

One thing we noticed in your K was that for the first time, your loan loss provision was a little bit less than your charge-offs. We took that to mean that you were, frankly, kind of over-reserved with your self-pay program, and now you are more normally reserved. Should we see anything notable in the bad debt line resulting from maybe a more normalized reserve pattern going forward? Or what is your expectation there?

**Alan Buckey – *LCA-Vision, Inc. – EVP of Finance, CFO***

- 27 -

Well, in the third quarter of last year, our 36-month financing program hit its three-year anniversary point, and so we adjusted reserves down about $300,000 to be in line with our historical experience there, so we were a little over-reserved. Now, all of the programs are mature, so we would expect bad debt expense and writeoffs to approximate each other going forward.

**John Ransom – *Raymond James – Analyst***

Have there been any changes in either the percentage of procedures that you're financing that I guess don't qualify for GE, or any change in the collection rates that you've noticed with the housing market and the $3 gas and the things you cited?

**Alan Buckey – *LCA-Vision, Inc. – EVP of Finance, CFO***

No.  It has been very stable. We have seen a little uptick in the use of our own financing in the first quarter, maybe a point or two, but nothing materially different out of GE.

**John Ransom – *Raymond James – Analyst***

Nothing material. And the collection rates on your own financing program continue to be just consistent with your historical experience?

**Alan Buckey – *LCA-Vision, Inc. – EVP of Finance, CFO***

Yes.

**John Ransom – *Raymond James – Analyst***

Could you remind me, on the three-year receivables, what is your current reserve expectation on that? Are you still discounting the revenues like you used to, in addition to providing a reserve?

**Alan Buckey – *LCA-Vision, Inc. – EVP of Finance, CFO***

Well, we're charging a higher interest rate on those extended programs, so the effective discounting has been greatly reduced. We're charging an 18.9% interest rate on the 36-month plan, so there really isn't – we consider that to be a fair market value interest rate. Back when we were charging a less than fair market value interest rate was when we had to do an MTV calculation on that.

We haven't really done specific reserve rates by program. I will tell you the 36-month is higher than the 18-month or the 12-month. But we feel like the risk is offset by the fact that we're charging the interest to the consumer. So people who are taking that 36-month plan are more sensitive to the monthly payment than they are to interest rates.

**John Ransom – *Raymond James – Analyst***

What reserve are you applying on the three-year – on the bad debt line, the bad debt provision?

**Alan Buckey – *LCA-Vision, Inc. – EVP of Finance, CFO***

Well, we haven't given specific reserves by those programs. I'll tell you the way we do it is I look at anything that's more than 36 months old in the 36-month program – that's 100% reserved. Then anything less than that is reserved at the average rate that we have collected for people who have gone full cycle in the past.

**John Ransom – *Raymond James – Analyst***

Which is what? I think – is it like 15% reserved or something? Or I guess you're not going to tell me.

**Alan Buckey – *LCA-Vision, Inc. – EVP of Finance, CFO***

It's at least that, probably more than that.

66.     Further during the conference call, LCA once again reconfirmed guidance:

**Steve Straus – *LCA-Vision, Inc. – CEO***

I'd like to thank everyone for joining us this morning. Today, we reported 2007 first-quarter revenue growth of 18%, marking another quarter of market-share gains in both new and existing markets, as we continue to consistently outperform the industry.

For the quarter, we grew revenues to more than $78 million and increased procedure volume 11%, more than 59,000. Same-store revenues were up 5%, net income was up 16% and earnings per diluted share grew 23%.

We continue to invest in expanding our store base, which provides significant opportunity for future growth. We executed well against this strategy in the first quarter by successfully opening four LasikPlus Vision Centers, all in new markets, including Long Island, New York; Harrisburg, Pennsylvania; Green Bay, Wisconsin; and Omaha, Nebraska. We now operate in 63 locations in 48 markets in 29 states.

*            *            *

We are affirming our full-year 2007 financial guidance. We are currently projecting full-year 2007 earnings per share to be in the range $2.05 to $2.15, with revenue growth between 20% and 25%. The revenue growth projection is compared to the originally reported revenue for 2006 of $256.9 million.

67.     Despite what market analysts termed mixed first quarter results for the Company, they continued to believe in the prospects for LCA given the confirmation of guidance.

- 29 -

68. On May 9, 2007, William Blair & Company issued a report based on LCA's conference call. The report reiterated defendants' statements regarding confirming guidance:

> Management reiterated its guidance for EPS of between $2.05 and $2.15 and total revenue growth (off of originally reported 2006 revenue) of between 20% and 25%. The company will experience EPS compression in the first half of 2007 (ad deferred revenues will be larger than amortized revenues) until it can restructure the way it sells its extended-warranties (which should occur by midyear, in our view). Then, the company will no longer need to defer revenues but will still benefit from the amortization of previously deferred results (thus boosting EPS in the second half of the year). The company expects, based on current trends, the weakness in the first half of the year to be offset by the gains in the second half of the year, leading to in-line EPS forecasts even with the accounting changes.

69. On May 10, 2007, LCA filed its quarterly report with the SEC on Form 10-Q. The Company's Form 10-Q was signed by Straus and Buckey and reaffirmed the previously announced financial results. With respect to its financial results, the Company represented:

> In the opinion of management, these condensed consolidated financial statements contain all adjustments (which include only normal recurring adjustments) necessary to present fairly the financial position, results of operations and cash flows for the interim periods reported.

70. In addition, Straus and Buckey as required by the securities laws, signed and filed certifications on behalf of themselves and the Company with the SEC relating to LCA's Form 10-Q for the first quarter of 2007, ending March 31, 2007, which stated that the report was truthful, the financial statements in it were accurate, and LCA's internal disclosure and accounting controls were designed to be effective to detect and prevent fraud and had been tested and found to be effective.

71. On May 10, 2007, Oppenheimer issued a report upgrading the shares of LCA from Neutral to Buy. The report pointed out that management's confirmation of guidance would mean a stronger second half of the year:

> **Summary:** We are upgrading the shares of LCA-Vision from Neutral to Buy and setting a $48 price target (16X our 2008 $3.00 EPS estimate).
>
> *       *       *
>
> **Reiterated guidance means strong 2H** . . . The company repeated its EPS guidance of $2.05 to $2.16 for the year after restatements. The company expects deferred

- 30 -

revenue to roughly equal credited revenue in 2007. LCAV repeated its guidance that surgical revenue prior to restatements will grow 20-25%. With 1Q growth of 18%, we can expect stronger quarters to come. We now forecast EPS of $2.10 for 2007 and $3.00 for 2008. This $0.60 change in our 2008 EPS estimate is based on the amortization of prior deferred revenue.

72.     On May 10, 2007, Maxim Group also issued a favorable report about the Company:

LCAV reports mixed 1Q07 results largely due to impact from new extended warranty recognition policy; Same-stores-sales lighter than expected but tough y/y comp; 2007 guidance still intact; Adjusting estimates; Reiterate Buy rating.

*What should investors do now?* We recommend that investors Buy shares of LCAV on weakness following its 1Q07 release. The company's 1Q07 results fell short of expectations, however, we attribute this shortfall largely to the impact from its new revenue recognition policy concerning separately priced extended warranties. Furthermore, we do not view the company's 5% same-store-sales growth as that negative given the tough y/y comp from the same period a year ago, and the weakening backdrop of the refractive industry. In our opinion, LCAV's current price gives investors an opportunity to purchase shares ahead of what we believe could be a strong 2H07, due to faster than expected new center openings at the beginning of this year and the recognition of deferred warrant revenue towards the back end of the year. Therefore, we are reiterating our Buy rating and 12-month price target $58.

\*       \*       \*

*2007 guidance maintained*. LCAV reiterated its original 2007 revenue and GAAP EPS guidance of 20%-25% y/y growth and $2.05-$2.15, respectively. The company's top-line guidance is based off of its previously reported 2006 year-end revenue of ~$256 million. This translates into a revenue range of $308.3-$321.1 million (midpoint is ~$314.7 million), which is inline with consensus of $312.8 million. The midpoint of the company's 2007 EPS guidance ($2.10) represents nearly 58% y/y growth relative to its restate 2006 GAAP EPS of $1.33. We believe that LCAV's 2007 guidance is still achievable, despite early indications of a softening market, due to further market share gains, as well as the positive impact from amortized warranty revenue.

73.     On May 23, 2007, LCA attended the JMP Securities Research Conference. During the investor presentation, LCA affirmed its EPS guidance of $2.05-$2.15 for 2007.

74.     On June 6, 2007, LCA made an investor presentation at the FTN Midwest Healthcare Conference. During the presentation, the Company once again confirmed the 2007 EPS guidance of $2.05-$2.15.

75. On June 21, 2007, LCA made another investor presentation this time at the William Blair 27th Annual Growth Stock Conference. Straus was comfortable with the market conditions and bullish about continuing to take market share from LCA's key competitors. Straus stated:

> US procedure volume – as you can see over the last four years and the first part of this year has been relatively flat. Alan and I are very comfortable with the market conditions because we know for us to grow, to meet our investor objectives, as well as to make sure that we are growing our business, we've got to take market share from our current competitors. We believe in the future the industry will grow and that tailwind will provide us some accelerated growth sometime in the future. But at this point in time, given the market conditions, the industry being relatively flat, we're comfortable with continuing to take market share from some of our vulnerable key competitors, both on the corporate side as well as on the independent surgeon practitioner side.

> Like most health-care delivery systems, the laser vision correction industry here in the US is highly fragmented. Well over half of the procedures performed currently are being performed by independent ophthalmic surgeons in their private practice. Their average volume pales in comparison to ours. And there are a lot of these surgeons that you'll see existing, in my humble opinion, the laser vision correction segment of their practice because the volumes aren't sustainable. It's a very expensive segment to support in their practice at low volumes, given the technology and direct to consumer marketing investment requirements. And we see an opportunity in our target markets and the existing markets we're serving to take share from several of these vulnerable independent surgeons. Also, we see some weakness in some of our corporate competitors that we're definitely targeting as well.

76. During the same conference call, Buckey explained that customer satisfaction resulted in repeat business and therefore, tracking patient progress and satisfaction was important. To accomplish this task, LCA had a data base which provided management with the Company's key operating metrics by region, center and market. Buckey stated:

> We are a very data driven company. I'm not intending you to analyze this chart but just to let you know that we've got an Oracle database that regenerates every night. So we know all our key operating metrics from company level and drill down by region, by center, by market. And we know how many people are scheduled for their eye exam, of those, how many attended; of those, how many were candidates versus non-candidates; and then, how many signed up for treatment. And then of those who were scheduled for treatment, how many attended. And we can use that to benchmark centers against each other, against the Company average, looking not only for underperforming centers but those that are outperforming to take our best ideas and share them across the Company.

- 32 -

77.     At the conference, Buckey also confirmed financial guidance for the year, including revenue of $308 million to $321 million and EPS of $2.05 to $2.15.  Buckey characterized the latest results as a triple-win:

> And what do I mean by that?  We think it's a win for our surgeons and employees because they're earning substantial financial returns for the kind of operating results they're delivering.  It's a win for our patients because they're great getting great quality of care at an affordable price.  And it's a win for our shareholders by producing very solid financial returns.

78.     On June 26, 2007, LCA made yet another investor presentation at the Jefferies Healthcare Conference and again confirmed revenue guidance in the range of $308 million to $321 million, and again confirmed its EPS guidance of $2.05-$2.15.

79.     On July 9, 2007, Oppenheimer issued a report continuing to recommend the stock based on recent statements made by the Company.  The report stated in part:

> **Summary:**  In light of LCA Vision's recent statement of forecasted 2007 revenue and execution of certain strategies, we continue to recommend the stock and are raising our price target to $57 (previously $48).

> **Increased revenue** . . .  The company is now forecasting 2007 revenue of $308mm-$321mm.  We have increased our 2007 estimate to $309.0mm from $305.3mm.

> *        *        *

> **Many positives**.  We believe LCA-Vision offers skilled surgeons at competitive prices while providing the best possible technologies to patients.  We expect LCAV to remain the market leader and continue to capture market share.  LCAV recently announced that it will expand its Intralase trial from four sites to eight sites.  We believe the company will eventually over Intralase technology in all geographical markets increasing its average price per procedure.  The company's CMO has now had time to review the business in detail and is considering a national advertising marketing in some cases over regional ads.  So far, TLCV (TLCV, $5.21, Not Covered) has been unable to replicate LCAV's prices.  At this time, the entry level price at LCAV is around $799.  At TLCV the entry level price remains around $999.  Center openings are moving along as scheduled.  The company just announced the opening of its 68th center in Scarsdale, NY.  Finally, the company has over $120mm in cash and has board approval to repurchase another $34.5mm in stock.  Should the shares suffer any weakness, this provides a potential buffer.

80.     On eight different days from February 12, 2007, through June 26, 2007, defendants confirmed the Company's EPS guidance of $2.05 to $2.15.

81.     Defendants' statements regarding the Company's 1Q 2007 financial results, business and prospects and guidance for 2007 were materially false and misleading when made.  Defendants knew or recklessly disregarded, but failed to disclose, the following:

(a)     LCA had a large bad debt problem related to patients receivables under its direct financing program for which defendants failed to properly account for in the Company's allowance for doubtful accounts; the allowance was materially understated given the exposure to bad debt faced by LCA;

(b)     LCA had far greater exposure to anticipated bad debts and defaults related to its patient receivables, than it had previously disclosed;

(c)     Much of LCA's purported growth was driven not so much by its marketing initiatives as by the easy credit LCA granted to customers, many of whom would ultimately not pay the amount owed;

(d)     Given the deterioration and the increased volatility in the subprime market, the Company would be forced to tighten its credit standards which would have a direct material negative impact on its long-term growth;

(e)     Defendants could see from their analysis of the Mozart system that demand was not as strong as represented to the public;

(f)     Defendants knew that the Company's revenues were driven almost entirely by the number of procedures performed in its vision centers during the first quarter of the each year and that the Company's existing stores (in operation for over 12 months) were not showing growth and any overall growth was being derived from new store openings.  As a result, the Company's

projections issued during the Class Period about its forecasted 2007 EPS were at a minimum reckless; and

(g)     Defendants had knowledge with respect to the falsity of the statements regarding the Company's guidance for 2007 due to their access to extensive amount of readily available information, including through the Mozart system, which contradicted their statements.

**False Statements and Omissions Related to Second Quarter 2007 Financial Results and 2007 Guidance**

82.     On July 31, 2007, the Company dropped a bombshell when it issued a press release reporting disappointing 2Q07 financial results and lowering 2007 guidance. LCA blamed the revised guidance on internal Company issues of under spent marketing and not market conditions, including softness of consumer spending.

83.     In the press release, LCA reported the following:

| (in thousands except EPS) | Three months ended | | Six months ended | |
| --- | --- | --- | --- | --- |
| | June 30, 2007 | June 30, 2006 | June 30, 2007 | June 30, 2006 |
| Direct costs of services | $24,629 | $18,259 | $49,095 | $39,174 |
| Operating income | $10,039 | $12,400 | $25,582 | $27,111 |
| Net income | $7,414 | $8,033 | $18,340 | $17,461 |
| Diluted [EPS] | $0.36 | $0.37 | $0.90 | $0.81 |

| (in thousands) | June 30, 2007 | December 31, 2006 (restated) |
| --- | --- | --- |
| Current [portion of] Accounts receivable, net | $17,948 | $15,470 |
| Current [portion of] allowance for doubtful accounts | $2,911 | $2,310 |
| Total current assets | $156,045 | $134,981 |
| Accounts receivable, net | $4,230 | $2,174 |
| Allowance for doubtful accounts | $1,208 | $532 |
| Total assets | $219,502 | $189,470 |

84.     The Company's stock dropped on this news but continued to trade at artificially inflated levels as defendants concealed how poor business really was and concealed their

falsification of LCA's financial results through its failure to record timely and adequate allowances for bad debts.

85.     On the same day LCA held a conference call for analysts and investors, among the topics discussed was the revised Full-Year 2007 Financial Guidance:

**Alan Buckey –** *LCA-Vision – SVP – Finance and CFO*

*       *       *

Given our performance year-to-date and based upon our current plans for the balance of 2007, we are revising our revenue and earnings per share guidance for 2007.

The Company now expects revenues to be between $308 million and $315 million for the year compared with prior guidance of $308 million to $321 million; and earnings per diluted share to be in the range of $1.90 to $2 compared with the previous guidance of $2.05 to $2.15.

86.     During the conference call both Straus and Buckey attributed the revised guidance to Company marketing issues.  The following exchange on this topic took place:

**Ryan Daniels –** *William Blair & Company – Analyst*

Couple of quick questions on the same store growth and the growth outlook going forward.  If we look at the weakness in the procedure volumes this quarter, can you give us a little more color on what might be driving that?  Whether it's a more challenging competitive environment, more challenging macro and consumer environment or something that you guys have identified on a Company-specific basis like the marketing or bundled pricing that are impacting volume?  Just any color there of what components to the negative growth might be?

**Steve Straus –** *LCA-Vision – CEO*

I will take the first part of that question and then also ask Alan to comment.

I believe we are a victim of our own inefficiencies right now.  I don't see us losing any measurable marketshare through competition, and in many consumer markets across the country we are seeing some softness.  But right now we are looking at our internal operations – marketing, people and metrics – to continue to streamline to make sure that we are more efficient and effective in each of the markets we're serving.

**Alan Buckey –** *LCA-Vision – SVP – Finance and CFO*

The other fact is that, you will remember we guided to a marketing spend of $17 million for the quarter and we only spent about $15.7 million.  It wasn't an attempt to try to costcut our way to success it was actually we undercleared some of

- 36 -

our advertising that we planned to spend. So we underdelivered on our appointment and (inaudible) which really by my math took about $0.10 in earnings out the quarter.

So I wouldn't look at it as a cost savings that dropped to the bottom line. It was kind of a missed opportunity where we underdelivered on our marketing clearance and that resulted in lower procedures in our same stores that we planned for internally and what we like to see.

87.     Further on the conference call defendants made the following statements concerning

LCA's growing bad debt problems:

**Alan Buckey – *LCA-Vision – SVP – Finance and CFO***

It was about 2% of revenues this year versus 1 % last year. So it is still not a huge percent of revenues; and still the right thing to do because of the high contribution margin associated with the procedures. So a little bit more expense this year than last year, but – our allowance increased about $1.9 million since the end of 2006. More than half of that was simply the growth in accounts receivable and the other half was split about 50-50 about $450,000 each between simply the mix in program from – to the longer-term paper and about $450,000 due to getting a little more conservative on our reserve rates.

Again more than half of it, it is just the growth in the receivable balance.

**Anthony Vendetti – *Maxim Group – Analyst***

You also mentioned that there was an increase in actual defaults. What percentage increase was that? Is that meaningful? And then if you could just talk about in general what you see the consumer environment? Is this sort of what impact are you seeing that having right now? Sort of in the quarter and then so far, so far this quarter in July so far?

**Alan Buckey – *LCA-Vision – SVP – Finance and CFO***

We haven't gotten into default rates specifically. I mean we track them internally. I think we're seeing a little more early default rates by consumers that we didn't probably see a year ago where some folks are defaulting within the first 90 days of taking out a loan. So I think the consumer is a little strapped and but we still think it's a good program for LCA-Vision.

**Steve Straus – *LCA-Vision – CEO***

Just to add onto that, and I remind everybody that this is retail medicine and it is an elective procedure. It is high-priced. It's a self-paid procedure. And whatever the economy does, plus or minus, will have an impact on our business and the business of our competitors in this sector.

**Anthony Vendetti – *Maxim Group – Analyst***

- 37 -

In terms of the defaults, isn't it – one of the ways you've triued [sic] to control that I guess is you've mentioned in the past. Alan, that you require them to give you access to their bank accounts so that you do it directed, debit on their account every month. Is that still being required or– ?

**Alan Buckey – *LCA-Vision – SVP – Finance and CFO***

Yes. As well as a downpayment.

88.     On July 31, 2007, LCA filed its quarterly report with the SEC on Form 10-Q. The Company's Form 10-Q was signed by Straus and Buckey and reaffirmed the previously announced financial results. With respect to its financial results, the Company represented:

In the opinion of management, these condensed consolidated financial statements contain all adjustments (which include only normal recurring adjustments) necessary to present fairly the financial position, results of operations and cash flows for the interim periods reported.

89.     Additionally, with respect to the Company's bad debt expense for the quarter, defendants made the following representations:

Direct costs of services increased in the second quarter of 2007 by $6,370,000, or 35%, over the second quarter of 2006. . . . Bad debt expense increased by $1,177,000 in the second quarter of 2007, as compared to the second quarter of 2006 for three reasons: 1) a higher percent of total revenues were financed by the company in 2007; 2) the mix of patient financing shifted to a greater use of 36-month financing from 12-month financing and the longer term receivables are reserved at a higher rate than shorter term receivables; and 3) the reserve rate on 18-month and 36-month receivables was increased as a result of recent collection rates with these programs.

90.     In addition, Straus and Buckey as required by the securities laws, signed and filed certifications on behalf of themselves and the Company with the SEC relating to LCA's Form 10-Q for the second quarter of 2007, ending June 30, 2007, which stated that the report was truthful, the financial statements in it were accurate, and LCA's internal disclosure and accounting controls were designed to be effective to detect and prevent fraud and had been tested and found to be effective.

91.     Upon the revelation of July 31, 2007, LCA's stock fell sharply from a close of $42.99 on July 30, 2007, to a low of $33.40 on August 1, 2007, a company-specific stock decline began – not due to the market forces but rather due to the entry of information into the market indicating

prior statements and assurances had been false – causing some of the artificial inflation to come out of LCA's stock. The stock drop represented 22% decline over a two day period on extremely high volume.

92. As *The Motley Fool* Web site reported, investors were "blindsided":

Egads, was that ever bad!

In last week's Foolish Forecast for Q2 earnings at LCA-Vision . . . I was puzzled that analysts predicted both double-digit sales growth and a double digit earnings decline for the LASIK specialist. It just didn't make sense, especially in light of CEO Steven Straus's recent assurance that the company was on track to achieve 20%-plus sales growth and better than 50% profit growth this year. Something was amiss.

And how. Reviewing Tuesday's results, it appears that the analysts ultimately weren't pessimistic ***enough***. The numbers were simply abysmal:

- Sales rose only 6% (or 16%, based on management's restatement of Q2 2006 results).

- Procedure volume increased an anemic 3%, with all of the growth coming from new store openings. Existing stores dragged down the final number with an 8% drop in same-store sales.

- Per-share profits fell by a penny to $0.36.

\*       \*       \*

The good news

Even the good news was bad at LCA this quarter. Straus pointed out that while profits were down, cash flow was up 14%. Good news? Not really. The 14% number was for year-to-date cash flow, and it relied heavily on last quarter's 17% growth. In Q2, cash flow actually performed worse than GAAP profits – down 35% year over year from last year's $8 million.

The not-yet news

Putting it all together, LCA decided to lower its forward earnings guidance by roughly 7%, to a midpoint of $1.95 per share. (The last time we checked, the midpoint was $2.10.) How confident should you be that LCA will meet its latest and less-than-greatest target?

Well, LCA has earned $0.90 per share already, but the year's more than half over. So unless management fulfills its promise to reenergize growth next quarter, I'd put the likelihood of hitting the latest earnings target somewhere south of 50%.

- 39 -

93. On July 31, 2007, William Blair & Company issued a report based on LCA's conference call mimicking management's comments that underspent marketing efforts and not the macroeconomic and competitive environments were to blame for the revised guidance:

> Interestingly, management indicated on today's conference call that the macroeconomic and competitive environments, while both challenging, were not the primary reasons behind the second-quarter shortfall and reduced guidance. Rather, management indicated that it underspent on its marketing efforts in the second quarter, which subsequently led to weaker procedure growth and the earnings shortfall. As such, *we believe execution issues were the primary culprit behind this quarter's miss*.

94. On August 1, 2007, Oppenheimer issued a report based on LCA's conference call and despite the revised guidance, maintained a Buy rating for the stock as a result of management predicting a stronger second half, among other factors. The report stated in part:

> *Problems derived from* . . . The company feels the miss can be blamed on marketing that simply did not get done. While the company intended to spend about $17mm-$17.5mm on marketing, many marketing programs are based on bidding, and LCAV only spend $15.7mm during the quarter. Management felt this miss on marketing opportunity cost the company significant revenue and nearly $0.10 on the bottom line. . . .

> \*       \*       \*

> *Management predicts stronger second half*. While acknowledging that management has lost some credibility with investors, we point out that the company expects a stronger second half of the year based on additional marketing, more same store centers being updated or relocated, and new managed care provider agreements which should drive volumes.

95. In August 2007, LCA conducted an Investor Presentation and reconfirmed the revised EPS guidance of $1.90-$2.00.

96. On September 20, 2007, LCA made a presentation at the Maxim Group First Annual Growth Conference during which Buckey reconfirmed the revised guidance of revenue of $308 million to $315 million and EPS of $1.90-$2.00.

97. Defendants' statements regarding the Company's 2Q07 financial results, business and prospects, and guidance for 2007 were materially false and misleading when made. Defendants knew or recklessly disregarded, but failed to disclose, the following:

(a) LCA had a large bad debt problem related to patients receivables under its direct financing program for which defendants failed to properly account for in the Company's allowance for doubtful accounts; the allowance was materially understated given the exposure to bad debt faced by LCA;

(b) LCA had far greater exposure to anticipated bad debts and defaults related to its patient receivables, than it had previously disclosed;

(c) Given the deterioration and the increased volatility in the subprime market, the Company would be forced to tighten its credit standards which would have a direct material negative impact on its long-term growth;

(d) Defendants knew that the Company's revenues were driven almost entirely by the number of procedures performed in its vision centers during the first quarter of the each year and that the Company's existing stores (in operation for over 12 months) were not showing growth and any overall growth was being derived from new store openings. As a result, the Company's projections issued during the Class Period about its forecasted 2007 EPS were at a minimum reckless; and

(e) Defendants had knowledge with respect to the falsity of the statements regarding the Company's guidance for 2007 due to their access to extensive amount of readily available information which contradicted their statements.

**LCA Announces Disastrous Third Quarter 2007 Financial Results and Suspends Guidance**

98. Due to management affirming the revised guidance in August and September 2007, investors were not informed of the truth concerning the Company's business and prospects until

October 30, 2007, when, before the market opened, the Company issued a negative press release admitting that it was unable to predict its fourth quarter EPS and that it was suspending financial guidance indefinitely. The Company further reported disappointing third quarter results.

99. The press release stated in part:

Commenting on the company's financial and operational results, Steve Straus, LCA-Vision's Chief Executive Officer, said, "Our ability to obtain a higher average price per procedure during the quarter favorably offset weaker same-store procedure volume as we continue to face headwinds due to softness in consumer discretionary spending and tightening credit markets."

\*        \*        \*

Outlook

Discussing the firm's outlook, Mr. Strauss said, "While we remain confident in the company's long-term growth prospects, in the near-term we face an uncertain business environment. Notably, *the percentage of pre-operative eye exams we are able to convert into treated patients has declined and is impacting our ability to accurately forecast conversion rates*. At the same time, macroeconomic trends and consumer sentiment are weakening, which gives us concern for the short-term. Given these trends and uncertainties, *we now expect that fourth quarter 2007 earnings per diluted share will be significantly below the $0.27 we reported in the fourth quarter of 2006, and we are suspending revenue guidance*. We remain committed to opening a total of 12 to 15 vision centers in 2007. We expect to invest approximately $16.5 million on marketing in the fourth quarter. We will expand the use of the IntraLase technology in the coming months, which should help increase average procedure price."

100. On the same day LCA held a conference call with analysts and investors to discuss its 3Q07 results and this time blamed softness in consumer spending, and not marketing efforts, as the culprit behind suspending guidance. The following statements were made by Straus:

**Steve Straus – *LCA Vision – CEO***

\*        \*        \*

While we continue to manage and grow the business, we're not pleased with our procedure volume growth and operating results. In the third quarter of 2007, we performed over 44,500 procedures, which represents a 5% increase over the 42,500 procedures performed in the third quarter of 2006. We opened two new LasikPlus Vision Centers in Fresno, California and Boise, Idaho.

In the first nine months of 2007, we performed over 152,300 procedures, which represents a 6% increase over the 143,200 procedures performed in the first nine months of 2006.  Year-to-date, we have opened 11 new Vision Centers and now operate 70 LasikPlus Vision Centers in 55 markets and 32 states.  We remain on track to open a total of 12 to 15 new Vision Centers this year.

As I mentioned in the news release, our ability to obtain a higher average price per procedure during the third quarter favorably offset weaker same-store procedure volume as we continue to face headwinds due to softness in consumer discretionary spending.  Third quarter marketing spending was up 33% over last year.  The number of appointments generated from our marketing efforts were in-line with our expectations and our marketing expenditures which indicates that there remains a significant amount of appeal to laser vision correction and LasikPlus.  However, a more cautious consumer resulted in slower growth in procedure volume.

*      *      *

While we remain confident in the Company's long-term growth prospects, in the near term we face an uncertain business environment.  Notably, the percentage of preoperative high exams we're able to converge into treated patients has declined and is impacting our ability to accurately forecast conversion rates.  At the same time, macroeconomic trends and consumer sentiment are weakening, which gives us concern in the short term, much like we have heard from many major retailers recently.

As we saw the conversion rate declining, we developed and implemented programs in an attempt to bolster performance.  Unfortunately, given the results we've seen over the past few weeks, we have concluded that this trend is not yet reversing.  Given these trends and uncertainties, we now expect the fourth quarter 2007 earnings per diluted share will be significantly below the $0.27 we reported in fourth quarter of 2006 and we're suspending revenue guidance.

We remain committed to opening a total of 12 to 15 Vision Centers in 2007.  We expect to spend approximately $16.5 million on marketing in the fourth quarter and we will expand the use of IntraLase technology in the coming months.  The possibility exists that the laser vision correction industry could continue to be challenged in 2008.  The American consumer is seeing oil prices rising and the housing market declining, so they are being cautious about spending.  We are confident that we're focused on the right priorities to manage the Company during these challenging times.  We are confident about our future.  LCA-Vision has a strong business model, committed employees and surgeons and a strong balance sheet.  We will continue to manage the Company in a manner that strengthens our brand and contributes to the long-term success for all of our stakeholders.

101.    During the same conference call, when pressed on the issue of suspended guidance,

Buckey blamed the lack of conversion rate from appointment to procedure:

**Anthony Vendetti – *Maxim Group – Analyst***

Okay. In, terms of – because I know when you lowered the revenue guidance last quarter, you lowered the upper end of the range. Is there any reason why this quarter in particular you're just suspending the outlook? Has the visibility shrunk that much? And if so, what do you think your current visibility is in terms of revenues right now?

**Alan Buckey – *LCA-Vision – CFO, EVP of Finance***

It's more uncertain than it has been in the past because of what Steve talked about in terms of the conversion rate from scheduled appointment to treated eye has deteriorated. And we have a pretty aggressive plan for October. The last two weeks are typically the biggest weeks of the year for new appointments and it was softer than we had wanted it to be. So if as we extrapolate that over the balance of the fourth quarter, but we don't know if those metrics have hit bottom yet or not. And we have tremendous resources telling us that in other sectors that the worst may be yet to come in terms of foreclosure rates on homes, credit crunch, adjustable rate mortgages resetting. And so we got to the point of just saying, we're going to be more cautious in the short-term.

102. Additionally on the conference call, defendants began to disclose the true impact the turmoil in the credit market was having on its business and its growing bad debt problems during which the following statements were made:

**Anthony Fendetti – *Maxim Group – Analyst***

You mentioned tightening credit markets. Can you talk about how that's actually impacting the ability of a patient to finance this procedure, and is that impacting the business as well?

**Alan Buckey – *LCA-Vision – CFO, EVP of Finance***

Well, as you are aware, we use a third party to finance a significant percentage of the total procedures, and they recently tightened some of their underwriting criteria on they will approve, and that could happen again.

\* \* \*

**Anthony Petrone – *Maxim Group – Analyst***

And just to go over the credit side of things here, so in terms of GE and what they're financing now, I know you've mentioned earlier that they're tightening a bit there. What percentage of the total volumes I guess during the quarter did they finance?

**Alan Buckey – *LCA-Vision – CFO, EVP of Finance***

Probably around 55.

- 44 -

**Anthony Petrone – *Maxim Group – Analyst***

Now of the difference of what they normally – I think that – I guess it's down from 60, so is LCAV picking up the balance there, or are you actually financing more of these customers yourself?

**Alan Buckey – *LCA-Vision – CFO, EVP of Finance***

We're doing 10 or 11, which is up a little bit from year ago, but it's not up dramatically.

103.    Furthermore, on October 30, 2007, LCA filed its quarterly report with the SEC on

Form 10-Q.  The Company's Form 10-Q again disclosed an increase in bad debt expense.

Direct costs of services increased in the third quarter of 2007 by $4,464,000, or 24%, over the third quarter of 2006. . . .

Bad debt expense increased by $942,000 in the third quarter of 2007, as compared to the third quarter of 2006 for three reasons: (1) a higher percentage of total revenues were financed by us in 2007; (2) the mix of patient financing shifted to a greater use of 36-month financing from 12-month financing, with the longer term receivables being reserved at a higher rate than the shorter term receivables due to increased credit risk; and (3) the reserve rate on 18-month and 36-month receivables was increased as a result of adverse changes to recent collection patterns with these programs.

104.    The market reaction to this news was swift and severe.  On October 30, 2007, the

Company's stock plummeted more than $9.00 per share, from a previous day close of $28.11 to

$19.10, a staggering 32% one day drop, on volume of 6.6 million shares, over 12 times the average

three-month volume.  $180.7 million in market value of the Company's stock had been erased.

105.    Investors were provided additional information through an article published by the

*Associated Press* on October 30, 2007 discussing LCA's dismal performance.  This article stated in

part:

Shares of LCA-Vision, Inc. plummeted to a new 52-week low following a fourth-quarter profit warning, after its chief executive cited disappointing procedure volumes and the weakening economy's effect on consumer sentiment.

The eye-related services provider's stock fell $9.01, or 32.1 percent to close at $19.10 Tuesday, having hit an annual low of $18.77 earlier in the day.  Over the past year, the stock has traded between $26.60 and $50.69.

- 45 -

LCA-Vision, Inc., which offers laser-vision correction services under the LasikPlus brand, predicted earnings will decline significantly in the fourth quarter, citing an uncertain near-term business outlook.  LCA-Vision also suspended its revenue guidance.  Third-quarter earnings doubled but revenue fell short of Wall Street forecasts.

"While we continue to manage and grow the business, we're not pleased with our procedure volume growth and operating results," said Chief Executive Steve Straus in a conference call.

Straus said the percentage of preoperative eye exams the company is able to convert into treated patients has declined, which is hurting LCA-Vision's ability to forecast the number of appointments.  Straus also said the company is concerned by weakening macroeconomic trends and consumer sentiment.

106.    On the same day, *Reuters* reported in part:

LCA-Vision Inc. on Tuesday forecast fourth-quarter profit below market view and suspended its revenue outlook, citing a decline in consumer spending, sending shares tumbling to a two-year low.

The provider of laser-based vision-correction services said it has been struggling with softness in consumer discretionary spending and tightening credit markets, which also hurt the number of procedures performed per outlet.

"It appears that in a tougher consumer cycle . . . marketing yields are declining, (and) near-term EPS visibility is impaired," Raymond James analyst John Ransom said in a research note.

Ransom cut his rating on the stock to "market perform" from "outperform."

For the fourth quarter, the company expects earnings to be significantly below the 27 cents a share it recorded a year ago.  Analysts were expecting 50 cents a share, according to Reuters Estimates.

In its statement, Cincinnati-based LCA said the increase in the number of pre-operative eye exams scheduled during the third quarter was consistent with its 33 percent increase in marketing spending.

However, cautious consumer spending resulted in slower growth in converting those exams into procedure volume, the company said, adding that the decline in quarterly same-store procedure volume was offset by a higher average price per procedure.

Net income in the third quarter nearly doubled to $10 million, or 51 cents a share, while revenue jumped 34 percent to $74.6 million.  Analysts were expecting a profit of 49 cents a share, on revenue of $78 million.

LCA shares dropped as much as 33 percent in intraday trade, and were trading at $19.00 in the afternoon trade on the Nasdaq. The stock has now lost more than 43 percent of its value since the beginning of the year.

107.    On October 30, 2007, William Blair & Company issued a report based on LCA's conference call. The report stated in part:

> Management was cautious on the fourth-quarter outlook and overall consumer environment, in our view, stating several times during the conference call that, perhaps, "the worst has yet to come." More specific, the company has started to see more signs of weakness in its forward bookings (which appear to have plummeted during the last few weeks of October), leading management to take a very cautious stance on its near-term outlook. As part of this caution, management removed all revenue guidance and merely stated that fourth-quarter results will fall significantly below the year-ago period. ***The bottom line is that current visibility at LCA-Vision is extremely low, in our opinion***.

108.    On October 31, 2007, Oppenheimer downgraded its stock rating of LCA to Neutral. The report stated in pertinent part:

> **Summary:** LCA-Vision reported September quarter results. For the second consecutive quarter, same-store procedures declined. This was offest by increasing ASPs such that same-store revenue was roughly flat. Total revenue came in approximately $5mm below consensus estimates. Earnings were in line at $0.51 due to well controlled expenses and a less-than-anticipated tax rate. Citing a difficult macroeconomic environment, fewer patients who attend informational sessions actually booking surgeries, and continued credit concerns, management feels unable to give a revenue forecast for the 4Q and stated times may get more difficult before they get better. Earnings are forecasted below the $0.27 earned in the year-ago quarter. (We were modeling $0.50.) It is noteworthy that $0.22 of this total will come from amortized revenue. On an apples to apples basis, removing all deferrals and amortizations, EPS in 2006 were $2.18. For this year, we now model $1.25, and for next year $1.33. We believe this is a more accurate way to look at earnings than on a GAAP basis where the numbers are $1.34, $1.65, and $1.92 respectively. In light of essentially non-existent Lasik growth in this economic environment, we have changed our rating to Neutral.

109.    On October 31, 2007, the market continued to digest the severity of LCA's previously undisclosed problems. The stock fell by more than 10%, from $19.10 to a close of $17.07. During intraday trading, the stock reached a 52-week low of $16.90 – off from highs of $50.69 during the Class Period.

110.    The full impact of LCA's problems was not absorbed by the market until November 2, 2007.  On that date, Columbine Capital Services, Inc., recommended that investors sell their LCA shares because of the Company's bleak future market performance.  The report concluded that "[t]he Columbine research team projects that LCA-Vision will underperform the market over the next 6 to 12 months.  The team has ranked in Unfavorable and recommends that investors sell it now and replace it with a stock ranked Most Favorable."  By that time, the stock had dropped to a trading-day low of $15.31, off almost 70% from its Class Period high of $50.56.

**Post Class Period Revelations**

111.    On February 11, 2008, LCA announced disastrous fourth quarter and year-end 2007 results, plummeting to a three-year low due to a step decline in fourth quarter profit, a decline in procedural volume and overall concerns regarding the weakening economy.  The Company reported net income and diluted EPS of $32.5 million and $1.64 per share for the full year.  The Company further reported revenue growth of only 11% (based upon originally reported results) and procedural growth of only 4%.

112.    Subsequent to announcing these results, the Company held a conference call with analysts, investors and media representatives during which the following was discussed:

**Erik Chiprick – *BMO Capital Markets – Analyst***

On the patient financing can you talk a little bit about your mix, what you are doing internally versus (inaudible) Credit and then also kind of what you're seeing on bad debt expense as a percent of revenues (inaudible) trends there.

**Alan Buckey – *LCA-Vision, Inc. – EVP of Finance, CFO***

The mixes between [care credit] and ourselves has remained fairly stable. It's still about 50% plus [care credit] and 10 to 12% we're doing ourselves. Our internal mix has shifted over the year to more longer-term paper which has higher reserve rates on it. And we have seen an increase in the default rates, write-off rates this year versus last year in our bad debt portfolio which is isn't inconsistent with what others have seen in the marketplace.

But it's still a good program for us. I think bad debts are right around 2.5% of total revenues today. The reserve rate at December 31 was about 23.2%, which is up

- 48 -

from 17.1% a year ago. But we think we have got receivables conservatively reserved even given the higher rates of default that we have seen lately.

*     *     *

**John Ransom – *Raymond James & Associates – Analyst***

And then just looking at your bad debt expense, I mean if you look at it on a per-procedure basis, it looks like compared to your nine-month average, it's up about $50 per procedure. Is this kind of the new normal in terms of bad debt in your view if we look at it? Is there anything that happened in the fourth quarter in terms of the catch-up reserve or anything that we need to think about going forward?

**Alan Buckey – *LCA-Vision, Inc. – EVP of Finance, CFO***

Well, we did boost some reserve rates in the fourth quarter. I think that we will see. The credit markets could always get worse and put more pressure there. We are also testing selectively raising our downpayment requirements to chop off the bottom part. So we're tightening our credit standards a bit here. And we think that that's probably prudent to do given everything that's going on in the consumer environment. We're going to try to manage that expense but there is some potential that it could remain under pressure.

**John Ransom – *Raymond James & Associates – Analyst***

But you are saying you boosted the reserve, so that's a policy change. This level should at least if the cycle continues this level should at least hold going forward in your mind?

**Alan Buckey – *LCA-Vision –EVP of Finance, CFO***

As long as payment rates don't get worse; correct.

113.    On February 28, 2008, LCA filed its annual report with the SEC on Form 10-K.  In the Company's annual report it disclosed that it had significantly increased its allowance for bad debts for the year to $5.1 million for year-end 2007 up from $2.8 million for year-end 2006.  This increase caused its allowance as a percentage of gross receivables to increase to 22.86% for 2007 up from 16.55% for 2006.  Additionally, the Company disclosed that it had increased its bad debt expense for the fourth quarter by an additional $2.9 million bringing its bad debt expense for 2007 to $7.7 million versus $1.9 million for 2006 due to an increase in uncollectible accounts.

Direct costs of services include the salary component of physician compensation for certain physicians employed by us, staffing, equipment, medical supplies, finance charges and facility costs of operating laser vision correction

centers. These direct costs increased in 2007 by $19,811,000, or 25.5%, compared to 2006. . . . The remaining increase resulted from $5,820,000 of increased bad debt expense partially offset by $340,000 in cost savings at existing centers.

Bad debt expense increased in 2007 as compared to 2006 for three primary reasons: (1) we financed a higher percent of total revenues in 2007; (2) the mix of patient financing shifted to a greater use of 36-month financing from 12-month financing, with the longer term receivables having increased credit risk; and (3) adverse changes in recent collection rates with our patient financing program given the downturn in the U.S. economy. The future value of revenues we finance and our ability to collect on such financings will depend on a number of factors, including the consumer credit environment and our ability to manage credit risk related to consumer debt, bankruptcies and other credit trends. The allowance for doubtful accounts has been increased to appropriately reflect the increase in credit loss exposure.

## LCA'S FALSE FINANCIAL REPORTING PRIOR TO AND DURING THE CLASS PERIOD

114. In order to inflate the price of LCA's stock, defendants caused the Company to falsely report its results for 2006 and the first six months of 2007 through improperly accounting for its bad debts and the revenue associated with the Company's extended warranty plans, which overstated the Company's reported revenue and net income. The Company has restated its previously issued financial results due to its improper accounting for revenue from warranty plans.

115. The results for 2006 and for the first six months of 2007 were included in a Form 10-K, an amended Form 10-K and Form 10-Q's filed with the SEC. The results were also included in press releases disseminated to the public. The SEC filings represented that the financial information presented therein was a fair statement of LCA's financial results and that the results were prepared in accordance with Generally Accepted Accounting Principles ("GAAP").

116. These representations were false and misleading as to the financial information reported, as such financial information was not prepared in conformity with GAAP, nor was the financial information a "fair representation" of LCA's financial condition and operations, causing the financial results to be presented in violation of GAAP and SEC rules.

117.    GAAP are those principles recognized by the accounting profession as the conventions, rules and procedures necessary to define accepted accounting practice at a particular time.  SEC Regulation S-X (17 C.F.R. §210.4-01(a)(1)) states that financial statements filed with the SEC which are not prepared in compliance with GAAP are presumed to be misleading and inaccurate, despite footnote or other disclosure.  Regulation S-X requires that interim financial statements must also comply with GAAP, with the exception that interim financial statements need not include disclosure which would be duplicative of disclosures accompanying annual financial statements.  17 C.F.R. §210.10-01(a).

**LCA's Improper Accounting for Its Bad Debts**

118.    In order to artificially inflate its stock price, LCA overstated its income and assets by failing to provide an adequate reserve for its allowance for doubtful accounts related to its receivables from its patient financing during the Class Period.

119.    In connection with its accounts receivable, a company is required to establish an allowance for doubtful accounts, *i.e.* a reserve for the estimated amount of receivables that a company deems to be uncollectible.  GAAP, as set forth in Financial Accounting Standards Board ("FASB") Statement of Financial Accounting Standard (SFAS) No. 5, ¶¶8, 22-23 states:

> An estimated loss from a loss contingency . . . shall be accrued by a charge to income if **both** of the following conditions are met:

> a.    Information available prior to issuance of the financial statements indicates that it is probable that an asset has been impaired or a liability has been incurred at the date of the financial statements.  It is implicit in this condition that it must be probable that one or more future events will occur confirming the fact of the loss.

> b.    The amount of loss can be reasonably estimated.

*        *        *

> The assets of an enterprise may include receivables that arose from credit sales, loans, or other transactions.  The conditions under which receivables exist usually involve some degree of uncertainty about their collectibility, in which case a

contingency exists as defined in paragraph 1. Losses from uncollectible receivables shall be accrued when both conditions in paragraph 8 are met. Those conditions may be considered in relation to individual receivables or in relation to groups of similar types of receivables. If the conditions are met, accrual shall be made even though the particular receivables that are uncollectible may not be identifiable.

If, based on current information and events, it is probable that the enterprise will be unable to collect all amounts due according to the contractual terms of the receivable, the condition in paragraph 8(a) is met. As used here, ***all amounts due according to the contractual terms*** means that both the contractual interest payments and the contractual principal payments will be collected as scheduled according to the receivable's contractual terms. However, a creditor need not consider an insignificant delay or insignificant shortfall in amount of payments as meeting the condition in paragraph 8(a). Whether the amount of loss can be reasonably estimated (the condition in paragraph 8(b)) will normally depend on, among other things, the experience of the enterprise, information about the ability of individual debtors to pay, and appraisal of the receivables in light of the current economic environment. In the case of an enterprise that has no experience of its own, reference to the experience of other enterprises in the same business may be appropriate. Inability to make a reasonable estimate of the amount of loss from uncollectible receivables (i.e., failure to satisfy the condition in paragraph 8(b)) precludes accrual and may, if there is significant uncertainty as to collection, suggest that the installment method, the cost recovery method, or some other method of revenue recognition be used (see paragraph 12 of APB *Opinion No. 10*, "Omnibus Opinion – 1966"); in addition, the disclosures called for by paragraph 10 of this Statement should be made.

120.  LCA's accounts receivable arise from its direct patient financing. Given the high cost of laser vision corrective surgery coupled with the fact that the surgery is considered elective and is generally not reimbursable by a third-party payer such as by a patient's medical insurance, a significant percentage of LCA's patients finance all or some of the cost of their procedures. Indeed, about 65% of the Company's use some type of financing with the remaining 35% using cash or credit card to pay for their procedures. Thus, financing was crucial to the Company's business and the collectibility of financing a key accounting determination in LCA's financial statements.

121.  The Company offers many of its patients financing options through an unaffiliated third-party finance company, Care Credit which is a subsidiary of GE Capital. Care Credit, which specializes in consumer loans for medical and dental procedures, provides LCA's patients with different payment plan options ranging from twelve to sixty month periods. The Company bears no credit risk for loans provided under this program.

122.    Nonetheless, not all of the Company's patients qualify for third-party financing. Accordingly, the Company began its own patient financing program in May 2002. The patients that the Company finances are patients that have been deemed not credit-worthy by the third-party financing company. The Company charges the patients a minimal up-front fee to cover some or all of its variable costs with the remaining balance to be paid in equal monthly installments under payment plans ranging from twelve to thirty-six months. The Company's thirty-six month payment plan charges an interest rate of 18.9%.

123.    LCA has relied heavily upon providing its patients with financing alternatives in order to help the Company achieve growth in procedure volume. The Company has in fact relied upon patient financing more so than its competitors. Historically, approximately 60% to 65% of the Company's patients have used financing to pay for the procedures compared to 30% to 40% for the industry as a whole making the Company more susceptible to downturns in the credit market. Care Credit has traditionally provided financing for 50% to 60% of the Company's procedures with the Company providing direct financing for 10% to 12% of its procedures.

124.    Many of the clients to which LCA provided financing ultimately did not pay the amount financed. Given these patients had frequently been rejected by Care Credit and generally were poor credit risks, the lack of payment was not surprising. According the GAAP, LCA was required to record a response for the expected amount of receivables which it wouldn't collect. However, during the Class Period, the Company failed to properly reserve for its allowance for doubtful accounts for patients that it provided with direct financing. Since the Company instituted its direct financing program, the Company had continually expanded its role in providing patient financing thus significantly increasing its credit risk including increasing its use during the Class Period. Additionally, during the Class Period, a greater number of the Company's patients using the

direct financing program selected a thirty-six month payment option instead of a twelve month payment plan as they had in the past.  In general, longer-term receivables carry a greater credit risk.

125.    Moreover, earlier in the Class Period, the subprime market began to deteriorate rapidly causing a major tightening in the credit market.  In response, Care Credit tightened its own underwriting criteria.  Accordingly, LCA was forced to finance an even greater amount of its patients under its direct financing program.

126.    As a result of these significant indicators, the Company should been increasing its allowance for bad debts in order to insulate itself from the deteriorating credit market.  Yet, the exact opposite occurred.  While the credit markets were tightening due to the turmoil in the subprime market and the Company's use of its own direct financing to risky customers was increasing, the defendants actually reduced the Company's allowance for doubtful accounts and bad debt expense.

127.    The Company's allowance as a percent of its gross receivables ranged between 21.25% and 22.56% for year-end 2004 and year-end 2005.  The Company began decreasing its allowance in 2006 and by 3Q06 it had dropped to 16.9%.  Thereafter the Company maintained it at this level throughout the Class Period until year-end 2007.  At the end of the Class Period, the Company announced that it had increased its allowance back up to 22.86% - the same level it was at prior to the Company's manipulation.

128.    The Company similarly manipulated its bad debt expense.  For fiscal year 2005, the Company recorded $1.78 million in bad debt expense.  Nonetheless, despite a large 34% increase in revenue year over year (based upon revenue as originally reported), for fiscal year 2006, the Company only slightly increased its bad debt expense to $1.86 million.  At the end of the Class Period, the Company announced that it had increased its bad debt expense for 2007 dramatically to $7.68 million – an increase of over four times the previous year's expense despite the fact that the Company's sales growth had slowed to 14% (based upon revenue as originally reported).

129.    The charts below demonstrate the Company's allowance for bad debts and bad debt expense both prior to and during the Class Period.



**Allowance for Bad Debts as a Percentage of Gross Accounts Receivables**



**Bad Debt Expense as a Percentage of Originally Reported Revenue**



130.    By not providing a proper allowance for its doubtful accounts related to its direct patient financing during the Class Period, LCA's assets and earnings during the Class Period were overstated in violation of GAAP.

**LCA's Restatement Improper Accounting for Its Deferred Revenue**

131.    Both prior to and during the Class Period, LCA overstated its revenue and income by improperly accounting for its deferred revenue from the sale of its lifetime warranties in violation of GAAP.

132.    When accounting for revenue associated with separately priced extended warranties, a company should immediately defer the full amount of the revenue related to the extended warranties and recognize it on a straight-line basis over the contract period unless the company has sufficient historical evidence to indicate that the costs of services are incurred on an other than straight-line basis.  A company must defer all of the revenue associated with the extended warranties which are separately priced.  A contract is separately priced if the customer has the option to purchase it for an

expressly stated amount separate and apart from the price of the product or service. FASB Technical Bulletin 90-1 ("FTB 90-1"), *Accounting for Separately Priced Extended Warranty and Product Maintenance Contracts*, ¶¶ 1-3.

133.    In connection with the Company's laser vision corrective surgery, the base surgical price included a one-year acuity program which covered the cost of post-surgical enhancements in the first year after the surgery. In addition, the Company offered its patients an option to purchase a lifetime acuity program warranty separately priced from the base surgical price. The majority of the Company's patients purchased the lifetime warranty. Both prior to and during the Class Period, LCA failed to properly defer the full amount of the revenue associated with its lifetime acuity program. For a majority of the revenue – approximately 93% of it, LCA recognized the total amount of the revenue it received from the sale of its extended warranties upfront at the time of the sale in clear violation of GAAP.  For a small portion of the revenue – 7%, the Company would defer the revenue and subsequently amortized it back into income. It further improperly recognized 77% of it in the first year and 13% in the second year despite the fact that the extended warranty did not take effect until the second year after the initial surgery given the automatic one-year warranty was included in the base surgical price. This was contrary to FTB 90-1, which requires that the revenue be "recognized in income on a straight-line basis over the contract period except in those circumstances in which sufficient historical evidence indicates that the costs of performing services under the contract are incurred on other than a straight-line basis." FTB 90-1, ¶3.

134.    In a comment letter the Company received on March 9, 2007, the SEC questioned the Company's accounting for its deferred revenue. As a result, the Company was forced to restate its previously issued financial statements. In its restatement, the Company admitted that it failed to properly defer the revenue associated with its lifetime warranties. It restated its financial statements in order to defer and recognize the total amount of revenue from the sale of its extended warranties

to start in the second year after the patient's initial surgery and continue recognizing it over seven years. Given the Company had sufficient historical evidence concerning its basis for incurring costs related to its performing enhancement procedures under its lifetime acuity programs, the Company recognized the deferred revenue on an other than straight line basis.

135. At the time the Company announced its restatement, it further announced that it planned on limiting or eliminating separately priced extended warranties in order to avoid being subject to FTB 90-1. Thereafter, the Company changed its pricing model effective June 15, 2007 and no longer offered separately priced lifetime acuity options and instead included the price of the lifetime warranty in with the base surgical price.

136. The extended warranties were a very high margin item. Accordingly, the failure to properly account for its lifetime warranties caused the Company's net income to be materially overstated. LCA overstated its revenue and net income for 2006 by $18 million or 8% and by $9.9 million or 35%, respectively. The Company further overstated its revenue and net income for 2005 by $15.5 million or 9% and by $8.7 million or 38%, respectively. It overstated its net income prior to 2005 by $8.8 million due to this GAAP violation.

**LCA's Restatement Is an Admission of Falsity**

137. As a result of LCA's improper accounting practices with respect to revenue, it has restated its financial statements for 2006 and for earlier periods. The fact that LCA has restated its financial statements is an admission that:

(a) The financial results originally issued prior to and during the Class Period and its public statements regarding those results were materially false and misleading;

(b) The financial statements reported prior to and during the Class Period were incorrect based on information available to defendants at the time the results were originally reported; and

- 58 -

(c) The financial statements can no longer be relied upon as being accurate.

138. The SEC has reiterated its position regarding restatements:

[T]he Commission often seeks to enter into evidence restated financial statements, and the documentation behind those restatements, in its securities fraud enforcement actions in order, *inter alia, to prove the falsity and materiality of the original financial statements [and] to demonstrate that persons responsible for the original misstatements acted with scienter* . . . .

*In re Sunbeam Sec. Litig.*, No. 98-8258-Civ.-Middlebrooks, Brief of the United States Securities and Exchange Commission as *Amicus Curiae* Regarding Defendants' Motions *In Limine* to Exclude Evidence of the Restatement and Restatement Report at 2 (S.D. Fla. Feb. 22, 2002).

139. The fact that LCA has restated its financial statements is an admission that the financial statements originally issued were false and that the overstatement of its revenue and income was material. Pursuant to GAAP, as set forth in Accounting Principles Board Opinion ("APB") No. 20, the type of restatement announced by LCA was to correct for material errors in its previously issued financial statements. *See* APB No. 20, ¶¶7-13. Moreover, SFAS No. 154, ¶25, *Accounting Changes and Error Corrections*, states: "Any error in the financial statements of a prior period discovered subsequent to their issuance shall be reported as a prior-period adjustment by restating the prior-period financial statements." Thus, GAAP provides that financial statements should be restated in order to correct an error in previously issued financial statements. LCA's possible restatement is due to an error with respect to accounting for inventory. Thus, the restatement would be an admission by LCA that its previously issued financial results and its public statements regarding those results were false.

**LCA's Financial Statements Violated Fundamental Concepts of GAAP**

140. Due to these accounting improprieties, the Company presented its financial results and statements in a manner which violated GAAP, including the following fundamental accounting principles:

- 59 -

(a)     The principle that interim financial reporting should be based upon the same accounting principles and practices used to prepare annual financial statements was violated.  (APB No. 28, ¶10);

(b)     The principle that financial reporting should provide information that is useful to present and potential investors and creditors and other users in making rational investment, credit and similar decisions was violated.  (FASB Statement of Concepts ("FASCON") No. 1, ¶34);

(c)     The principle that financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and effects of transactions, events and circumstances that change resources and claims to those resources was violated.  (*Id*., ¶40);

(d)     The principle that financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to owners (stockholders) for the use of enterprise resources entrusted to it was violated.  To the extent that management offers securities of the enterprise to the public, it voluntarily accepts wider responsibilities for accountability to prospective investors and to the public in general.  (*Id*., ¶50);

(e)     The principle that financial reporting should provide information about an enterprise's financial performance during a period was violated.  Investors and creditors often use information about the past to help in assessing the prospects of an enterprise.  Thus, although investment and credit decisions reflect investors' expectations about future enterprise performance, those expectations are commonly based at least partly on evaluations of past enterprise performance.  (*Id*., ¶42);

(f)     The principle that financial reporting should be reliable in that it represents what it purports to represent was violated.  That information should be reliable, as well as relevant, is a notion that is central to accounting.  (*Id*., ¶¶58-59);

(g)     The principle of completeness, which means that nothing is left out of the information that may be necessary to insure that it validly represents underlying events and conditions was violated.  (*Id.*, ¶79); and

(h)     The principle that conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered was violated.  The best way to avoid injury to investors is to try to ensure that what is reported represents what it purports to represent.  (*Id.*, ¶¶95, 97).

141.    Further, the undisclosed adverse information concealed by defendants during the Class Period is the type of information which, because of SEC regulations, regulations of the national stock exchanges and customary business practice, is expected by investors and securities analysts to be disclosed and is known by corporate officials and their legal and financial advisors to be the type of information which is expected to be and must be disclosed.

### DEFENDANTS CERTIFIED FALSE AND MISLEADING FINANCIAL RESULTS

142.    Straus, Buckey and Joffe knowingly certified the following false and misleading financial statements during the Class Period:

#### SCHEDULE OF CERTIFIED FINANCIAL STATEMENTS

| Financial Statement Filed | Filing Period | Filing Date | Signed/Certified by | |
|---|---|---|---|---|
| | | | CEO | CFO |
| Form 10-Q | 9/30/06 | 10/30/06 | Joffe | Buckey |
| Form 10-K | 12/31/06 | 2/27/07 | Straus | Buckey |
| Form 10-K/A | 12/31/06 | 05/09/07 | Straus | Buckey |
| Form 10-Q | 3/31/07 | 05/10/07 | Straus | Buckey |
| Form 10-Q | 6/30/07 | 7/31/07 | Straus | Buckey |

143.    These financial statements were not in accordance with GAAP and SEC rules. Section 302 of the Sarbanes-Oxley Act and SEC Rules 13a-14(a) and 15d-14(a) of the 1934 Act required Straus and Joffe as CEO and Buckey as CFO to certify to the SEC and investors both the fairness of the financial information in each quarterly and annual report.  Straus, Buckey and Joffe

were required to certify that the financial statements and other financial information included in the reports were fairly presented in all material respects. Straus, Buckey and Joffe also stated that the reports did not contain any untrue statement of material fact or omit to state a material fact. In addition, Straus, Buckey and Joffe stated that LCA has established and maintained disclosure controls and procedures sufficient to ensure that the financial and non-financial information required to be disclosed in SEC reports was recorded, processed, summarized and reported within the specified time periods.

144.     Straus, Buckey and Joffe knowingly certified misleading and inaccurate financial statements that were not in accordance with GAAP and SEC rules. In accordance with §906 of the Sarbanes-Oxley Act and 18 U.S.C. §1350, Straus, Buckey and Joffe were required to certify each periodic report that includes financial statements. Their signed certifications falsely stated that: (i) the report fully complied with the requirements of §13(a) or §15(d) of the 1934 Act; and (ii) the information contained in the report fairly presented, in all material respects, the financial condition and results of operations of LCA.

145.     On the dates noted in the Schedule of Certified Financial Statements at ¶142 above, Straus, Buckey and Joffe signed and filed with the SEC certifications under SEC Rules 13a-14(a)/15d-14(a) of the 1934 Act and §906 of the Sarbanes-Oxley Act attesting to the accuracy and truthfulness of the corresponding Forms 10-K and 10-Q for LCA. At the time Straus, Buckey and Joffe signed these certifications, they knew or recklessly disregarded that they were false for the reasons alleged herein.

## LCA'S VIOLATIONS OF SEC REGULATIONS DUE TO INADEQUATE CONTROLS

146.     Throughout the Class Period, defendants were able to cause the Company to issue materially false and misleading financial statements by means of circumventing and failing to establish and maintain adequate internal accounting controls over financial reporting relating to its

accounting for its revenue. Section 13(b)(2) of the 1934 Act states, in pertinent part, that every reporting company must

> (A)   make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer;

> (B)   devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that –

> \*        \*        \*

> (ii)   transactions are recorded as necessary . . . to permit preparation of financial statements in conformity with [GAAP].

15 U.S.C. §78m(b)(2)(A)-(B).

147.   These provisions require an issuer to employ and supervise reliable personnel, to maintain reasonable assurances that transactions are executed as authorized, to properly record transactions on an issuer's books and, at reasonable intervals, to compare accounting records with physical assets. *SEC v. World-Wide Coin Inv.*, 567 F. Supp. 724, 746 (N.D. Ga. 1983).

148.   Defendants caused LCA to violate §13(b)(2)(A) of the 1934 Act by failing to maintain accurate records. LCA's inaccurate and false records were not isolated or unique instances because they were improperly maintained for multiple reporting periods. Accordingly, LCA violated §13(b)(2)(A) of the 1934 Act.

149.   In addition, defendants caused LCA to violate §13(b)(2)(B) of the 1934 Act by failing to implement procedures reasonably designed to prevent accounting irregularities. LCA failed to ensure that proper review and checks were in place to ensure that it was recording and properly reporting accounting for its revenue. In fact, despite knowing the true dismal state of the Company's lack of adequate controls, defendants regularly issued quarterly financial statements throughout the Class Period without ever disclosing the deficiencies in LCA's internal accounting controls and falsely asserting that its financial statements complied with GAAP.

150.     During the Class Period, defendants caused the Company to make representations that LCA's internal disclosure and accounting controls were designed to be effective and detect and prevent fraud and had been tested and found to be effective.

151.     These representations were false as LCA's disclosure controls and procedures were not effective and the Company's financial statements were not fairly presented in accordance with GAAP.  During the Class Period, LCA violated §13(b)(2)(A) of the 1934 Act by failing to maintain adequate internal controls in order to insure that its financial statements were prepared in conformity with GAAP and that its public filings were accurate.

152.     The Company has now admitted that its disclosure controls and procedures through December 31, 2006 were inadequate.     In the Report of Management on Internal Control over Financial Reporting contained in the Company's restated 10K filed on May 9, 2007, it stated in part:

> As of December 31, 2006, we did not maintain effective internal controls over the Company's accounting for deferred revenues associated with separately priced extended warranties. This control deficiency resulted in an amendment of our Annual Report on Form 10-K for the year ended December 31, 2006, in order to restate the consolidated financial statements for 2006, 2005 and 2004, and each of the quarters in 2006 and 2005. Accordingly, management has concluded that this control deficiency constitutes a material weakness.

153.     LCA's lack of adequate internal controls rendered LCA's Class Period financial reporting inherently unreliable and precluded the Company from preparing financial statements that complied with GAAP.  Nonetheless, throughout the Class Period, the Company regularly issued quarterly and annual financial statements without disclosing the existence of all of the significant and material deficiencies in its internal accounting controls and falsely asserted that its financial statements complied with GAAP.

## INSIDER SALES

154.     While defendants were issuing the fraudulent statements identified herein about LCA's financial results and business, Joffe sold at least 374,000 shares of LCA stock – typically only days after issuing favorable albeit false, statements about the Company – for insider trading

proceeds of $13.2 million. Notwithstanding Joffe's knowledge about the ongoing fraud and his duty as an officer of the Company to disclose adverse material facts before trading in LCA stock, Joffe personally profited from the artificial inflation in LCA's stock price which defendants' fraudulent scheme created.

155.    Defendant Joffe personally sold 374,829 shares of LCA stock for insider trading proceeds of $13.2 million, also benefiting from the artificial inflation in LCA's stock price. Based on defendant Joffe's Form 4's filed with the SEC, as of Joffe's final Class Period trade, he had sold 82.63% of his LCA holdings, at an average share price of $35.28. Joffe's insider trading was not part of any general or specific pre-planned pattern of stock sales, but was timed to profit from the artificial inflation in LCA stock price. Joffe's reported insider trading during the Class Period is detailed below:

**LCA**

| INSIDER | Date | Shares | Price | Proceeds |
|---------|------|--------|-------|----------|
| JOFFE | 11/29/2006 | 340,000 | $34.24-$35.39 | $11,755,820 |
| | 3/6/2007 | 30,000 | $42.00-$42.28 | $1,262,691 |
| | 3/7/2007 | 4,829 | $42.61-$42.62 | $205,798 |
| **Total** | | **374,829** | | **13,224,309** |

## ANNUAL COMPANY BONUSES

156.    During the Class Period defendants were eligible to receive a bonus based on certain performance criteria. The Company's 2006 10-K sets forth the possibility of a bonus and the amount that Joffe and Buckey received in 2006. The annual incentive bonuses are described in the 2006 10-K as follows:

### Annual Incentive Bonuses (Non-Equity Incentive Compensation)

The Company's Executive Cash Bonus Plan establishes performance criteria for the payment of annual bonuses to the Company's executive officers and such other additional employees as may be selected by the Compensation Committee from time to time. Bonus amounts are calculated as a percent of base salary at the end of the year based upon the extent to which threshold, target and maximum performance goals set annually by the Committee are achieved. The 2006 performance measure

was pre-tax income. Based upon 2006 performance, Mr. Joffe and Mr. Buckey were paid bonuses of $128,475 and $115,627, respectively.

Bonus levels for achieving the threshold, target and maximum performance for 2007 are 75%, 100% and 125% of base salary, respectively, for Mr. Straus, with linear interpolation between those percentages. These levels were established in accordance with Mr. Straus' employment agreement, which is described below. For Mr. Buckey, the bonus levels for achieving threshold, target and maximum performance are 20%, 40% and 60% of base salary, respectively. The 2007 performance measure is pre-tax income. The Committee may select one or more additional or different objective performance measures in the future.

### LOSS CAUSATION/ECONOMIC LOSS

157. By misrepresenting LCA's business, the defendants presented a misleading picture of the Company's business and prospects. Thus, instead of truthfully disclosing during the Class Period that LCA's business was not as healthy as represented, LCA falsely reported its 2007 guidance and its financial results including its improper accounting for its accounts receivables and its deferred revenue and it further concealed its growing bad debt problem.

158. These omissions caused and maintained the artificial inflation in LCA's stock price throughout the Class Period and until the truth about demand for its services and its declining business was revealed to the market.

159. Defendants' false and misleading statements had the intended effect and caused LCA's stock to trade at artificially inflated levels throughout the Class Period, reaching as high as $50.56 per share in early July 2007.

160. The truth about LCA's business operations, finances, business metrics and financial prospects began to enter the market with a series of partial disclosures and revelations which were accompanied by denials and continuing misrepresentations by defendants. As a result, the artificial inflation in LCA's stock price did not all come out of the stock at once, rather the artificial price inflation came out over time, in bits, pieces and spurts as the stock continued to trade at artificially inflated levels, albeit at lower prices, through November of 2007.

161. On April 18, 2007, LCA announced that it would be restating its financial results due to the improper accounting for its extended warranties. The announcement caused LCA's stock to decline $1.24 per share to close at $42.71 per share on April 18, 2007 on volume of 1.3 million shares, nearly 3 times the average three-month volume. The stock continued to slide closing down another $1.39 per share the next day. Nonetheless, in connection with the restatement announcement, defendants further announced that they were affirming the Company's 2007 guidance. Thereafter, defendants continued on numerous occasions to reaffirm guidance for 2007 causing the stock to continue to trade at artificially inflated prices.

162. On July 31, 2007, defendants announced disappointing 2Q07 financial results based in part on an increase in bad debt expense and further announced they were lowering Company guidance. As a result of this partial disclosure, LCA's stock declined $7.48 per share to close at $35.51 per share, a one-day decline of 17% on volume of 3.5 million shares, eight times the average three-month volume. The stock continued its decline the next day closing down another $2.11 per share.

163. Then on October 31, 2007, defendants were forced to publicly disclose the extent of its bad debt problems and that it would be suspending guidance, causing its stock to drop $9.01 per share to close at $19.10 per share, a one-day decline of 32% on volume of 6.6 million shares, over 12 times the average three-month volume. Later, as more information came out about LCA's business and prospects and its exposure to the volatile credit market, the Company's stock declined to as low as $15.58 per share on November 2, 2007, 69% below the Class Period high.

164. As a direct result of defendants' admissions and the public revelations regarding the truth about LCA's exposure to bad debt, its profitability and its actual business prospects going forward, LCA's stock price plummeted 69%, falling from $50.56 per share on July 5, 2007 to $15.58 per share on November 2, 2007, a decline of $34.98 per share. This drop removed the inflation from

LCA's stock price, causing real economic loss to investors who had purchased the stock during the Class Period. In sum, as the truth about defendants' fraud and LCA's business performance was revealed, the Company's stock price plummeted, the artificial inflation came out of the stock, and Lead Plaintiff and other members of the Class were damaged.

165. The decline in LCA's stock price was a direct result of the nature and extent of defendants' fraud finally being revealed to investors and the market. The timing and magnitude of LCA's stock price declines negate any inference that the loss suffered by Lead Plaintiff and other Class members was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to the defendants' fraudulent conduct. The economic loss, *i.e.*, damages, suffered by Lead Plaintiff and other members of the Class was a direct result of defendants' fraudulent scheme to artificially inflate LCA's securities prices and the subsequent significant decline in the value of LCA's securities when the truth was revealed.

**APPLICABILITY OF PRESUMPTION OF RELIANCE:
FRAUD-ON-THE-MARKET DOCTRINE**

166. At all relevant times, the market for LCA's securities was an efficient market for the following reasons, among others:

(a) LCA's stock met the requirements for listing, and was listed and actively traded on the NASDAQ, an efficient and automated market;

(b) As a regulated issuer, LCA filed periodic public reports for the SEC and NASDAQ;

(c) LCA regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

- 68 -

(d)  LCA was followed by numerous securities analysts employed by major brokerage firms who wrote reports, which were distributed to the sales force and certain customers of their respective brokerage firms.  Each of those reports was publicly available and entered the public marketplace.

167.  As a result of the foregoing, the market for LCA's securities promptly digested current information regarding LCA from all publicly available sources and reflected such information in LCA's stock price.  Under these circumstances, all purchasers of LCA's securities during the Class Period suffered similar injury through their purchase of LCA securities at artificially inflated prices and a presumption of reliance applies.

## NO SAFE HARBOR EXISTS FOR DEFENDANTS' STATEMENTS

168.  The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Consolidated Complaint.  The specific statements pleaded herein either were not identified as "forward-looking statements" when made or were not accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements were made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of the Company, who knew that those statements were false when made.

## LEAD PLAINTIFF'S CLASS ACTION ALLEGATIONS

169.  Lead Plaintiff brings this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of purchasers of LCA's publicly traded securities during the Class Period who were damaged by defendants' fraud.  Excluded from the

Class are defendants, the officers and directors of the Company, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

170.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, LCA's common stock was actively traded on the NASDAQ.  While the exact numbers of Class members is unknown to Lead Plaintiff at this time and can only be ascertained through appropriate discovery, Lead Plaintiff believes that there are thousands of members in the proposed class.  Record owners and other members of the Class may be identified from records maintained by LCA or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

171.    Lead Plaintiff's claims are typical of the claims of members of the Class as all members of the Class were similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

172.    Lead Plaintiff will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

173.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)    Whether the federal securities laws were violated by defendants' acts as alleged herein;

(b)    Whether statements made by defendants to the investing public during the Class Period misrepresented and omitted material facts about the business, operations and financial results of the Company; and

(c)     To what extent the members of the Class have sustained damages and the proper measure of damages.

174.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## FIRST CLAIM

### Violation of Section 10(b) of the 1934 Act and Rule 10b-5
### Promulgated Thereunder Against All Defendants

175.     Lead Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

176.     During the Class Period, defendants, and each of them, carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (a) deceive the investing public, including Lead Plaintiff and other Class members, as alleged herein; (b) artificially inflate and maintain the market price of LCA's securities; and (c) cause Lead Plaintiff and other members of the Class to purchase LCA's securities at artificially inflated prices and, as a result, suffer economic losses when the truth about defendants' fraud was revealed.  In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

177.     Defendants: (a) employed devices, schemes and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for LCA's securities in violation of §10(b) of the 1934 Act and Rule 10b-5.  All

defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

178.     In addition to the duties of full disclosure imposed on defendants as a result of their making of affirmative statements and reports, or participation in the making of affirmative statements and reports to the investing public, defendants had a duty to promptly disseminate truthful information that would be material to investors in compliance with the integrated disclosure provisions of the SEC as embodied in SEC Regulation S-X, 17 C.F.R. §§210.01, *et seq.*, and Regulation S-K, 17 C.F.R. §§229.10, *et seq.*, and other SEC regulations, including accurate and truthful information with respect to the Company's operations, financial condition, revenue and earnings so that the market price of the Company's securities would be based on truthful, complete and accurate information.

179.     Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations and future prospects of LCA as specified herein.

180.     These defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices and a course of conduct as alleged herein in an effort to assure investors of LCA's value and performance and continued substantial growth.  This included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about LCA's and its business operations and future prospects in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of LCA's securities during the Class Period.

181.    The Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (a) the Individual Defendants were high-level executives and directors at the Company during the Class Period; (b) the Individual Defendants were privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; and (c) the Individual Defendants were aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

182.    Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them.  Such defendants' material misrepresentations and omissions were done knowingly or recklessly and for the purpose and effect of concealing LCA's financial results, operating condition and business prospects from the investing public and supporting the artificially inflated price of its securities.  As demonstrated by defendants' misstatements and omissions regarding the Company's financial results and operations throughout the Class Period, defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

183.    As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of LCA's securities was artificially inflated during the Class Period.  In ignorance of the fact that market prices of LCA's publicly traded securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by defendants, or upon the integrity of the market in which the securities trade and/or on the absence of material adverse information that was known to or recklessly disregarded by defendants but not disclosed in public statements by defendants during the

Class Period, Lead Plaintiff and the other members of the Class acquired LCA securities during the Class Period at artificially inflated prices and were damaged thereby.

184.    At the time of said misrepresentations and omissions, Lead Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true.  Had Lead Plaintiff and the other members of the Class and the marketplace known of the true financial condition and business prospects of LCA, which were not disclosed by defendants, Lead Plaintiff and other members of the Class would not have purchased or otherwise acquired their LCA securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

185.    By virtue of the foregoing, defendants have violated §10(b) of the 1934 Act, and Rule 10b-5 promulgated thereunder.

186.    As a direct and proximate result of defendants' wrongful conduct, Lead Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

**SECOND CLAIM**

**Violation of Section 20(a) of the 1934 Act**
**Against the Individual Defendants and LCA**

187.    Lead Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

188.    The Individual Defendants acted as controlling persons of LCA within the meaning of §20(a) of the 1934 Act as alleged herein.  LCA controlled all of its employees and each of the Individual Defendants.  By virtue of their high-level positions, and their ownership and contractual rights, participation in and awareness of the Company's operations and intimate knowledge of the statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly

or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Lead Plaintiff contends are false and misleading.  The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Lead Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

189.    In particular, the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

190.    As set forth above, LCA and the Individual Defendants each violated §10(b) and Rule 10b-5 by their acts and omissions as alleged in this complaint.  By virtue of their positions as controlling persons, the defendants are liable pursuant to §20(a) of the 1934 Act.  As a direct and proximate result of defendants' wrongful conduct, Lead Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's during the Class Period.

## PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiff prays for relief and judgment, as follows:

A.    Determining that this action is a proper class action, designating Lead Plaintiff as Class representatives under Rule 23 of the Federal Rules of Civil Procedure and Lead Plaintiff's counsel as lead counsel;

B.    Awarding compensatory damages in favor of Lead Plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C. Awarding Lead Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D. Such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Lead Plaintiff demands a trial by jury.

DATED: April 9, 2008

COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP
HENRY ROSEN
X. JAY ALVAREZ

_____
s/ HENRY ROSEN
HENRY ROSEN

655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058
619/231-7423 (fax)
E-mail: henryr@csgrr.com
E-mail: jaya@csgrr.com

Lead Counsel for Lead Plaintiff

STRAUSS & TROY
Richard S. Wayne (0022390)
Thomas P. Glass (0062382)
The Federal Reserve Building
150 E. Fourth Street
Cincinnati, OH 45202-4018
Telephone: 513/621-2120
513/629-9426 (fax)
E-mail: rswayne@strausstroy.com

Liaison Counsel

LAW OFFICES OF ALFRED G.
  YATES, JR., P.C.
ALFRED G. YATES, JR.,
519 Allegheny Building
429 Forbes Avenue
Pittsburgh, PA  15219
Telephone:  412/391-5164
412/471-1033 (fax)
E-mail:  yateslaw@aol.com

Additional Counsel for Lead Plaintiff

S:\CasesSD\LCA-Vision\cpt_consolidated00050347.doc

CERTIFICATE OF SERVICE

I hereby certify that on April 9, 2008, I electronically filed the foregoing with the Clerk of the

Court using the CM/ECF system which will send notification of such filing to the e-mail addresses

denoted on the attached Electronic Mail Notice List, and I hereby certify that I have mailed the

foregoing document or paper via the United States Postal Service to the non-CM/ECF participants

indicated on the attached Manual Notice List.

I certify under penalty of perjury under the laws of the United States of America that the

foregoing is true and correct.  Executed on April 9, 2008.


  s/ HENRY ROSEN
  HENRY ROSEN

  COUGHLIN STOIA GELLER
      RUDMAN & ROBBINS LLP
  655 West Broadway, Suite 1900
  San Diego, CA  92101-3301
  Telephone:  619/231-1058
  619/231-7423 (fax)

  E-mail:henryr@csgrr.com

# Mailing Information for a Case 1:07-cv-00750-SJD

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Xavier Jay Alvarez**
  jaya@csgrr.com

- **Matthew Roberts Chasar**
  mrchasar@strausstroy.com,lmschutte@strausstroy.com

- **Grant Spencer Cowan**
  gcowan@fbtlaw.com

- **Jason D. Frank**
  jason.frank@bingham.com

- **Thomas P Glass**
  tpglass@strausstroy.com,dkhilling@strausstroy.com

- **Jordan D Hershman**
  jordan.hershman@bingham.com

- **Maureen Mueller**
  mmueller@csgrr.com

- **Henry Rosen**
  henryr@csgrr.com

- **Jason Watkins**
  jason.watkins@bingham.com,stephanie.corley@bingham.com,sarah.kim@bingham.com

- **Richard Stuart Wayne**
  rswayne@strausstroy.com,acjansen@strausstroy.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)