IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| **BEAVER COUNTY RETIREMENT BD.,** | : | Case No. 1:07-CV-750 |
| | : | |
| Plaintiff, | : | Chief Judge Susan J. Dlott |
| | : | |
| v. | : | ORDER GRANTING IN PART AND |
| | : | DENYING IN PART MOTION TO |
| **LCA-VISION INC., et al.,** | : | STRIKE AND GRANTING MOTION |
| | : | TO DISMISS |
| Defendants. | : | |
| | : | |
| | : | |

This matter is before the Court on two motions: the motion to dismiss of Defendants

LCA-Vision, Inc. ("LCA" or the "Company"), Steven E. Straus, Alan H. Buckey, and Craig P.R.

Joffe (doc. 31), and the motion to strike of Lead Plaintiff Beaver County Retirement Board (doc.

39). The Court heard oral argument from counsel on both motions on March 3, 2009. For the

following reasons, Plaintiff's motion to strike is GRANTED IN PART and DENIED IN PART

and Defendants' motion to dismiss is GRANTED.

## I. BACKGROUND

Lead Plaintiff Beaver County Retirement Board seeks to represent itself and a putative

class of all those who purchased or otherwise acquired the publicly traded securities of LCA

between October 24, 2006 and November 2, 2007 (the "Class Period"). LCA provides laser

vision correction services under the LasikPlus brand. LCA owns and operates seventy-six

LasikPlus fixed-site laser vision correction centers in the United States and a joint venture in

Canada. Defendant Straus served as LCA's chief executive officer ("CEO") and was director of

the Company during the Class Period. Defendant Buckey was LCA's executive vice president

("EVP") of finance and chief financial officer ("CFO") during the Class Period. Defendant Joffe was a director, chief operating officer ("COO"), and general counsel of LCA during the Class Period and served as interim CEO until November 2006.

Plaintiff's seventy-six page, 190-paragraph amended consolidated complaint (the "Complaint"), filed on April 9, 2008, asserts that LCA and Messrs. Straus, Buckey, and Joffe violated §§ 10(b) and 20(a) of the Securities Exchange Act of 1934 and Rule 10b-5 promulgated by the Securities and Exchange Commission ("SEC").[1] Plaintiff claims that Defendants made repeated false and misleading guidance projections and engaged in false financial reporting throughout the Class Period—specifically, that they assured the investing community that the health of the business was strong, that revenue growth would be 20-25%, and that the Company would continue to capture market share from its key competitor. According to Plaintiff, Defendants knew otherwise because their internal computerized tracking system, known as Mozart, showed that business was declining in early 2007 and continued to do so until October 2007 when the Company reported "disastrous" third quarter 2007 results and suspended its 2007 guidance. Plaintiff claims that the class members in this action lost hundreds of millions of dollars as the LCA stock collapsed from a high of $50.69 per share to a low of $15.58 during the Class Period.

LCA's key competitor is TLC Vision Corporation ("TLC"). During the summer of 2007, LCA made presentations at various conferences during which it displayed a graphic indicating that since the first quarter of 2003, TLC's market share had been dropping while LCA's had been increasing until each company had 13% market share in the second quarter of 2007.

---

[1] Plaintiff's amended consolidated complaint was filed as CM/ECF Doc. 21.

Beginning in 2005 and through November 2007, as TLC's market share shrank, its stock price stayed relatively flat or decreased. During that same time period, LCA's stock price increased dramatically until the end of the Class Period, when the stock price dropped sharply. According to Plaintiff, to prevent LCA's stock price from falling like TLC's, Defendants throughout the fall of 2006 and the first three quarters of 2007 engaged in a scheme to convince its investors that its business was not suffering the same adverse trends as TLC.

Plaintiff alleges that during that period, LCA issued 2007 earnings per share ("EPS") guidance projections of $2.05 to $2.15 with revenue growth between 20-25%, all the while knowing that this guidance was impossible to meet based on data it had showing volume of appointments, scheduled procedures, and cost of treatment. This data, according to Plaintiff, would have shown that in early 2007, consumer demand for the lasik procedure had decreased, and by summer 2007, the Company's business prospects had dropped off dramatically.

Plaintiff claims that in addition to issuing false guidance, Defendants engaged in false financial reporting during the Class Period. Specifically, Plaintiff alleges that Defendants did not establish an appropriate allowance for doubtful accounts, causing its assets and income to be overstated. Generally Accepted Accounting Principles ("GAAP") require a company to establish an allowance for doubtful accounts, in this case, receivables from patients who financed their laser vision correction procedure. Just prior to the Class Period, LCA expanded its direct financing program to patients who did not qualify for third-party financing. This, according to Plaintiff, increased LCA's bad debt exposure, but LCA failed to increase its allowance for bad debts during the Class Period. To the contrary, LCA *decreased* its allowance for doubtful accounts from 22.56% at the end of 2005 to 16.9% by the third quarter of 2006, a

level it maintained until the end of 2007. LCA allegedly should have increased its doubtful account allowance during this time because more patients participating in direct financing were choosing 36-month repayment terms as opposed to 12-month terms, and longer term receivables carry greater risk. Furthermore, Plaintiff alleges that because LCA was lending to patients who did not qualify for third-party financing, LCA knew that some of the patients would never pay the amount financed. Plaintiff claims that LCA's improper accounting wrongfully concealed these bad debts until the second and third quarters of 2007.

Finally, Plaintiff alleges that Defendants caused the Company to falsely report its revenue for year-end 2006 by failing to defer revenue associated with the sale of its lifetime warranties and instead recognizing the majority of the revenue immediately. Plaintiff states that when accounting for revenue associated with separately priced extended warranties, a company should immediately defer the full amount of the revenue related to the warranties and recognize it on a straight-line basis over the contract period unless the company has sufficient historical evidence to indicate that the costs of services are incurred on other than straight-line basis. However, during the Class Period, LCA failed to defer the full amount of the revenue associated with its lifetime warranties, instead recognizing the majority of the revenue at the time of the sale—a practice that allegedly violated GAAP. In April 2007, LCA announced that it would have to restate its previously issued financial results due to this improper accounting. LCA filed with the SEC an amended 2006 annual report on Form 10-K/A on May 8, 2007. In this revised report, LCA recognized the deferred revenue from the sale of its extended warranties over seven years. Plaintiff alleges that LCA's failure to properly account for its lifetime warranties caused the Company's net income to be materially overstated and that LCA overstated its revenue and

net income for 2006 by $18 million or 8% and by $9.9 million or 35%, respectively, due to this GAAP violation. Plaintiff also accuses LCA of violating SEC regulations by failing to maintain adequate internal accounting controls over financial reporting. Plaintiff asserts that LCA admitted the inadequacy of its disclosure controls and procedures in its restated 10-K filed on May 9, 2007.[2]

The sunny outlook projected by LCA in 2006 began to darken following LCA's restatement of its 2006 financial results. On July 31, 2007, LCA issued a press release reporting disappointing second quarter 2007 financial results and lowering 2007 guidance to $1.90 to $2.00 EPS, down from the previous guidance of $2.05 to $2.15 EPS. Plaintiff alleges that "LCA blamed the revised guidance on internal Company issues of under spent marketing and not market conditions, including softness of consumer spending." (Compl. ¶ 82.) Following the announcement of these results, LCA's stock fell 22% over two days.

In August and September 2007, LCA affirmed its revised 2007 guidance of an earnings per share ("EPS") of $1.90 to $2.00. However, on October 30, 2007, LCA announced disappointing third quarter results and suspended revenue guidance indefinitely. The Company's press release quoted Mr. Straus: "[W]e continue to face headwinds due to softness in consumer discretionary spending and tightening credit markets." (*Id.* ¶ 99.) On a conference call with investors that day, Mr. Straus noted that LCA had increased marketing spending but that the

---

[2] The Report of Management on Internal Control over Financial Reporting contained in the Company's restated 10-K stated that "[a]s of December 31, 2006, we did not maintain effective internal controls over the Company's accounting for deferred revenues associated with separately priced extended warranties. This control deficiency resulted in an amendment of our Annual Report on Form 10-K for the year ended December 31, 2006. . . . Accordingly, management has concluded that this control deficiency constitutes a material weakness." (Compl. ¶ 152.)

percentage of preoperative exams converted into treated patients had declined in conjunction with macroeconomic trends and weakening consumer sentiment: "The American consumer is seeing oil prices rising and the housing market declining, so they are being cautions about spending." (*Id.* ¶ 100.)  Mr. Buckey, LCA's CFO and EVP of finance, stated on the same conference call that the third party LCA relied on to finance a significant percentage of procedures had recently tightened its underwriting criteria, and LCA's third-quarter 2006 Form 10-Q disclosed an increase in bad debt expense.  The result of this news was a 32% one-day drop in LCA's stock price, from a previous day close of $28.11 to $10.10.  Then, in February 2008, LCA announced "disastrous" fourth quarter and year-end 2007 results, an EPS of $1.64 (as opposed to the $2.05 to $2.15 projected) and 2007 revenue growth of only 11% (as opposed to the 20-25% projected).

Plaintiff highlights Mr. Joffe's insider trading during the Class Period, alleging that notwithstanding his knowledge about the ongoing fraud and his duty to disclose adverse material facts before trading in LCA stock, Mr. Joffe personally profited from the artificial inflation in LCA's stock price.  Mr. Joffe allegedly sold 82.63% of his LCA holdings resulting in proceeds of $13,224,309 during the Class Period.

To summarize, Plaintiff alleges that Defendants made materially false and misleading statements and omissions during the Class Period concerning (1) LCA's 2007 EPS guidance projection and revenue growth, which were being impacted by weakness in consumer spending; (2) its growing bad debt exposure; and (3) its year-end 2006 financial results, which should have deferred revenue associated with the sale of lifetime warranties.  Plaintiff claims that investors did not learn the truth concerning the Company's business and prospects until October 30, 2007

when the Company issued a press release admitting that it was unable to predict its fourth quarter EPS and that it was suspending financial guidance indefinitely. By means of their fraudulent conduct, alleges Plaintiff, Defendants deceived the investing public regarding LCA's prospects and business, artificially inflated the price of LCA's common stock, and caused Plaintiff and other putative class members to purchase LCA common stock at inflated prices.

## II. LEGAL STANDARD

Federal Civil Rule 12(b)(6) authorizes dismissal of a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). In reviewing a motion to dismiss, a court "must read all well-pleaded allegations of the complaint as true." *Weiner v. Klais and Co., Inc.*, 108 F.3d 86, 88 (6th Cir. 1997) (citing *Bower v. Federal Express Corp.*, 96 F.3d 200, 203 (6th Cir. 1996)). In addition, a court must construe all allegations in the light most favorable to the plaintiff. *Bower*, 96 F.3d at 203 (citing *Sinay v. Lamson & Sessions*, 948 F.2d 1037, 1039 (6th Cir. 1991)).

In the aftermath of the Supreme Court's decision in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 127 S. Ct. 1955 (2007), the Sixth Circuit has explained that a plaintiff's allegations, while "assumed to be true, must do more than create speculation or suspicion of a legally cognizable cause of action; they must show entitlement to relief." *League of United Latin Am. Citizens v. Bredesen*, 500 F.3d 523, 527 (6th Cir. 2007). Moreover, the plaintiffs' "obligation to provide the 'grounds' of their entitlement to relief requires more than labels and conclusions or a formulaic recitation of the elements of the cause of action." *Id*. "To state a valid claim, a complaint must contain either direct or inferential allegations respecting all the material elements to sustain recovery under some viable legal theory." *Id*.

In deciding a motion to dismiss, a court ordinarily must look to the four corners of the complaint. However, if documents are attached to, incorporated by, or specifically referred to in the complaint, they are considered part of the complaint and a court may consider them. *See Weiner v. Klais & Co., Inc.*, 108 F.3d 86, 89 (6th Cir. 1997). A court also may consider matters outside the complaint if such materials are integral to the complaint, are public records, or are otherwise appropriate for the taking of judicial notice. *Wyser-Pratte Mgmt. Co., Inc. v. Telxon Corp.*, 413 F.3d 553, 560 (6th Cir. 2005). The determination of whether a document is "integral" to the complaint is within the court's discretion and is guided by the judicial notice standards of Federal Rule of Evidence 201. *In re Cardinal Health, Inc., Sec. Litig.*, 426 F. Supp. 2d 688, 712 (S.D. Ohio 2006). A judicially noticed fact "must be one not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201.

In ruling on a motion to dismiss in a securities fraud action, "courts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference and matters of which a court may take judicial notice." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 127 S. Ct. 2499, 2509 (2007). Courts may take judicial notice of information that was publicly available to reasonable investors at the time the defendant made the allegedly false statements. *In re UnumProvident Corp. Sec. Litig.*, 396 F. Supp. 2d 858, 876 (E.D. Tenn. 2005) (citing *Philips v. LCI Int'l, Inc.*, 190 F.3d 609, 617 (4th Cir. 1999)). This includes "the full text of the SEC filings, prospectus, analysts' reports and statements 'integral to

the complaint.'" *Bovee v. Coopers & Lybrand C.P.A.*, 272 F.3d 356, 360 (6th Cir. 2001); *see also In re FirstEnergy Corp. Sec. Litig.*, 316 F. Supp. 2d 581, 591 (N.D. Ohio) (same). However, the Court may take judicial notice of these documents only to the extent that their "existence or contents prove facts whose accuracy cannot be reasonably questioned." *Passa v. City of Columbus*, 123 F. App'x 694, 697 (6th Cir. 2005).

## III.  ANALYSIS

### A.  Plaintiff's Motion to Strike

Plaintiff did not attach exhibits to its Complaint.  However, it referenced, quoted, or duplicated numerous documents or charts in the pleading, including the following: charts of LCA's market share and stock price; 10-Q and 10-K SEC filings from third quarter of 2006 through the second quarter of 2007; LCA's amended 2006 10-K; LCA press releases concerning third quarter, fourth quarter, and fiscal year 2006 as well as first and second quarter 2007 financial results; and William Blair & Company and other stock rating reports.

Defendants attached copies of many of these documents, along with numerous other exhibits, to their motion to dismiss.  Plaintiff moves to strike fifteen of these exhibits: appendixes 1, 19-20, 36-38, and 41-49.[3]  Plaintiff argues that these documents should be stricken because they are not referenced in the Complaint, are not integral to the Complaint, and are not worthy of judicial notice.  Defendants respond that the challenged documents, which consist of LCA's historical stock prices, the Conference Board's Consumer Confidence Index from 2000-2007, analyst reports, and newspaper and magazine articles containing information concerning LCA and consumer confidence, are integral to or are referenced in the Complaint or consist of

---

[3]  Documents submitted in support of Defendants' motion to dismiss are filed as CM/ECF Doc. 32.

public information of which the Court may take judicial notice. As a preliminary matter, the Court finds that the challenged documents are not referred to in the Complaint; therefore, the Court will strike them unless they are integral to the complaint, are public records, or are otherwise appropriate for the taking of judicial notice.

## 1. Historical Stock Prices (App. 49)

Plaintiff moves to strike the appendix consisting of LCA's historical stock prices from January 2006 through November 2007 on grounds that it was not attached to the Complaint and is not integral to the Complaint. This argument is without merit. Plaintiff's Complaint is grounded on allegations that Defendants' wrongful conduct artificially inflated LCA's stock price and that Plaintiff was injured when the stock price collapsed. Plaintiff also refers to LCA's stock prices in describing Joffe's alleged insider trading. Accordingly, LCA's historical stock prices are integral to the Complaint. In addition to being integral to Plaintiff's Complaint, LCA's historical stock prices are otherwise proper for judicial notice because they are well publicized and can be independently verified. A court "may take judicial notice of well-publicized stock prices without converting the motion to dismiss into a motion for summary judgment," and the Court will do so here. *In re Keithley Instruments, Inc. Sec. Litig.*, 268 F. Supp. 2d 887, 896 n.6 (N.D. Ohio 2002). Plaintiff's motion to strike Appendix 49 is DENIED.

## 2. Conference Board's Indexes (Apps. 1 and 45)

Appendix 1 to Defendants' motion is a graph representing the Conference Board's Consumer Confidence Index from January 2000 through April 2008. The graph shows that consumer confidence was relatively flat, approximately between 100 and 110,[4] from January

---

[4] The Consumer Confidence Index is benchmarked to the year 1985, which was neither a peak nor a trough for consumer confidence. Thus, 1985=100 on the Index.

2006 until July 2007, at which time consumer confidence began a rapid drop.  Appendix 45 is

the Conference Board's U.S. Leading Economic Indicators and related Composite Indexes for

August 2007.  That document shows that in August 2007, the index of leading economic

indicators fell, with the largest negative contributor being the index of consumer expectations.

Defendants rely on these indexes to support their argument that LCA's disappointing

third quarter 2007 results were consistent with the decline in consumer confidence.  Plaintiff

moves to strike the documents on grounds that they are being offered to raise a disputed issue of

fact, namely, that LCA's stock price dropped because the economy was facing a downturn, not

because of LCA's alleged fraud.  Plaintiff observes that while the Court may have the authority

to consider the text of publicly available documents such as the Indexes, the contents of these

documents may not be considered to resolve factual issues in dispute on a motion to dismiss.

(Doc. 57 at 6 (citing *FirstEnergy*, 316 F. Supp. 2d at 592; *Cardinal Health*, 426 F. Supp. 2d at

714; *Passa v. City of Columbus*, 123 F. App'x 694, 697 (6th Cir. 2005)).

The Court's review of case law guides it to conclude that the Consumer Confidence

Index and Leading Economic Indicators are appropriate for judicial notice in this case.  In *Passa*,

the Sixth Circuit Court of Appeals considered whether the district court had properly relied upon

a description of a city-run program that was posted on the city's website.  The court observed

that all circuits to consider the issue have held that a court may take judicial notice of at least

some public records when ruling on a 12(b)(6) motion.  123 F. App'x at 697.  It went on to

observe that "the majority of these courts, however, have held that the use of such documents is

proper only for the fact of the documents' existence, and not for the truth of the matters asserted

therein."  *Id*.  The court stopped short of adopting this holding, instead focusing on the rule that

"a court may only take judicial notice of a public record whose existence or contents prove facts whose accuracy cannot reasonably be questioned" and concluding that "a court, on a motion to dismiss, must only take judicial notice of facts which are not subject to reasonable dispute." *Id.*

Applying *Passa* to this case, the indexes are appropriate for judicial notice. The indexes are objective and oft-relied on tools for investors, and Plaintiff does not dispute the accuracy or authenticity of the documents or their contents. Contrary to Plaintiff's suggestion, the indexes themselves do not purport to answer the question of what made LCA's stock price drop–the disputed fact in this case. In taking notice of these indexes, however, the Court will draw all inferences in Plaintiffs' favor as it must at this stage of the litigation. *FirstEnergy Corp.*, 316 F. Supp. 2d at 592. Plaintiff's motion to strike Appendixes 1 and 45 is DENIED.

### 3. *News Releases Regarding LCA CEO (Apps. 19-20)*

Appendixes 19 and 20 are LCA news releases. The first, dated February 3, 2006, announces the appointment of Craig Joffe as Interim CEO; the second, dated November 2, 2006, announces the appointment of Steven Strauss as CEO. Defendants rely on these press releases to demonstrate that Mr. Joffe's stock sales, which Plaintiff argues gives rise to an inference of scienter, were rather prompted by his change in status with LCA. (Doc. 32-2 at 34.) Plaintiff argues that these press releases should be stricken from the record because Defendants submitted them to refute the Complaint's factual allegations regarding Mr. Joffe's allegedly improper stock sales.

The Court finds that the news releases are appropriate for judicial notice. The contents of the press releases at issue are capable of accurate and ready determination by resort to sources whose accuracy cannot be reasonably questioned. Press releases also are self-authenticating

under evidentiary rule 902(6). *In re UnumProvident*, 396 F. Supp. 2d at 876 (citing *Woolsey v. Nat'l Transp. Safety Bd.*, 993 F.2d 516, 520-21 (5th Cir. 1993)). Furthermore, the exhibits do not refute the Complaint's factual allegations: the press releases state the date on which Mr. Joffe was named interim CEO and the date on which Mr. Straus was named CEO–two facts that the Complaint does not dispute. Plaintiff's motion to strike Appendixes 19 and 20 is DENIED.

### 4. Industry Analyst Reports (Apps. 36-38)

Appendixes 36 through 38 are copies of *Market Scope, Ophthalmic Market Perspectives*, reports of independent industry analysts following the ophthalmic market. Plaintiff argues that these reports should be stricken because they are not relied upon in the Complaint, are biased, and are proffered for the truth of the matters asserted. Defendants respond that the Court may take judicial notice of analyst reports to establish "whether and when certain information was provided to the market." (Doc. 54 at 11, quoting *In re PetSmart Inc. Sec. Litig.*, 61 F. Supp. 2d 1106, 1116 n.10 (C.D. Cal. 2003)). Defendants noted at oral argument that they are not submitting the reports for their truth but rather to establish a context for Defendants' alleged statements made during the Class Period. Indeed, the conclusion reached by the analysts in the May 9, 2007 *Market Scope* report–that consumer demand for lasik would remain strong through 2007–turned out to be entirely wrong.

The evidence before the Court does not make it clear whether these industry reports were publicly available to reasonable investors at the time the Defendant made the allegedly fraudulent statements or omissions. Also, Plaintiff's assertion that the reports are biased leads the Court to conclude that the facts set forth therein may be subject to reasonable dispute. For

these reasons, the Court finds that the *MarketScope* reports are not appropriate for judicial notice. Plaintiff's motion to strike Appendixes 36 through 38 is GRANTED.

**5. *Newspaper and Magazine Articles (Apps. 41-44, 46-48.)***

Defendants provide the Court with articles from *Fortune Small Business*, *Business Week*, *The Wall Street Journal*, and *The New York Times* which concern LCA and consumer confidence during the Class Period. In particular, these articles discuss the positive economic outlook in early 2007, the declining economic indicators and consumer confidence in the fall of 2007, and the connection between poor consumer confidence and the decreased demand for lasik vision correction surgery. Defendants urge the Court to take judicial notice of these documents because they reflect market phenomena and place into context the challenged statements of the Defendants. Plaintiff argues that Defendants rely on these articles to rebut the Complaint's allegation that LCA's stock dropped because of the Defendants' fraud.

The Court cannot conclude that these articles, albeit relevant to Plaintiff's claims, are integral to the Complaint. Further, to the extent the articles refer to independently verifiable data, such as consumer confidence levels, they are redundant because the Court has already taken judicial notice of the consumer confidence and other economic indicator indexes for the relevant time period. Accordingly, Plaintiff's motion to strike Appendixes 41 through 44 and 46 through 48 is GRANTED.

**B. Defendants' Motion to Dismiss**

**1. *Section 10(b)[5] and Rule 10b-5[6] Claims***

---

[5] Section 10 of the Securities Exchange Act provides:
>    It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange . . .

### a.  Elements and Pleading Standard

Section 10(b) of the Securities Exchange Act and Rule 10b-5 promulgated thereunder prohibit "[f]raudulent, material misstatements or omissions in connection with the sale or purchase of a security."  *Cardinal Health*, 426 F. Supp. 2d at 715 (citing *PR Diamonds, Inc. v. Chandler*, 91 F. App'x 418, 426 (6th Cir. 2004)).  To state a claim under Section 10(b) or under SEC Rule 10b-5, a plaintiff must allege: "(1) a misrepresentation or omission; (2) of a material fact that the defendant had a duty to disclose; (3) made with scienter; (4) justifiably relied on by plaintiffs; and (5) proximately causing them injury."  *Ley v. Visteon Corp.*, 543 F.3d 801, 806 (6th Cir. 2008) (quoting *City of Monroe Employees Ret. Sys. v. Bridgestone Corp.*, 399 F.3d 651, 668 (6th Cir. 2005)).  "A statement is said to be "actionable" when it satisfies the first two of

---

> (b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, or any securities-based swap agreement (as defined in section 206B of the Gramm-Leach-Bliley Act), any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j.

> [6] Rule 10b-5 provides:
> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
> (a) To employ any device, scheme, or artifice to defraud,
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.

these requirements, *i.e.*, it is a misrepresentation or omission of a material fact that the defendant had a duty to disclose." *Id.*

Federal Civil Rule 9(b) requires that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). Rule 9's heightened pleading requirements originally were meant to curb vexatious litigation under Rule 10b-5. *Cardinal Health*, 426 F. Supp. 2d at 716 (citing *In re Comshare Inc. Sec. Litig*, 183 F.3d 542, 548 (6th Cir. 1999)). However, concluding that Rule 9 had not prevented the abuse of securities law by private litigants, Congress enacted the Private Securities Litigation Reform Act of 1995 (the "PSLRA"). *Id.*; *see also Tellabs*, 127 S. Ct. at 2504 (discussing the PSLRA's "exacting" pleading requirements). The PSLRA states, in relevant part:

> In any private action arising under this chapter in which the plaintiff alleges that the defendant--
>
> (A) made an untrue statement of a material fact; or
>
> (B) omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances in which they were made, not misleading;
>
> *the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading*, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.
>
> . . .
>
> In any private action arising under this chapter in which the plaintiff may recover money damages only on proof that the defendant acted with a particular state of mind, *the complaint shall*, with respect to each act or omission alleged to violate this chapter, *state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.*

15 U.S.C. § 78u-4(b)(1) and (2) (emphasis added).  Accordingly, in addition to having to plead

fraud with particularity as required by Rule 9, a private securities complainant must (1) "specify

each statement alleged to have been misleading [and] the reason or reasons why the statement is

misleading" and (2) "state with particularity facts giving rise to a strong inference that the

defendant acted with the required state of mind."  *Tellabs*, 127 S. Ct. at 2508.

**b.  Misleading Statements**

Plaintiff's allegations of Defendants' misconduct can be divided into two general

categories: false guidance and false financial reporting.  The Court must ascertain whether the

Complaint adequately specifies each misleading statement and the reasons why the statements

are misleading.[7]

Plaintiff cites the following as the sources of Defendants' allegedly false and misleading

statements and omissions: (1) LCA's 3Q06[8] financial results and Form 10-Q ; (2) LCA's 4Q06

and FY06 financial results and corollary investor conference call; (3) an April 18, 2007 press

release and investor conference call announcing that LCA would restate financial results for

2004, 2005 and 2006; (4) a May 9, 2007 amended annual report for year end 2006 ("Form 10-

K/A"); (5) LCA's 1Q07 financial results and corollary investor conference call; (6) a May 23,

---

[7]  Plaintiff asserts that the Court must take all allegations together as a whole in
evaluating the motion to dismiss, citing *Tellabs*, 127 S. Ct. at 2511 ("the court's job is not to
scrutinize each allegation in isolation but to assess all the allegations holistically.")  The *Tellabs*
quote on which Plaintiff relies pertains to the scienter prong of the PSLRA requirements, not the
misleading statements prong.  *Id.*  While the Court must not scrutinize individual allegations in
isolation in determining whether Plaintiff has adequately alleged scienter, it must–as a
preliminary matter–determine whether the Complaint sufficiently specifies LCA's alleged
misleading statements and the reasons why the statements are misleading.  *Id.* at 2508.

[8]  Third quarter 2006 will be abbreviated as 3Q06.  Other financial periods will be
abbreviated in like manner for brevity's sake.

2007 conference during which LCA affirmed its 2007 EPS guidance; (7) a June 6, 2007 conference during which LCA confirmed EPS guidance; (8) a June 21, 2007 conference during which LCA confirmed EPS guidance; (9) a June 26, 2007 conference during which LCA confirmed financial guidance; (10) LCA's 2Q07 financial results and corollary investor conference call, during which the Company lowered 2007 guidance; (11) an August 2007 investor presentation during which LCA confirmed the revised guidance; and (12) a September 20, 2007 presentation during which Buckey confirmed the revised guidance.

Plaintiff alleges that these statements were materially false and misleading because Defendants failed to disclose the following:[9] (1) that LCA had a bad debt problem related to patient financing; (2) that LCA failed to properly account for deferred revenue related to extended warranties; (3) that LCA would have to tighten its credit standards due to deterioration in the subprime market; (4) that much of LCA's purported growth was driven by the easy credit LCA granted to customers; (5) that the Company's revenues were driven almost entirely by the number of procedures performed in its vision centers during the first quarter of each year; (6) that the Company's existing stores were not showing growth and any overall growth was being derived from new store openings; and (7) that Defendants could see from their analysis of the Mozart data tracking system that demand for the lasik procedure was not as strong as represented to the public.

*I. False Guidance*

Plaintiff alleges that Defendant's statements regarding business prospects and guidance for 2007 made during the Class Period were materially false and misleading because they

---

[9] The Court has consolidated the repetitive or redundant allegations of paragraphs 45, 53, 63, 81, and 97 of the Complaint.

omitted material facts necessary in order to make the statements not misleading. *See* 15 U.S.C. § 78u-4(b)(1)(B). According to Plaintiff, Defendants confirmed 2007 guidance numerous times even though they knew the guidance was impossible to meet. When the Company ultimately revised its 2007 guidance on July 31, 2007, Plaintiff claims that it continued to try to conceal "the true cause for the revision—the definite weakness in consumer spending." (Opp. Brief, doc. 38, at 3.)

Defendants argue that Plaintiff's claim concerning false guidance implicates forward-looking statements made by Defendants. The PSLRA specifies that, under certain circumstances, a person or entity shall not be liable with respect to forward-looking statements. Therefore, the Court must first decide whether Defendants' allegedly misleading statements fall within this "safe harbor" provision of the PSLRA. If so, Defendants cannot be held liable for Plaintiff's claims based on false guidance.

Section 21E of the Securities Exchange Act limits liability for forward-looking statements. This "safe harbor" provision provides that an issuer shall not be held liable with respect to any written or oral forward-looking statement to the extent that:

> (A) the forward-looking statement is--
>
> (i) identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement; or
>
> (ii) immaterial; or
>
> (B) the plaintiff fails to prove that the forward-looking statement–
>
> (i) if made by a natural person, was made with actual knowledge by that person that the statement was false or misleading; or

(ii) if made by a business entity; was--

(I) made by or with the approval of an executive officer of that entity; and

(II) made or approved by such officer with actual knowledge by that officer that the statement was false or misleading.

15 U.S.C. § 78u-5(c)(1).[10]  In other words, if a forward-looking statement is accompanied by meaningful cautionary language, the issuer is immune from liability and state of mind is irrelevant.  *Miller v. Champion Enter., Inc.*, 346 F.3d 660, 672 (6th Cir. 2003).  If the statement is not accompanied by meaningful cautionary language, the plaintiff must allege specific facts giving rise to a strong inference that the misleading statement was made with actual knowledge that the statement was misleading.  *Id*. at 672-73.

As a preliminary matter, Plaintiff asserts that not all of Defendants' fraudulent statements were forward-looking.  However, guidance, or projections, are by definition forward-looking statements.[11]  Accordingly, to the extent LCA's projections concerning its business prospects and

---

[10]   The safe harbor provision creates a scienter requirement unique to forward-looking statements:  for those accompanied by meaningful cautionary language, scienter is irrelevant, and for those not accompanied by meaningful cautionary language, the required state of mind is actual knowledge of the statements' false or misleading nature.  *PR Diamonds, Inc. v. Chandler*, 364 F.3d 671, 682 n.3 (6th Cir. 2004).

[11]  The PSLRA defines a "forward-looking" statement as:

(A) a statement containing a projection of revenues, income (including income loss), earnings (including earnings loss) per share, capital expenditures, dividends, capital structure, or other financial items;

(B) a statement of the plans and objectives of management for future operations, including plans or objectives relating to the products or services of the issuer;

(C) a statement of future economic performance, including any

2007 guidance were accompanied by meaningful cautionary language, LCA cannot be held liable for the projections.

Plaintiff does not dispute that Defendants' business projections and guidance were accompanied by cautionary language.  Rather, Plaintiff contends that the cautionary language accompanying LCA's press releases, conference calls, slide show presentations, and SEC filings was nothing more than "boilerplate" and that it was so broad that it would apply "to *any* business that sells products to consumers."  (Opp. Brief at 12, quoting *Yanek v. Staar Surgical Co.*, 388 F. Supp. 2d 1110, 1123 (C.D. Cal. 2005).)  "Cautionary statements must be substantive and tailored to the specific future projections, estimates or opinions . . . which the plaintiffs challenge." *Helwig v. Vencor, Inc.*, 251 F.3d 540, 559 (6th Cir. 2001) (en banc).  The Court will consider the sources of the alleged false statements in chronological order, as set forth in the Complaint, to ascertain whether they include meaningful cautionary language.[12]

_____

                    such statement contained in a discussion and analysis of financial condition by the management or in the results of operations included pursuant to the rules and regulations of the Commission;

                    (D) any statement of the assumptions underlying or relating to any statement described in subparagraph (A), (B), or (C);

                    (E) any report issued by an outside reviewer retained by an issuer, to the extent that the report assesses a forward-looking statement made by the issuer; or

                    (F) a statement containing a projection or estimate of such other items as may be specified by rule or regulation of the Commission.

15 U.S.C. § 78u-5(i)(1).

    [12] "On any motion to dismiss based upon [the safe harbor provision], the court shall consider any statement cited in the complaint and any cautionary statement accompanying the forward-looking statement . . . cited by the defendant."  15 U.S.C. § 78u-5(e).

LCA's October 30, 2006 10-Q included the following statement:

> This quarterly report on Form 10-Q contains forward-looking
> statements . . . .  Forward-looking statements contained herein are
> based on information available to us as of the date hereof.  Actual
> results could differ materially from those stated or implied in such
> forward-looking statements due to risks and uncertainties
> associated with our business, including, without limitation, those
> concerning economic, political and sociological conditions; market
> acceptance of our services; the successful execution of marketing
> strategies; competition in the laser vision correction industry; an
> inability to attract new patients; the possibility of long-term side
> effects and adverse publicity regarding laser vision correction;
> operational and management instability; regulatory action against
> us or others in the laser vision correction industry; and the
> relatively high fixed cost structure of our business.

(Motion to Dismiss App. 6 at 13.)  The 10-Q further provided, "Our revenues are impacted by a
number of factors, including. . . [g]eneral economic conditions and consumer confidence levels."
(*Id*.)

LCA's February 12, 2007 Form 8-K, which furnished the press release issued that day
and stated expected earnings per share for full-year 2007 to be in the $2.05 to $2.15 range,
included a similar, but not identical, "forward-looking statements" notice.  (*Id*. App. 8.)  The
statement specifically noted that actual results could differ from those forecasted due to
uncertainties such as "the successful execution of marketing strategies to cost effectively drive
patients to our vision centers, which recent results would indicate are no longer as effective as
they have been in prior periods."  (*Id*.)  The conference call held that day began with LCA's vice
president of investor relations stating that "the comments made during the call may include
forward-looking statements within the meaning of federal securities laws.  These forward-
looking statements involve risks and uncertainties that could cause actual results to be materially

different from any anticipated results" and referring listeners to the Company's SEC filings for a description of those risks and uncertainties.[13]  (*Id*. App. 22 at 1-2.)

Both LCA's February 27, 2007 Form 10-K and its May 9, 2007 Form 10-K/A included LCA's typical cautionary statements and additionally itemized several specific risk factors, such as the following:

> *Changes in general economic conditions may cause fluctuations in our revenues and profitability.*
>
> The cost of laser vision correction procedures is typically not reimbursed by third-party payors such as health care insurance companies or government programs.  Accordingly, as we have experienced in prior fiscal periods, our operating results may vary based upon the impact of changes in the disposable income of consumers interested in laser vision correction, among other economic factors.  A significant decrease in consumer disposable income in a weakening economy may result in a decrease in the number of laser vision procedures performed and a decline in our revenues and profitability.  In addition, weak economic conditions may cause some of our customers to experience financial distress or declare bankruptcy, which may negatively impact our accounts receivable collection experience.  Weak economic conditions may also change the risk profile or volume of business our unaffiliated finance business partner is willing to underwrite, which could adversely affect our results of operations and cash flow.
>
> *Our industry is highly correlated with consumer confidence.*
>
> Following the events of September 11, 2001, we experienced a marked drop-off in business.  Similarly, with the spike in oil prices in 2005, we also saw deterioration in volume, especially from patients at the lower-income levels.  Deteriorating consumer confidence can negatively impact our financial performance.
>
> . . . .

---

[13]  The PSLRA's safe harbor provision provides that when forward-looking statements are made orally, the speaker may avail him or herself of the safe harbor by referring listeners to recent SEC filings.  15 U.S.C. § 78u-5.

> *We have expanded the role and mix of financing as a percentage of our revenues. As a result, our direct financing program has grown, increasing our credit risk.*
>
> . . . We are now exposed to significantly increased credit risk, particularly given that patients who participate in our direct financing program generally have not been deemed creditworthy by third-party financing companies with more experience in credit issues than we have. If the uncollectible amounts exceed the amounts we have reserved, we could be required to write down our accounts receivable, and our cash flow and results of operations would be adversely affected.

(*Id*. App. 9 at 10-12, App. 12 at 12-13.)

LCA's April 18, 2007 Form 8-K, which furnished the press release issued that day and which announced that the Company would restate its financial results for 2005, 2005, and 2006, included the same or similar forward-looking statements that accompanied the earlier-issued Form 8-K. (*Id*. App. 11.) Likewise, the investor conference call held that day opened with a "forward-looking statements" warning and reference to LCA's Form 10-K. (*Id*. App. 23.)

LCA's May 9, 2007 8-K, which furnished the press release issued that day announcing 1Q2007 financial results, and the investor conference call minutes from that day both include LCA's typical forward-looking statements admonishment. (*Id*. Apps. 13, 24.)

LCA's May 23, 2007 presentation at the JMP Securities Research Conference began with a slide indicating that the presentation contained forward-looking statements subject to certain risks and uncertainties and referring to the Company's Forms 10-K/A and 10-Q. *Id*. App. 30.) Presentations made by LCA on June 6, 2007 (FTN Midwest Healthcare Conference); June 21, 2007 (William Blair 27th Annual Growth Stock Conference); June 26, 2007 (Jefferies Healthcare Conference); August 2007 (Investor Presentation); and September 20, 2007 (Maxim

Group First Annual Growth Conference) contained a forward-looking statements remark identical to that used in the May 23, 2007 presentation. (*Id*. Apps. 31-35.)

On July 31, 2007, LCA issued a Form 8-K that furnished the press release issued that day announcing 2Q07 financial results and revising full-year 2007 financial guidance. The press release included forward-looking statements admonishments. (*Id*. App. 15.) During the July 31 conference call, when an analyst asked the question:

> If we look at the weakness in the procedure volumes this quarter, can you give us a little more color on what might be driving that? Whether it's a more challenging competitive environment, more challenging macro and consumer environment or something that you guys have identified on a Company-specific basis like the marketing or bundled pricing that are impacting volume?

Mr. Straus responded:

> I believe we are a victim of our own inefficiencies right now. I don't see us losing any measurable marketshare through competition, and in many consumer markets across the country we are seeing some softness. But right now we are looking at our internal operations–marketing, people and metrics–to continue to make sure that we are more efficient and effective in each of the markets we're serving.

(*Id*. App. 27 at 5.) In that same conference call, Mr. Straus reiterated:

> I remind everybody that this is retail medicine and it is an elective procedure. It is high-priced. It's a self-paid procedure. And whatever the economy does, plus or minus, will have an impact on our business and the business of our competitors in this sector.

(*Id*. at 9.)

Plaintiff's Complaint lists several facts that Defendants failed to disclose and which rendered the Company's projections about its forecasted 2007 EPS reckless at a minimum (*see*, *e.g.*, Compl. ¶ 63 and subparts). However, Plaintiff concludes that the cause of Defendants' need

to revise 2007 guidance was because of "definite weakness in consumer spending." (*Id.* ¶ 8; *see also* ¶ 38 (the "truth" was that "consumer spending was soft and the business outlook was poor"), *¶* 82 ("market conditions, including softness of consumer spending" was what prompted the need for revised guidance).)

This case is substantially similar to *In re Keithley Instruments, Inc. Securities Litigation*, 268 F. Supp. 2d 887 (N.D. Ohio 2002), in which the court dismissed a securities fraud complaint after finding that the statements about which the plaintiff complained were protected by the safe harbor. Plaintiffs in *Keithley Instruments* alleged that positive language contained in the defendant's press releases and Form 10-Q was misleading because it did not disclose that the defendant was experiencing a host of problems with its product line. *Id.* at 892. The court in *Keithley Instruments* found that "Keithley's cautionary language warned explicitly that its expected sales and earnings were susceptible to 'cyclical' and 'volatile' customer demand. And, despite the Shareholders' vague allegations of other problems, it was precisely this volatility to which Keithley points as the reason for its declining prospects." *Id.* at 905.

As described above, LCA's guidance and business projections were accompanied by written and oral warnings. Because these warnings specifically addressed how laser vision surgery is uniquely impacted by economic factors and consumer confidence, the Court does not deem them to be mere boilerplate. In particular, Defendants warned that because the cost of laser vision correction was not reimbursed by third-party payors, "a significant decrease in consumer disposable income in a weakening economy may result in . . . a decline in our revenues and profitability." (Motion to Dismiss Apps. 9, 12.) LCA also expressly warned: "*Our industry is highly correlated with consumer confidence. . . .* Deteriorating consumer confidence

26

can negatively impact our financial performance." (LCA 2006 10-K, Motion to Dismiss App. 9.) Indeed, at the beginning of the Class Period, LCA's stock was approximately $34 a share and the Consumer Confidence Index was near 105. (Motion to Dismiss Apps. 1 and 49.) In July 2007 when LCA stock was trading at just under $50 a share, the Index surpassed 110. (*Id.*) At the end of the Class Period, LCA's stock was approximately $16 a share and the Consumer Confidence Index was near 85. (*Id.*)

As in *Keithley Instruments*, the Defendant here specifically warned of the Company's susceptibility to waning consumer confidence and a souring economy, precisely the factors that Plaintiff claims lead to the revised guidance. Further, to the extent that Plaintiff claims that Defendants' guidance projections were misleading because they concealed bad debt and failed to establish sufficient reserves for doubtful accounts, LCA's cautionary statement states that LCA was "exposed to significantly increased credit risk" and that "[i]f the uncollectible amounts exceed the amounts we have reserved, we could be required to write down our accounts receivable." (*Id.*)

For these reasons, the Court finds that the PSLRA's safe harbor provision shields Defendants from liability for their statements with respect to 2007 guidance. Plaintiff's allegation that Defendants had actual knowledge that consumer demand was slipping because of their access to patient statistics in the Mozart database does not save the claim because the existence of the meaningful cautionary statement renders the issuer's state of mind irrelevant. *Miller*, 346 F.3d at 672, 678. Defendants' motion for summary judgment with respect to Plaintiff's claims regarding LCA's 2007 guidance is GRANTED.

*ii. False Financial Reporting*

LCA's financial results for 2006 and for the first six months of 2007 were included in a Form 10-K, an amended Form 10-K, and Form 10-Qs filed with the SEC. The SEC filings represented that the financial information presented therein was a fair statement of LCA's financial results and that the results were prepared in accordance with Generally Accepted Accounting Principles ("GAAP").[14] Plaintiff's Complaint asserts that LCA failed to comply with GAAP in two material respects: (1) it failed to provide an adequate reserve for its allowance for doubtful accounts related to its receivables from patient financing during the Class Period (Compl. ¶¶ 118-130), and (2) it overstated its revenue and income by improperly accounting for its deferred revenue from the sale of its lifetime warranties (*id.* ¶¶ 131-135).

*(1) Allowance for Doubtful Accounts*

A company is required to establish an allowance for doubtful accounts, *i.e.*, a reserve for the estimated amount of receivables that a company deems to be uncollectible. (Compl. ¶ 119.) GAAP, as set forth in Financial Accounting Standards Board ("FASB") Statement of Financial Accounting Standard (FAS) No. 5, ¶¶ 8, 22-23, states:

> An estimated loss from a contingency . . . shall be accrued by a charge to income if both of the following conditions are met:
>
> a. Information available prior to issuance of the financial statements indicates that it is probable that an asset has been impaired or a liability has been incurred at the date of the financial statements. It is implicit in this condition that it must be probable that one or more future events will occur confirming the fact of the loss.
>
> b. The amount of loss can be reasonably estimated.

---

[14] Defendants Straus, Buckey, and Joffe each signed certifications pursuant to § 302 of the Sarbanes-Oxley Act attesting that they reviewed the contents of certain of LCA's 2006 or 2007 10-K and/or10-Q filings with the SEC and certifying that the reports were truthful and the financial statements were accurate. (Compl. ¶ 142.)

LCA's accounts receivable arise from its direct patient financing program, which it began in May 2002. The patients to whom LCA provides financing have not been deemed credit worthy by the third party financing company. LCA charges the patients a minimal up-front fee to cover some or all of its variable costs with the remaining balance to be paid in equal monthly installments under payment plans ranging from twelve to thirty-six months. Many of the patients to whom LCA provided financing ultimately did not pay the amount financed.

Plaintiff claims that during the Class Period the Company failed to properly reserve for its allowance for doubtful accounts. Specifically, the Complaint alleges that during the Class Period, (1) a greater number of the Company's patients using direct financing selected a thirty-six month payment option instead of a twelve-month plan, and that longer-term receivables carry a greater credit risk, and (2) the subprime market began to deteriorate rapidly causing a major tightening in the credit market and forcing LCA to finance an even greater amount of its patients under its direct financing program. As a result of these "significant indicators," LCA should have increased its allowance for bad debts but instead did the opposite, reducing its allowance from 21.25% to 22.56% of its gross receivables in 2004 and 2005 to 16.9% by 3Q06. Plaintiff also alleges that LCA manipulated its bad debt expense, increasing the bad debt expense from $1.78 million in 2005 to $1.86 million in 2006 despite a 34% increase in revenue over the year.

Defendants, relying on *Zaluski v. United American Healthcare Corp.*, 527 F.3d 564 (6th Cir. 2008), argue that these allegations are insufficient to state a claim for securities fraud. In *Zaluski*, the Sixth Circuit explained that to state a securities fraud claim premised on a GAAP violation, a plaintiff first has to show that the defendant violated GAAP and that the violation was material. *Id*. at 576. Then, a plaintiff must show a strong inference of scienter regarding the

alleged misrepresentation. *Id*. In *Zaluski*, the plaintiff alleged that the defendant violated GAAP because its financial statements did not disclose a loss contingency associated with repeated breaches of contract. *Id*. The court found that the complaint's allegations were insufficient to demonstrate a GAAP violation because the defendant's alleged knowledge of certain facts did not "give rise to a 'probability' of impairment, the standard the GAAP uses when determining whether disclosure is necessary." *Id*. at 577. Defendants also rely on *Greebel v. FTP Software, Inc.*, 194 F.3d 185 (1st Cir. 1999), for its finding that the plaintiff's claims premised on defendant's alleged GAAP violations fell short because the allegations "[did] not include such basic details as the approximate amount by which revenues and earnings were overstated." *Id*. at 204.

The Court finds that Plaintiff's allegations with regard to Defendant's alleged violation of FAS 5 are sufficiently specific to show that Defendants violated GAAP and that such a violation was material. While FAS 5 requires a company to make estimates, and while GAAP "tolerate[s] a range of reasonable treatments, leaving the choice among alternatives to management," (*Greebel*, 194 F.3d at 205), the Court must at this stage of the proceedings accept Plaintiff's factual allegations as true. Here, Plaintiff alleges that LCA should have increased its bad debt reserves rather than lowering them based on known credit problems of its patients using direct financing. Plaintiff also alleges that LCA's act of raising its bad debt allowance back to 2005 levels at the end of the Class Period demonstrates that the decreased allowance was in furtherance of LCA's scheme to manipulate its financial statements. Plaintiff points to pre- and post-Class Period reserve levels as being unmanipulated, and the Court finds that this is sufficient to demonstrate what Plaintiff believed was the proper reserve level during the Class

Period.  That Plaintiff has sufficiently pleaded a GAAP violation does not end the inquiry,

however, as Plaintiff also must show a strong inference of scienter, discussed *infra*.

*(2)  Extended Warranty Revenue and Restatement of Financials*

Plaintiff claims that LCA's restatement of its financial statements is an admission that the

originally issued financial results were materially false and misleading and incorrect based on

information available to Defendants at the time the results were originally reported.  While

Defendants argue that the need for a restatement does not alone support an inference of scienter,

they do not refute that a restatement demonstrates the falsity of the prior statement.  Indeed,

Defendants even quote the Northern District of Ohio court as saying, "[t]he need for a

restatement, *while it may demonstrate the falsity of a prior statement*, does not automatically

result in a finding of scienter."  (Motion to Dismiss at 38, quoting *In re The Goodyear Tire &*

*Rubber Co.*, 436 F. Supp. 2d 873, 894 (N.D. Ohio 2006)).

District courts within the Sixth Circuit consistently hold that the mere fact that financial

results are restated is sufficient at the pleading stage to establish that the results were false when

originally made.  *In re Huffy Corp. Sec. Litig*, 577 F. Supp. 2d 968, 1017-18 (S.D. Ohio 2008);

*In re Telxon Corp. Sec. Litig.*, 133 F. Supp. 2d 1010, 1026 (N.D. Ohio 2000).  Accordingly, the

Court finds that LCA's original 2006 financial results were false to the extent they were

subsequently restated, and Plaintiff has adequately alleged that these financial results constituted

a misrepresentation of material fact.  However, Plaintiffs also must allege facts that give rise to a

strong inference that Defendants made these misrepresentations with scienter.

**c.  Scienter**

Having determined that Plaintiff has adequately pled that Defendants made misrepresentations or omissions of material fact with respect to its financial reporting during the Class Period, the Court will proceed to analyze the Complaint to determine whether it also states with particularity facts giving rise to a strong inference that Defendants did so with scienter. *Tellabs*, 127 S. Ct. at 2508. Scienter is the defendant's intention "'to deceive, manipulate, or defraud.'" *Id.* at 2504 (quoting *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 194 and n. 12 (1976)). In the Sixth Circuit, recklessness, defined as "highly unreasonable conduct which is an extreme departure from the standards of ordinary care," can amount to scienter under § 10(b) and Rule 10b-5. *In re Comshare Inc. Sec. Litig.*, 183 F.3d 542, 550 (6th Cir. 1999) (quoting *Mansbach v. Prescott, Ball & Turben*, 598 F.2d 1017, 1025 (6th Cir. 1979)).

The Supreme Court has established a three-step "prescription" for analyzing whether a securities fraud complaint adequately pleads scienter under the PSLRA.

> *First*, faced with a Rule 12(b)(6) motion to dismiss a § 10(b) action, courts must, as with any motion to dismiss for failure to plead a claim on which relief can be granted, accept all factual allegations in the complaint as true. . . .
>
> *Second*, courts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice. . . . The inquiry . . . is whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard. . . .
>
> *Third*, in determining whether the pleaded facts give rise to a "strong" inference of scienter, the court must take into account plausible opposing inferences. . . . To determine whether the plaintiff has alleged facts that give rise to the requisite "strong inference" of scienter, a court must consider plausible nonculpable explanations for the defendant's conduct, as well as inferences

favoring the plaintiff. . . . A complaint will survive, we hold, only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged.

*Tellabs*, 127 S. Ct. at 2509-2510 (internal citations omitted).

The Sixth Circuit has set forth a non-exclusive list of factors a court may consider when deciding whether a plaintiff has adequately alleged scienter:

> (1) insider trading at a suspicious time or in an unusual amount; (2) divergence between internal reports and external statements on the same subject; (3) closeness in time of an allegedly fraudulent statement or omission and the later disclosure of inconsistent information; (4) evidence of bribery by a top company official; (5) existence of an ancillary lawsuit charging fraud by a company and the company's quick settlement of that suit; (6) disregard of the most current factual information before making statements; (7) disclosure of accounting information in such a way that its negative implications could only be understood by someone with a high degree of sophistication; (8) the personal interest of certain directors in not informing disinterested directors of an impending sale of stock; and (9) the self-interested motivation of defendants in the form of saving their salaries or jobs.

*Ley*, 543 F.3d at 810 (quoting *Helwig*, 251 F.3d at 553).

Plaintiff asserts that the following facts give rise to an inference of scienter: LCA's accounting improprieties with respect to lifetime warranties and the consequential restatement of financials (Compl. ¶¶ 131, 140); Defendants' signatures on the Sarbanes-Oxley certifications during the Class Period (*Id.* ¶ 142); Defendants' access to nonpublic information and their holding themselves out as the persons most knowledgeable about LCA's financial results (*Id.* ¶¶ 21-27); Mr. Joffe's insider trading (*Id.* ¶ 154); Messrs. Joffe and Buckey's 2006 bonus (*Id.* ¶ 156); and Defendants' post-Class-Period admissions that the Company tightened its credit standards and raised their allowance for bad debt (*Id.* ¶¶ 111-113). While the Court will

consider Plaintiff's allegations in total when determining whether they sufficiently plead scienter, it will address each argument individually for purposes of clarity. *See Ley*, 543 F.3d at 810.

*I. Accounting Violations and Restatement of Financial Results*

Plaintiff argues that the accounting rule pertaining to the deferral of extended warranty revenue was so simple that its violation alone supports a strong inference of scienter. Plaintiff also argues that the magnitude of the impact of the resulting restatement further supports a strong inference of scienter. Specifically, LCA's originally reported full-year net income for 2005 was overstated by $8.7 million or 38%, and full-year net income for 2006 was overstated by $9.9 million or 35%. (Pl. Ex. 1 from 3/3/09 hearing.) LCA's originally reported full-year revenue for 2005 was overstated by $15.5 million, or 9%, and full-year revenue for 2006 was overstated by $18 million, or 7.5%. (*Id*.) Plaintiff claims that these originally reported results made it appear that LCA's business was booming when, in fact, it was not.

The Sixth Circuit has recognized that "allegations of accounting violations that are so simple, basic, and pervasive in nature, and so great in magnitude, that they should have been obvious to a defendant" may give rise to an inference of scienter. *PR Diamonds, Inc. v. Chandler*, 364 F.3d 671, 684 (6th Cir. 2004). In *PR Diamonds*, the Sixth Circuit discussed cases in which accounting improprieties were sufficiently drastic to support a strong inference of scienter. In *In re MicroStrategy, Incorporated Securities Litigation*, 115 F. Supp. 2d 260 (E.D. Va. 2000), for example, alleged accounting violations caused the company to report aggregate net income of $18.9 million over three years, when in fact the company incurred a net loss for those years of more than $36 million. *PR Diamonds*, 364 F.3d at 685. In addition, the company

overstated its revenues over the same period by a total of $66 million. *Id.* The *MicroStrategy* court concluded that the alleged GAAP violations and the subsequent restatements were "of such a great magnitude–amounting to a night-and-day difference with regard to MicroStrategy's representations of profitability–as to compel an inference that fraud or recklessness was afoot." *Id.* (quoting *In re MicroStrategy*, 115 F. Supp. 2d at 636-37). Similarly, in *In re Telxon Corporation Securities Litigation*, 133 F. Supp. 2d 1010 (N.D. Ohio 2000), the court found that the plaintiff had adequately alleged scienter when the complaint, among other allegations, stated that the defendant overstated its revenues by over $20 million in a single quarter and reported profits when it should have been reporting losses over several different quarters, and when the accounting errors appeared to be fortuitously timed. *PR Diamonds*, 364 F.3d at 685 (citing *Telxon*, 133 F. Supp. 2d at 1031).

The accounting violations and reporting problems alleged by Plaintiff in this case are not "so simple, basic, or pervasive in nature" that they should have been obvious to Defendants. *PR Diamonds*, 364 F.3d at 684. First, the accounting rule that LCA allegedly violated with respect to lifetime warranties is not as simple as Plaintiff suggests. The Financial Accounting Standards Board has set forth different accounting standards for "warranties" and for "separately priced extended warranties." "Warranty" accounting is included within the scope of Statement of Financial Accounting Standards No. 5 ("FAS 5"), *Accounting for Contingencies*. FAS 5 "addresses warranty obligations that are incurred in connection with the sale of the product, that is, obligations that are not separately priced or sold but are included in the sale of the product." FTB 90-1 ¶ 8. "Separately priced extended warranty" accounting, on the other hand, is governed by Technical Bulletin 90-1 ("FTB 90-1"), which provides that:

> Revenue from separately priced extended warranty and product maintenance contracts should be deferred and recognized in income on a straightline basis over the contract period except in those circumstances in which sufficient historical evidence indicates that the costs of performing services under the contract are incurred on other than a straight-line basis. In those circumstances, revenue should be recognized over the contract period in proportion to the costs expected to be incurred in performing services under the contract.

FTB 90-1 ¶ 3, cited at Compl. ¶ 132.

Mr. Straus, LCA's CEO, discussed the accounting change involving extended warranties during the April 18, 2007 business conference call, which followed the Company's press release announcing a planned restatement of prior year financial statements. (Motion to Dismiss App. 23.) Mr. Straus explained that LCA had been deferring a portion of extended warranty revenue consistent with the percentage of patients who returned to LasikPlus centers for enhancement–historically 7%. Thus, the policy had been to defer 7% of the warranty revenue, which was then amortized back into income consistent with patterns of patient return visits for enhancements, which was 77% by the end of the first year and a further 13% by the end of the second year following the initial procedure. (*Id.*) This type of accounting was more consistent with "warranty" accounting than with "separately priced extended warranty" accounting. In other words, LCA had been "deferr[ing] the revenue associated with what we – for those patients we expected to treat in the future, not 100% of the patients who bought it." (Comments of Alan Buckey, Motion to Dismiss App. 23 at 10.)

Although the language of FTB 90-1 is plain, and although LCA's management "determined that a control deficiency related to the recognition and measurement of deferred revenues constituted a material weakness in our internal control over financial reporting" (LCA

Form 10-K/A at 4, Motion to Dismiss App. 12), it cannot be said that the accounting principle violated in this instance was "simple" or "basic." An accounting violation that results in an overstatement of income by more than 35% in a given year is serious. However, LCA's accounting error related to extended warranty revenue is not as simple, nor its impact of the magnitude, as those accounting errors in cases in which courts have concluded that the accounting violations were obvious to Defendants.

The Court now turns to the allegedly improper accounting related to LCA's bad debts. Plaintiff claims that Defendants intentionally failed to provide an adequate allowance for doubtful accounts in order to artificially inflate its stock prices. (Compl. ¶ 118.) The Court also must consider plausible nonculpable explanations for Defendant's conduct in lowering the bad debt reserves during the Class Period. *Tellabs,* 127 S. Ct. at 2510.

On May 9, 2007, the date on which LCA released 1Q07 financial results, Mr. Buckey stated that the Company lowered its bad debt reserves based on historical experience:

> [I]n the third quarter of last year, our 36-month financing program hit its three-year anniversary point, and so we adjusted reserves down about $300,000 to be in line with our historical experience there, so we were a little over-reserved. Now, all of the programs are mature, so we would expect bad debt expense and writeoffs to approximate each other going forward.

(Compl. ¶ 65.) Plaintiff's Complaint states that Defendants should have known not to decrease the bad debt reserve because it was expanding its patient financing, more patients were selecting the 36-month repayment option, and the subprime market was deteriorating. While these allegations suffice to show that LCA's accounting violated GAAP, they fall short of establishing a strong inference that Defendants knew the doubtful account allowance was inaccurate or that they manipulated the allowance with an intent to deceive. Plaintiff has not alleged any facts that

contradict Mr. Buckey's statement that the Company downwardly adjusted its bad debt reserves based on its experience in collecting debt on a 36-month term. Plaintiff has pointed to no information conveyed either internally or externally that demonstrates that the reserve was adjusted for any reason other than that given by Mr. Buckey or that LCA had knowledge that the adjusted reserve amounts would be insufficient. Therefore, although it construes all inferences in Plaintiff's favor, the Court finds that the nonculpable explanation for Defendants' bad debt accounting is more plausible than Plaintiff's explanation that Defendants engaged in accounting errors with an intent to deceive or with recklessness.

*ii. Certifications*

The Sixth Circuit has held that a "Sarbanes-Oxley certification is only probative of scienter if the person signing the certification was severely reckless in certifying the accuracy of the financial statement." *Ley*, 543 F.3d at 812 (quoting *Garfield v. NDC Health Corp.*, 466 F.3d 1255, 1266 (11th Cir. 2006)). In *Ley*, the Sixth Circuit stated that a plaintiff must "allege facts to suggest that [defendants] had reason to know or should have suspected accounting irregularities or other 'red flags' at the time they signed the certifications." *Id.*

In this case, Plaintiff alleges that "Straus, Buckey and Joffe knowingly certified misleading and inaccurate financial statements that were not in accordance with GAAP and SEC rules." (Compl. ¶ 144.) However, Plaintiff does not allege any facts to substantiate this assertion. Indeed, there are no facts in the Complaint that suggest that any of the Defendants had reason to know or should have suspected accounting irregularities at the time they signed the certifications. Accordingly, under the guiding precedent of *Ley*, the Court finds that the Sarbanes-Oxley certifications are not probative of scienter in this case.

*iii. Status and Access to Information*

Plaintiff claims that Defendants Straus, Buckey, and Joffe, as senior executive officers and directors of LCA, were privy to confidential and proprietary information concerning LCA, its operations, finances, financial condition, and business prospects. (Compl. ¶ 26.) Additionally, Defendants allegedly had access to LCA's multi-function tracking system known as Mozart, which tracked information such as number of appointments, number of eye procedures completed, treatment prices, and customer satisfaction. (*Id*. ¶ 39.)

Under Sixth Circuit law, mere access to information is not enough to establish scienter. *PR Diamonds, Inc.*, 364 F.3d at 688 ("fraudulent intent cannot be inferred merely from the Individual Defendants' positions in the Company and alleged access to information."). Rather, the complaint must allege specific facts or circumstances suggestive of their knowledge. *Id*. Plaintiff specifies in the Complaint that Mr. Buckey knew about LCA's "operating metrics" based on his comments made during a conference. Mr. Buckey stated:

> We are a very data driven company. I'm not intending you to analyze this chart but just to let you know that we've got an Oracle database that regenerates every night. So we know all our key operating metrics from company level and drill down by region, by center, by market. And we know how many people are scheduled for their eye exam, of those, how many attended; of those, how many were candidates versus non-candidates; and then, how many signed up for treatment.

(Compl. ¶ 76.) This allegation is sufficient to demonstrate that Mr. Buckey had information regarding the number of procedures done and that he received this information frequently enough that he would have been aware of patient volume trends. However, lacking from the Complaint is any specific factual information about what the Mozart reports showed and how information conveyed to investors differed from the internal reports.

Plaintiff alleges generally that internal information showed that the Company's existing stores were not showing growth and that any overall growth was being derived from new store openings. (*Id.* ¶ 81(f).) Plaintiff also alleges that the Mozart system would allow Defendants to do comparisons on a daily, weekly, monthly and quarterly basis, and that reviewing this data "would have shown that in February/March 2007 business was declining and by the summer of 2007 business was going off a cliff." (*Id.* ¶ 39.)

The PSLRA requires that a plaintiff do more than make conclusory allegations about what an internal reporting system would have shown. *See*, *e.g.*, *Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1068 (9th Cir. 2008) (allegations that defendants were aware of company-wide information because they used a "management information system" was too general to support a strong inference of scienter); *Shaw v. Digital Equipment Corp.*, 82 F.3d 1194, 1224 (1st Cir. 1996) ("[W]e think that the plaintiffs' allegations of a 'highly-efficient reporting system' may speak to the question of *how* defendants might have known what they allegedly knew, but absent some indication of the specific factual content of any single report generated by the alleged reporting system, do not independently provide a factual basis for inferring any such knowledge."); *In re Focus Enhancements, Inc. Sec. Litig.*, 309 F. Supp. 2d 134, 161 (D. Mass. 2001) ("[T]he existence of a sophisticated internal reporting system for sales is, without more, insufficient to establish scienter without a specific allegation of the factual content of a report.")

The Complaint in this case does not allege any specific information that the Mozart reports produced that was conveyed to any of the Defendants. It does not allege when any particular information might have been received by any of the Defendants. But perhaps most

important, the Complaint does not specify any information generated by a Mozart report that was either concealed from investors or misrepresented by the Defendants. Mozart compiled information as it was created and generated statistics of past performance. Even assuming that the Defendants received every Mozart report and reviewed it, there is nothing in the Complaint to indicate that Defendants should have known from the reports what the Company's future performance would be.[15] Therefore, Plaintiff's allegations that Defendants knew business was declining and consumer sentiment waning because of their positions in the Company and access to internal information are insufficient to create a strong inference of scienter.

*iv. Insider Trading*

Insider trading at a suspicious time or in an unusual amount is relevant to scienter. *Helwig*, 251 F.3d at 552. The Complaint alleges that Mr. Joffe sold at least 374,000 shares of LCA stock–typically only days after issuing favorable albeit false statements about the Company. (Compl. ¶ 154.) A chronology of events follows:

**October 24, 2006:** LCA released financial results for the third quarter and nine months ended September 30, 2006. (*Id*. ¶ 41.) LCA filed its quarterly report with the SEC on October 30, signed by Messrs. Joffe and Buckey. Due to the positive financial results, LCA's stock increased from $32.92 per share on the weekend prior to the earnings release to $34.76 per share after the release. (*Id*. ¶¶ 42, 44.) At that time, Mr. Joffe was Interim CEO of LCA, a position he had held since February 3, 2006, in addition to being COO and general counsel to LCA. (Motion to Dismiss App. 19.)

---

[15] While history may be a good predictor of the future, is it certainly not a guarantee. Even if Mozart showed that fewer patients were electing the lasik procedure in a certain month, it could not predict whether the same would occur the next month.

**November 2, 2006:** LCA appointed Mr. Straus as CEO.  (*Id*. App. 20.)

**November 29, 2006:** Mr. Joffe sold 340,000 shares at a price of $34.24 to $35.39 for proceeds of $11,755,820.  (Compl. ¶ 155.)

**February 12, 2007:** LCA released its fourth quarter and full year 2006 results, reporting strengthened same-store revenues.  LCA's stock increased from $38.71 on February 9, 2007 to $46.13 per share on February 12, 2007.  (*Id*. ¶¶ 46, 48, 50.)

**February 27, 2007:** LCA filed its annual report with the SEC on Form 10-K, which was signed by Messrs. Straus and Buckey.

**March 6, 2007:** Mr. Joffe sold 30,000 shares at a price of $42.00 to $42.28 for proceeds of $1,262,691.  (*Id*. ¶ 155.)

**March 7, 2007:** Mr. Joffe sold 4,829 shares at a price of $42.61 to $42.62 for proceeds of $205,798.  (*Id*.)  As of Mr. Joffe's March 7 trade, he had sold 82.63 % of his LCA holdings.

**March 27, 2007:** LCA announced that Mr. Joffe had resigned from the Board of Directors on March 22, 2007 and would resign as Chief Operating Officer and General Counsel as of March 30, 2007.  (Motion to Dismiss App. 10.)

**March 30, 2007:** Mr. Joffe's employment with LCA ends.

**July 31, 2007:** LCA reduces its 2007 guidance.

**October 20, 2007:** LCA suspended its 2007 guidance.

"[C]ourts have repeatedly held that the mere existence of stock sales does not raise a strong inference of fraudulent intent.  Plaintiffs have the burden at the pleading stage of explaining *why* the stock sales were unusual or suspicious."  *Keithley Instruments*, 268 F. Supp. 2d at 902 (quoting *In re PetSmart, Inc. Sec. Litig.,* 61 F. Supp. 2d 982, 1000 (D. Ariz. 1999)).

"To carry this burden, the plaintiff must show that the stock trades were 'in amounts dramatically out of line with prior trading practices, at times calculated to maximize personal benefit from undisclosed inside information.'" *Id.* "A complaint that merely provides 'the names of the insiders who sold stock, the quantities of stock sold and the prices at which the sales occurred, and the dates of the sales' is insufficient, because it does not reveal critical contextual data." *Id.* (quoting *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1423 (3d Cir. 1997)).

Plaintiff in this case has provided the number of shares, the price of shares, and the dates the shares were sold by Mr. Joffe during the Class Period. Absent from the Complaint is any information on Mr. Joffe's stock sales prior to the Class Period, so it is difficult if not impossible for the Court to ascertain from the Complaint whether Mr. Joffe's stock sales during the Class Period were unusual in comparison to past activity. Furthermore, Plaintiff's allegation that Mr. Joffe's sales were "typically only days after issuing favorable albeit false, statements about the Company" (Compl. ¶ 154), is not accurate; Mr. Joffe's first and largest Class Period stock sale occurred more than a month after the release of financial results; his second and third Class Period stock sales occurred three weeks after the release of financial results.

Defendants provide facts that do create some context for Mr. Joffe's stock sales, pointing out that the bulk of Mr. Joffe's Class Period stock sales occurred in the same month that Mr. Straus was named CEO (and consequently Mr. Joffe was no longer a candidate for the permanent CEO position). Mr. Joffe's March stocks sales preceded the announcement that Mr. Joffe had resigned from LCA's Board of Directors and would be resigning as COO and general counsel. Defendants suggest that Mr. Joffe's sales thus occurred in connection with major

changes in his status with the Company and that it is not unusual for individuals leaving a company to sell shares. (Motion to Dismiss at 33 (citing *Greebel*, 194 F.3d at 206 (1st Cir. 1999)). Plaintiff argues that *Greebel* is inapposite because in that case, the court held that sales were not suspicious where $4 million worth of stock was sold three months prior to the executive's departure, whereas $19 million was sold after he left the company. In this case, Mr. Joffe made his largest stock sale four months prior to his departure.

Defendants also observe that of the three individual Defendants, only Mr. Joffe sold any stock during the Class Period; the Company's CEO and CFO did not. Defendants argue that this fact weighs against a strong inference of scienter and that other courts have so held. (Motion to Dismiss at 34 (citing *Nathenson v. Zonagen Inc.*, 267 F.3d 400, 420-21 (5th Cir. 2001); *In re John Alden Fin. Corp. Sec. Litig*, 248 F. Supp. 2d 1273, 1282 (S.D. Fla. 2003).) Defendants argue that additional facts weigh against a finding of scienter, namely that during the Class Period the Company repurchased over $56 million of its own stock, and that Mr. Joffe's stock sales in the full year prior to the Class Period yielded gross proceeds much greater than his sales during the Class Period. (Motion to Dismiss App. 50.)

In a case with similarities, the Eighth Circuit found that where the complaint lacked allegations, such as prior trading history, that would have shown the defendant's trading activity was unusual, and when none of the other individual defendants were alleged to have traded any stock during the class period, the complaint failed to satisfy the PSLRA's scienter pleading standard. *In re Cerner Corp. Sec. Litig.*, 425 F.3d 1079, 1085 (8th Cir. 2005). The Court comes to the same conclusion here.

After drawing the inferences in Plaintiff's favor, the nonculpable explanation for Mr. Joffe's Class Period trading activity–that he was selling his LCA stock because he had been passed over for the position of CEO and was going to vacate his post at the Company–is more plausible than the explanation that he sold stock to take advantage of artificially inflated stock prices.[16]  Neither the timing nor the volume of Mr. Joffe's trading is particularly suspicious. LCA's announcements concerning its financial information and management changes were both fairly close in time to Mr. Joffe's trading.  However, Mr. Joffe did not sell his stock within "days" of the Company's release of financial information but rather several weeks later; he sold substantially more LCA stock in 2005 (1,450,000 shares) than he did during the Class Period (374,829 shares) (see App. 50); and he did not sell stock when the share prices were at their highest prior to his March 30 departure from LCA (on February 12, 2007, shares traded as high as $47.54) (App. 49).  When considered in conjunction with the facts that LCA's CEO and CFO sold no shares during the Class Period and that the Company repurchased shares during that Period, Mr. Joffe's insider trading does not support a strong inference of scienter.

*v. Bonus*

Self-interested motivation of a defendant in the form of saving his or her salary is a factor to be considered when deciding whether a plaintiff has adequately alleged scienter.  *Helwig*, 251 F.3d at 553.  Plaintiff alleges that the individual Defendants were eligible to receive a bonus based on certain performance criteria.  The Complaint quotes the annual incentive bonuses as described in the 2006 Form 10-K and states that Messrs. Joffe and Buckey received bonuses in

---

[16]  *Tellabs* requires the Court to take into account "plausible opposing inferences," and a complaint will survive "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." 127 S. Ct. at 2510.

2006.  (Compl. ¶ 156.)  The Complaint does not allege that any Defendant received a

performance-based bonus in 2007.

The Sixth Circuit draws a distinction between a corporate defendant's motive to be

successful and a motive to commit fraud:

> In order to demonstrate motive, a plaintiff must show concrete
> benefits that could be realized by one or more of the false
> statements and wrongful nondisclosures alleged. . . . [C]ourts
> distinguish motives common to corporations and executives
> generally from motives to commit fraud.  All corporate managers
> share a desire for their companies to appear successful.  That
> desire does not comprise a motive for fraud.

*PR Diamonds*, 364 F.3d at 690 (citations omitted).  With respect to the issue of bonuses in

particular, courts have noted that "[a]lleging scienter based upon the fact that individual

Defendants received bonuses linked to company performance would raise a strong inference

'that most executives commit securities fraud.'" *In re Kindred Healthcare, Inc. Sec. Litig.*, 299

F. Supp. 2d 724, 741 (W.D. Ky. 2004) (quoting *In re Humana Inc. Sec. Litig.*, No. 3:99-CV-

0398-S (W.D. Ky. Nov. 7, 2000)).

Plaintiff's allegations with respect to annual company bonuses are too vague to be

considered relevant to the Court's inquiry into the Defendants' states of mind.  Accordingly, the

Court will not consider the availability of bonuses as relevant to its determination of whether

Defendants acted with scienter.

*vi.  Post-Class Period Admissions*

On February 11, 2008, LCA announced fourth quarter and year-end 2007 results that

revealed a steep decline in fourth quarter profit, a decline in procedural volume, and overall

concerns regarding the weakening economy.  Subsequent to announcing these results, the

Company held a conference call during which Mr. Buckey admitted that LCA had seen an increase in patient financing default rates and that it had increased its allowance for bad debts and tightened its credit standards. In its Form 10-K filed with the SEC on February 28, 2008, LCA disclosed that it increased its bad debt expense for 2007 to $7.7 million versus $1.9 million for 2006 due to three factors: (1) LCA financed a higher percent of total revenues in 2007, (2) the mix of patient financing shifted to a greater use of 36-month financing from 12-month financing, and (3) it had experienced adverse changes in recent collection rates with its patient financing program given the downturn in the U.S. economy. (Compl. ¶ 113.)

Plaintiff contends that LCA's acknowledgment that its allowance for bad debt was under-allocated supports an inference of scienter because it provides insight into what the Defendants knew during the class period. (Opp. Brief at 40 (quoting *DeMarco v. Depotech Corp.*, 149 F. Supp. 2d 1212, 1223 n. 6 (S.D. Cal. 2001)). Defendants counter that Plaintiff has offered no facts to support its theory that Defendants knew when it lowered its allowance for doubtful accounts that it would later need to raise it.

Plaintiff has not alleged any specifics about what Defendants knew about patient default rates and when they knew it. There is no evidence that Defendants knew that lowering bad debt reserves was inappropriate given their experience with patient financing. The mere fact that LCA lowered its allowance for doubtful accounts and then raised it does not suffice to create an inference that Defendants knowingly or recklessly manipulated the allowance to falsely inflate LCA's stock price.

Having considered the Complaint in its entirety, as well as documents incorporated into the Complaint by reference and other matters appropriate for judicial notice, the Court finds that

the facts, taken collectively, do not rise to a strong inference of scienter. Any inference of scienter that one might draw from the facts alleged is not as compelling as an inference that the conduct complained of was undertaken legitimately by the Defendants. Because Plaintiff has failed to allege facts that give rise to a strong inference of either intent or recklessness on the part of the Defendants, its § 10(b) and Rule 10b-5 claims cannot survive Defendants' motion to dismiss. Defendants' motion for summary judgment with respect to Plaintiff's remaining claims brought under § 10(b) of the Securities Exchange Act and Rule 10(b)(5) is GRANTED.

## 2. Section 20(a) Claims

Section 20(a) of the Securities Exchange Act provides that anyone who, directly or indirectly, controls any person liable under any provision of the Exchange Act or of any rule or regulation promulgated thereunder shall be jointly and severally liable with and to the same extent as the entity that person controls. In *PR Diamonds*, the Sixth Circuit set forth the elements which must be established in order to impose liability under § 20(a):

> Section 20(a) thus establishes two requirements for a finding of control person liability. First, the "controlled person" must have committed an underlying violation of the securities laws or the rules and regulations promulgated thereunder. Second, the "controlling person" defendant in a Section 20(a) claim must have directly or indirectly controlled the person liable for the securities law violation. "Control" is defined as "the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise." 17 C.F.R. § 230.405.

364 F.3d at 696-97.

Because Plaintiff has failed to adequately plead an underlying violation of the securities laws or the rules and regulations promulgated thereunder, its § 20(a) claims must likewise fail.

Defendants' motion for summary judgment with respect to Plaintiff's claims brought under § 20(a) of the Securities Exchange Act is GRANTED.

### 3. Dismissal with Prejudice

Defendants ask the Court to dismiss Plaintiff's Complaint with prejudice, observing that Plaintiffs filed three original complaints and then submitted the Consolidated Complaint after a five-month opportunity to investigate their allegations and replead their claims. According to Defendants, allowing Plaintiff to file another complaint would frustrate the purpose of the PSLRA.

Generally, a court gives a plaintiff leave to amend the complaint when a motion to dismiss is granted. *See* Fed. R. Civ. P. 15(a)(2) ("The court should freely give leave [to amend] when justice so requires.") However, in cases involving the PSLRA, leave to amend is not as readily granted. In *Miller v. Champion Enterprises, Inc.*, 346 F.3d 660 (6th Cir. 2003), the Sixth Circuit Court of Appeals considered the tension between Rule 15(a) and the pleading requirements of the PSLRA, finding that "the purpose of the PSLRA would be frustrated if district courts were required to allow repeated amendments to complaints filed under the PSLRA." *Id.* at 692.

In this case, Plaintiff did not file a motion to amend along with its memorandum in opposition to Defendants' motion to dismiss. Rather, in a footnote to the last sentence of its memorandum, Plaintiff requested leave to amend under Fed. R. Civ. P 15(a) in the event the Court granted Defendants' motion. This case is similar to *PR Diamonds*, in which plaintiffs employed a similar tactic. 364 F.3d at 699. In that case, the Sixth Circuit Court of Appeals concluded that "a bare request in an opposition to a motion to dismiss–without any indication of

the particular grounds on which amendment is sought–does not constitute a motion within the contemplation of Rule 15(a)." *Id.* (quoting *Confederate Mem'l Ass'n v. Hines*, 995 F.2d 295, 299 (D.C. Cir. 1993)).  Further, the *PR Diamonds* court noted that the district court was within its discretion to withhold granting plaintiffs an opportunity to amend because the tension between Rule 15(a) and the PSLRA is to be resolved in favor of the PSLRA: "[W]e think it is correct to interpret the PSLRA as restricting the ability of plaintiffs to amend their complaint." *Id.* at 700 (quoting *Miller*, 346 F.3d at 692).  In this case, Plaintiff has not properly requested leave to amend, and the Court would be guided by *Miller* to deny such leave even if properly requested.

**CONCLUSION**

For the reasons set forth above, the Court GRANTS Plaintiff's motion to strike (doc. 39) as to Defendants' Appendixes 36-38, 41-44, and 46-48 and DENIES Plaintiff's motion to strike as to Appendixes 1, 19-20, 45, and 49.  The Court also GRANTS Defendants' motion to dismiss (doc. 31) with prejudice.

**IT IS SO ORDERED.**


_____s/Susan J. Dlott_____
Chief Judge Susan J. Dlott
United States District Court